**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| **STEPHANIE CARTER**, | |
| Plaintiff, | |
| v. | Case No. 22-1275 |
| **DENIS RICHARD MCDONOUGH**, in his official capacity as United States Secretary of Veterans Affairs; and the **UNITED STATES DEPARTMENT OF VETERANS AFFAIRS**, | **COMPLAINT** |
| Defendants. | |

Plaintiff Stephanie Carter, by and through counsel, and for her complaint against the Defendants, hereby states as follows:

**INTRODUCTION**

1.      The legality and morality of abortion has been one of the most contentious public issues in our Nation's history. The Supreme Court's 1973 decision in *Roe v. Wade* created a so-called "right" to abortion but did not settle the debate, nor will the Supreme Court's recent decision in *Dobbs v. Jackson Women's Health Organization*, which overruled *Roe* and directed the debate back to state legislatures. *See* 142 S. Ct. 2228 (2022). Opinion polls indicate the public remains sharply divided on the issue.

2.      Ignoring the value and necessity of that public debate, the Biden Administration decided to usurp congressional directives and immediately provide abortions and abortion counseling to veterans at U.S. Department of Veterans Affairs ("VA") medical facilities despite a decades-long prohibition on such activity. On September 9, 2022, the VA published an Interim Final Rule that announced the VA would "immediately" begin providing a wide breadth of

abortion services for veterans and Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") beneficiaries at all of its facilities. Reproductive Health Services, 87 Fed. Reg. 55,287, 55,296 (Sept. 9, 2022) (to be codified at 38 C.F.R. pt.17) (the "Rule").

3.      The Rule states that "abortion is essential health care," abortion counseling is "a responsibility of the provider," abortion services are a "Federal dut[y]" for VA employees, and that abortion services will be offered "just as counseling is offered or covered by VA regarding any other health care decision." *Id.* at 55,291, 55,292, 55,294.

4.      Plaintiff Stephanie Carter is a nurse practitioner at the Olin E. Teague Veterans' Center in Temple, Texas ("Temple VA facility"). Ms. Carter has supported the VA's general mission, which includes helping veterans with integrity, commitment, respect, and high moral principles, for 23 years. As an Army veteran herself, and as a Christian who views her nursing work as a calling, Ms. Carter relished the opportunity to serve her fellow veterans as a nurse practitioner. All of that changed suddenly on September 9, 2022, when the VA published the Rule.

5.      Overnight, Ms. Carter found herself working at a medical facility whose mission now included providing abortions and abortion counseling.

6.      Because of her religious beliefs, Ms. Carter cannot perform, prescribe, or counsel for abortions, or work in a facility that performs abortion services for reasons other than to save the life of the mother because, in her view, unborn babies are created in the image of God and should be protected.

7.      Yet, the Rule does not account for medical providers' religious liberties; and the Rule, as-applied, requires Ms. Carter to participate in abortions and counsel women about abortion.

8.    Because the VA's application and enforcement of the Rule substantially burdens Ms. Carter's sincerely held religious beliefs and forces her to choose between her job and her religious convictions, she brings this lawsuit.

9.    Ms. Carter initially requested a religious accommodation from participating in abortion services at the VA on two occasions in October but was told by her supervisor that there was no process in place for the VA to consider her requests. More than three months after the VA implemented the Rule, a religious accommodation process does not exist.

10.    The VA cannot demonstrate that it has any compelling reason for enforcing the Rule at the Temple VA facility and substantially burdening Ms. Carter's sincerely held religious beliefs because the Rule was not properly promulgated.

11.    The VA has no compelling interest in applying the Rule to Ms. Carter because Congress did not grant the Secretary of the VA the authority to unilaterally implement a Rule that now allows the VA to provide unlimited abortion services to both veterans and CHAMPVA beneficiaries.

12.    The VA has no compelling interest in applying the Rule to Ms. Carter because Congress also did not grant the Secretary of the VA the authority to implement the Rule without following the democratic rulemaking process required by the Administrative Procedure Act ("APA").

13.    While, on the one hand, the VA feigns the existence of an imminent need to provide unlimited abortion services to veterans and CHAMPVA beneficiaries to justify its failure to follow the APA rulemaking process, on the other hand, the VA does not have any sense of urgency to ensure that the religious liberties of its employees are protected.

14.     Because the Rule fails to account for Ms. Carter's religious liberties, and the Secretary of the VA lacks a compelling interest to apply the Rule to Ms. Carter because the Secretary exceeded his authority by enacting the Rule, the VA's enforcement of the Rule at the Temple VA facility is causing irreparable injury to Ms. Carter.

15.     In addition to the crisis of conscience Ms. Carter is facing on a daily basis due to the substantial burden the VA is placing on her religious beliefs, she is faced with the prospect of being prosecuted and held civilly liable under Texas State law for complying with the Rule in the regular course of her duties as a federal employee. The Temple VA facility is under the jurisdiction of *both* the federal government *and* the State of Texas. Because abortions are prohibited in Texas, for reasons other than to save the life of the mother, Ms. Carter could face a felony conviction, steep civil penalties, and loss of her nursing license if she engages in the breadth of abortion services required by the Rule.

16.     This is an action under the United States Constitution and the Religious Freedom Restoration Act ("RFRA"), brought to enjoin the application of the Rule to Ms. Carter and enforcement of the Rule at the Temple VA facility. The Rule's application to Ms. Carter and enforcement at the Temple VA facility has deprived and continues to deprive Ms. Carter of her paramount rights and guarantees under the United States Constitution and RFRA.

## JURISDICTION AND VENUE

17.     The Court has subject matter jurisdiction over these as-applied claims pursuant to 28 U.S.C. § 1331 because this action arises under the United States Constitution and federal law.

18.     The Court also has jurisdiction over these as-applied claims under 28 U.S.C. § 1346 because this is a civil action against the United States.

19.     The Court also has jurisdiction over these as-applied claims under 28 U.S.C. § 1361 to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

20.     The Court also has jurisdiction over these as-applied claims pursuant to 42 U.S.C. § 2000bb-1(c) because Plaintiffs' religious exercise has been burdened by Defendants.

21.     The Court has authority to award the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 2000bb-1, Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of the Court; and costs and attorneys' fees pursuant to 42 U.S.C. § 1988(b).

22.     Venue is proper in this district under 28 U.S.C. § 1391 because a federal agency and an officer of that agency in his official capacity are defendants, and a substantial part of the events giving rise to the Plaintiff's claims occurred in this District. Further, the plaintiff resides in this District, a substantial part of the events giving rise to the complaint occurred in this District, and no real property is involved.

## PARTIES

23.     Plaintiff Stephanie Carter is a devout Christian and nurse practitioner who practices nursing at the Temple VA facility.

24.     Ms. Carter believes her work as a nurse practitioner is a God-given calling.

25.     Ms. Carter is a veteran. She served in the Army for 8 years.

26.     Ms. Carter is licensed by the State of Texas to practice as a nurse practitioner at the VA since 2017.

27.     Ms. Carter has been employed by the VA for 23 years, and as a nurse practitioner at the Temple VA facility, located at 1901 Veterans Memorial Drive, Temple, TX 76504, for approximately 2 years.

28.     Defendant Denis McDonough is the United States Secretary of Veterans Affairs. He is sued in his official capacity only.

29.     Defendant United States Department of Veterans Affairs is an agency of the federal government that provides benefits, health care, and cemetery services to military veterans. The VA applied the Rule to Ms. Carter in violation of her constitutional and RFRA rights.

**FACTUAL BACKGROUND**

<u>The VA's Mission</u>

30.     Since 1865, the VA, through the Veterans Health Administration ("VHA"), has provided medical care to honorably discharged members of the military who suffered service-connected medical conditions. VA History, VA History Office, https://www.va.gov/HISTORY/VA_History/Overview.asp (last visited Dec. 4, 2022).

31.     Today, the "primary function" of the VHA is "to provide a complete medical and hospital service for the medical care and treatment of veterans." 38 U.S.C. § 7301.

32.     VA operates hospitals, outpatient clinics, telemedicine, and community care facilities. VA History, *supra.*

33.     The VA operates approximately 1,600 health care facilities, including 144 VA Medical Centers and 1,232 outpatient sites, making it one of the largest health care systems in the world. *Id*.

34.     Approximately sixty percent of all medical residents in the United States spend a portion of their time training in specific discipline at a VA facility. *Id.*

**Care for Qualifying Veterans**

35.     Congress broadly requires that "The [VA] Secretary . . . shall furnish hospital care and medical services which the Secretary determines to be needed" to veterans who meet a specific list of eligibility criteria. 38 U.S.C. § 1710(a)(1)–(3).

36.     In 1996, Congress passed the Veterans' Health Care Eligibility Reform Act ("VHCERA") to "improve administration of health care by the [VA]" and required the VA Secretary to "establish and operate a system of annual patient enrollment" that articulated "needed" care. 38 U.S.C. § 1705, 1710; Veterans' Health Care Eligibility Reform Act of 1996, Pub. L. No. 104-262 § 104, 110 Stat. 3177 (1996).

37.     Since 1999, the VA has offered qualifying veterans a medical benefits package that reflects the care the Secretary determines to be "needed" under § 1710. *See* 38 C.F.R. § 17.38; *see also* Enrollment—Provision of Hospital and Outpatient Care to Veterans, 64 Fed. Reg. 54,207 (Oct. 6, 1999) (to be codified at 38 C.F.R. pt. 17).

38.     The medical benefits package, as provided in VA regulations, offers basic care, including outpatient, inpatient, pharmaceutical, emergency, palliative, and preventative care. It also provides periodic medical examinations, mental health services, immunizations, and vision testing, among other things. 38 C.F.R. § 17.38(a).

39.     The VA includes specific care in the medical benefits package "if it is determined by appropriate health care professionals that the care is needed to promote, preserve, or restore the health of the individual and is in accord with generally accepted standards of medical practice." 38 C.F.R. § 17.38(b).

40.     From its initial promulgation in 1999 until September 2022, the medical benefits package expressly excluded certain care, including abortions and abortion counseling. *Compare*

38 C.F.R. § 17.38(c)(1) *with* 64 Fed. Reg. at 54,218. That medical benefits package stated: "In addition to the care specifically excluded from the 'medical benefits package' under paragraphs (a) and (b) of this section, the 'medical benefits package' does not include the following: (1) Abortions and abortion counseling." 64 Fed. Reg. at 54,218.

**<u>Care for Qualifying Beneficiaries</u>**

41.     In a similar enrollment-based manner, the VA provides health care benefits to eligible beneficiaries of veterans through the CHAMPVA. 38 U.S.C. § 1781(b).

42.     Under this statute, the VA provides medical care to eligible beneficiaries "in the same or similar manner and subject to the same or similar limitations" as the Department of Defense provides to eligible beneficiaries under its TRICARE Select program. *Id; see also* 38 C.F.R. § 17.270; 32 C.F.R. §199.17.

43.     Like the health care program for veterans, the scope of medical services offered to CHAMPVA beneficiaries is defined by VA regulations. 38 C.F.R § 17.270.

44.     CHAMPVA-covered services include "medical services and supplies that are medically necessary and appropriate for the treatment of a condition and that are not specifically excluded under 17.272 (a)(1) through (84)." 38 C.F.R. § 17.270(b).

45.     Since its initial promulgation in September 1998 until September 2022, the CHAMPVA medical benefits package expressly excluded "abortion[,] except when a physician certifies that the life of the mother would be endangered if the fetus were carried to term [and] abortion counseling." CHAMPVA, 63 Fed. Reg. 48100, 48105 (Sept. 9, 1998) (to be codified at 38 C.F.R. pt. 17).

46.     TRICARE regulations allow for abortion when a physician certifies that the pregnancy was the result of rape or incest, National Defense Authorization Act for Fiscal Year

2013, Pub. L. No. 112-239 § 704, 126 Stat. 1632 (2013), or where the life of the mother would be endangered if the fetus were carried to term, 32 C.F.R. § 199.4(e)(2).

**The VA's Limitation on Performing Abortions**

***Section 106 of the Veterans Health Care Act of 1992***

47.    In 1992, Congress passed the Veterans Health Care Act of 1992 ("VHCA") and President George H. W. Bush signed it into law. Veterans Health Care Act of 1992, Pub. L. No. 102-585, 106 Stat. 4943 (1992).

48.    In his signing statement, President Bush wrote that this legislation will "improve the delivery of health care and other services to our Nation's veterans." George Bush, *Statement on Signing the Veterans Health Care Act of 1992*, The American Presidency Project (Nov. 4, 1992),   https://www.presidency.ucsb.edu/documents/statement-signing-the-veterans-health-care-act-1992.

49.    As to women veterans, the Act "authorize[d] VA to provide counseling services to women who suffer the trauma of being sexually assaulted or harassed during their military service," *id.,* and devotes an entire title to Women Veterans Health Programs, *see* Pub. L. No. 102-585 §§ 101–110.

50.    Congress expressly noted that Section 106 of the VHCA regulates the VA Secretary's authority under 38 U.S.C § 1710 and reflects a congressional emphasis on providing reproductive health care and preventative gynecological cancer screenings. *Id.* at § 106.

51.    Consistent with Congress' purpose, however, the VHCA excludes abortions and abortion counseling as reproductive health care. *Id.*

52.    Specifically, Section 106, states:

9

<<38 U.S.C.A. § 1710 NOTE>>

*In furnishing hospital care and medical services under chapter 17 of title 38*, United States Code, the Secretary of Veterans Affairs may provide to women the following health care services: (1) Papanicolaou tests (pap smears), (2) [b]reast examinations and mammography, (3) [g]eneral reproductive health care, including the management of menopause, *but not including under this section infertility services, abortions,* or pregnancy care (including prenatal and delivery care), except for such care relating to a pregnancy that is complicated or in which the risks of complication are increased by a service-connected condition.

*Id.* (emphasis added).

53.     Section 106 recognizes the threat that gynecological cancers pose to our nation's veterans and specifically authorizes the Secretary to provide these services. *See* S. Rep. No. 102-409, at 40 (1992) ("The Committee believes that these additions would provide eligible woman veterans with counseling and services necessary to address an array of women veterans' health-care problems, particularly the apparently disproportionate incidence of reproductive cancers among women veterans.").

54.     Section 106 prohibits the VA from performing abortions. Pub. L. No. 102-585 § 106.

55.     After the congressional mandate in the VHCA to create a benefits enrollment program, the VA promulgated a medical benefits package in 1999 that excluded abortion, consistent with Section 106. 64 Fed. Reg. at 54,218.

***Limitations on Abortions for CHAMPVA Recipients***

56.     The VA Secretary is required to provide medical care to spouses and other qualifying beneficiaries in that same or similar manner to TRICARE Select. 38 U.S.C. § 1781(b).

57.     TRICARE Select currently covers abortions in only three narrow situations: rape, incest, and where the life of the mother would be endangered if the fetus were carried to term. 32 C.F.R. § 199.4(e)(2); Pub. L. No. 112-239 § 704.

58. Similarly, CHAMPVA regulations previously provided for abortion "when a physician certifies that the life of the mother would be endangered if the fetus were carried to term." 63 Fed. Reg. at 48,105.

59. TRICARE Select does not cover abortions for the health of the mother. 32 C.F.R. § 199.4(e)(2); Pub. L. No. 112-239 § 704.

60. In previous rules, the VA interpreted the "same or similar manner" phrase in 38 U.S.C. § 1781(b) not to require identical operation to TRICARE Select, instead giving themselves "flexibility to administer the program." CHAMPVA, 87 Fed. Reg. 41,594-02, 41,595 (Jul. 13, 2022) (to be codified at 38 C.F.R. pt. 17).

61. In the past, minor differences have occurred in care, such as CHAMPVA allowing for annual physical exams. 38 C.F.R. § 17.272(30)(xiii).

**The _Dobbs_ Decision**

62. On June 24, 2022, the Supreme Court of the United States issued its decision in _Dobbs v. Jackson Women's Health Organization._ 142 S. Ct. 2228 (2022).

63. In its opinion, the Court held that the Constitution does not confer a right to abortion and that "[t]he permissibility of abortion, and the limitations, upon it, are to be resolved like the most important question in our democracy: by citizens trying to persuade one another and then voting." _Dobbs_, 142 S. Ct. at 2243 (quoting _Planned Parenthood of Se. Pa. v. Casey,_ 505 U.S. 833, 979 (Scalia, J., concurring in judgment in part and dissenting in part).

64. Because the Supreme Court overruled _Roe v. Wade_ and _Planned Parenthood of Southeastern Pennsylvania v. Casey_, several states activated previously enacted restrictions on abortions and abortion counseling. _See, e.g.,_ Okla. Stat. tit. 21, § 861; Ark. Code § 5-61-304.

65.     Texas was one state that previously enacted restrictions on abortion and abortion counseling. Tex. Health & Safety Code §170A.002.

66.     Prior to the *Dobbs* decision, Texas also enacted the Heartbeat Act, which prohibits abortions when a physician can detect a fetal heartbeat. Tex. Health & Safety Code § 171.204. The Heartbeat Act also authorizes private citizens to sue persons who perform or induce an abortion or aid and abet in an abortion. *Id.* at § 171.208.

67.     After the *Dobbs* decision, Democrat Senators began to pressure President Biden to use federal lands to provide abortion access in states where it was otherwise restricted. Alex Gangitano, *Harris says administration isn't discussing abortion services on federal land*, The Hill (Jun. 27, 2022, 5:03 PM), https://thehill.com/homenews/administration/3538718-harris-says-administration-isnt-discussing-abortion-services-on-federal-land/.

68.     On June 27, 2022, three days after the decision in *Dobbs,* Vice President Kamala Harris said, "I mean, it's not right now what we're discussing," when asked whether the Biden Administration was considering performing abortions on Federal land. *Id.*

69.     On June 28, 2022, Karine Jean-Pierre, the White House press secretary, confirmed this point by warning of "dangerous ramifications" should the Biden Administration choose to that course of action. Alex Gangitano, *White House cites 'dangerous ramifications'* to *providing abortion services on federal land*, The Hill (Jun. 28, 2022, 9:02 AM), https://thehill.com/homenews/administration/3539343-white-house-cites-dangerous-ramifications-to-providing-abortion-services-on-federal-land/.

70.     On June 29, 2022, Secretary McDonough said that "consistent with regulation, VA does not provide abortion services or travel assistance related to abortion procedures" and that at the time, there were no plans to change that. Leo Shane, III, *No plans to increase abortion services*

*at VA after Supreme Court ruling,* Military Times (Jun. 29, 2022), https://www.militarytimes.com/veterans/2022/06/29/no-plans-to-increase-abortion-services-at-va-after-supreme-court-ruling/.

71.     Less than one month after *Dobbs*, the Biden Administration changed course.

72.     On July 20, 2022, Secretary McDonough stated that "[the VA is] closely watching what happens for our veterans and if we see that there is a diminution in access to services, or if we see that, because of threatened legal jeopardy to our providers or confusion from our providers about what's allowable, and we think, therefore, that we need to change policy and make those rules, we will." Patricia Kime, *VA Considers Providing Abortions as it Monitors States' Responses to Supreme Court Ruling,* Military.com (Jul. 21, 2022), https://www.yahoo.com/video/va-considers-providing-abortions-monitors-182927345.html.

73.     The Secretary proposed that "it is a long-held view of the VA general counsel that we are not statutorily prohibited from providing abortion counseling or abortion services." *Id.* However, should the VA choose to offer abortions and abortion counseling, the Secretary reassured listeners that "[i]f [the VA is] going to offer it, we do that through the rules, and I have also said to Congress that we would not surprise them." *Id.*

**The Rule**

74.     On September 2, 2022, the VA announced a new interim final rule allowing the VA to "provide access to abortion counseling and—in certain cases—abortions to pregnant Veterans and VA beneficiaries." Press Release, U.S. Dep't of Veterans Affs., VA will offer abortion counseling and—in certain cases—abortions to pregnant Veterans and VA beneficiaries, (Sept. 2, 2022) (https://www.va.gov/opa/pressrel/pressrelease.cfm?id=5820).

75.     The Rule was published in the Federal Register on September 9, 2022. 87 Fed. Reg.at 55,287.

76.     The Rule went into effect immediately on September 9, 2022. *Id*.

77.     The VA did not provide the public the opportunity to comment on the Rule before it took effect. *Id*.

78.     The VA determined that the public may submit comments on the Rule for the 30 days after its effective date. *Id*.

79.     Secretary McDonough stated that soliciting public comment before the Rule was effective would be "impracticable and contrary to the public interest" and stated that good cause existed sufficient to bypass the thirty-day delay. *Id*. at 55,295.

80.     The Rule does not protect or mention the religious liberties of VA employees.

**The Rule Provides Abortions for Veterans**

81.     The Rule amended the VA's medical benefits package to offer abortions when a health care professional "determines such care is needed to promote, preserve, or restore *the health*" of the pregnant veteran or when pregnancy is the result of rape or incest. *Id.* at 55,288 (quoting 38 C.F.R. §17.38(b)) (emphasis added).

82.     The VA determined that abortion access for veterans was "needed" under 38 U.S.C. § 1710 when the pregnancy threatens the life *or health* of the mother or is a result of rape or incest. *Id*.

83.     According to the Rule, "abortion is essential health care" when a VA health care professional determines that "conditions . . . render an abortion needed to preserve *the health* of a veteran." *Id.* at 55,291 (emphasis added).

14

84.     Under the Rule, "[a]ssessment of the conditions, injuries, illness, or diseases that will qualify for this care will be made by appropriate health care professionals on a case-by-case basis." *Id* at 55,294. Abortions based on rape or incest can be performed based on the veterans self-reporting of the incident. *Id.*

85.     The Rule imposes no gestational limits to VA abortions.

86.     The Rule permits abortions for either physical or mental health reasons, noting that veterans of reproductive age may have "mental health conditions that may increase the risks associated with pregnancy." *Id.* at 55,295.

87.     The Rule imposes no limits on when a health care professional may conclude that an abortion is needed to "promote" the "health" of the pregnant veteran. *Id.* at 55,294.

88.     The VA's medical benefits package regulation, 38 C.F.R. § 17.38(b)(1)–(3), defines "promote health," "preserve health," and "restoring health," to include care that will "enhance the quality of life or daily functional level of the veteran."

89.     Every pregnancy, including healthy pregnancies, could arguably limit the pregnant mother's "daily functional levels."

90.     Thus, the Rule permits abortions, with no stated gestational age limits, so long as a heath care professional concludes that the abortion is needed to enhance the quality of life or daily functional level of the pregnant veteran.

91.     The Rule permits *any* abortion a health care professional and pregnant woman determines is needed.

**The Rule Provides Abortion Counseling for Veterans**

92.     The Rule amended the VA's medical benefits package to include "abortion counseling." 87 Fed. Reg. at 55,294.

93.    The VA determined that abortion counseling was also "needed" under 38 U.S.C. § 1710 and drafted the Rule to remove existing prohibitions on abortion counseling. *Id.*

94.    The Rule's provision of abortion counseling has three purposes.

95.    First, abortion counseling aids the mother "in making a decision about an unwanted pregnancy." *Id.* at 55,292.

96.    Second, abortion counseling helps the mother implement her decision about her unwanted pregnancy. *Id.*

97.    Third, abortion counseling assists the mother in "controlling her future fertility.*"* *Id.*

98.    Abortion counseling is "a responsibility of the provider" and a "right" of the pregnant veteran under the Rule. *Id.*

**The Rule Provides Abortions and Abortion Counseling for CHAMPVA Beneficiaries**

99.    The Rule provides abortion services and abortion counseling for CHAMPVA beneficiaries, which includes spouses, children, survivors, and caregivers of veterans who meet certain eligibility criteria. 38 U.S.C. § 1781(a).

100.    Consistent with its determination of necessity for veterans, the VA decided that abortions and abortion counseling were "medically necessary and appropriate for treatment of a condition," 38 C.F.R. § 17.272(a), and inclusion in the benefits for CHAMPVA recipients would be the "same or similar" as the care included in TRICARE Select, 38 U.S.C. § 1781(b).

101.    Prior to the Rule, CHAMPVA beneficiaries could receive needed health care when it was certified that the life of the mother would be endangered, should the pregnancy be carried to term. 63 Fed. Reg. at 48,105.

102.    The Rule amends the pertinent regulation to allow abortions when the health of the mother is endangered, or the pregnancy is the result of rape or incest and removes the prohibition on abortion counseling. 87 Fed. Reg. at 55,294.

103.    The evidentiary standards for abortions based on life or health of the mother, rape, or incest are the same as those for veterans. *Id.*

104.    Defendants are actively proceeding with implementation of the Rule at VA facilities.

105.    Defendants confirmed on or about September 21, 2022, that it had performed at least one abortion at a VA facility. Courtney Kube, *VA performs its first abortion weeks after saying it would in certain cases*, NBCNews.com (Sept. 22, 2022, 1:58 PM) https://www.nbcnews.com/health/health-news/va-performs-first-abortion-weeks-saying-certain-cases-rcna49007.

106.    The Temple VA facility where Ms. Carter works, has advised that it will perform abortions and abortion counseling.

**The Rule's Application to VA Employees Like Ms. Carter**

107.    VA employees must act in accordance with agency regulations.

108.    The Rule describes abortion services and counseling as "Federal duties" of "all VA employees." 87 Fed. Reg. 55,294 ("This rulemaking serves as notice that all VA employees . . . may not be held liable under state or local law or regulation for reasonably performing their *Federal duties*.").

109.    VA health care professionals offer services under the veterans' and CHAMPVA beneficiaries' medical benefits packages and could receive a request for abortion counseling at any time after the Rule's date of publication.

110.    The VA employs more than 371,000 health care professionals and support staff at 1,298 health care facilities nationwide, including 171 VA Medical Centers. *See* About VA, Veterans Health Administration, https://www.va.gov/health/aboutvha.asp (last visited Dec. 11, 2022).

111.    The Rule estimated that as many as 155,000 veterans and 50,000 CHAMPVA beneficiaries ages 18 through 49 could become pregnant, are enrolled in VA health care, and are living in States that have enacted new abortion regulations since *Dobbs*. 87 Fed. Reg. at 55,295.

112.    The VA publicizes that "[y]our local VA facility" offers services for women, including for women's health, screening and disease prevention, and routine gynecologic services. Health Benefits, VA, https://www.va.gov/healthbenefits/resources/publications/hbco/hbco_medical_benefits_package.asp (last visited Dec. 11, 2022).

113.    The VA states that the medical benefits package includes "all . . . the necessary inpatient hospital care and outpatient services to promote, preserve, or restore [qualifying veterans'] health." *Id*.

114.    As all VA health care professionals provide services under the medical benefits package, the Rule altered the official duties of all VA health care professionals.

115.    Previously, the VA medical benefits package for veterans categorically prohibited all abortions and abortion counseling. 64 Fed. Reg. at 54,218. The medical benefits package for CHAMPVA beneficiaries permitted lifesaving health care when it was certified that the life of the mother would be endangered, should the pregnancy be carried to term. 63 Fed. Reg. at 48,105.

116.    Now, the Rule states that "abortion counseling is . . . a responsibility of the provider," and will be offered "just as counseling is offered or covered by VA regarding any other health care decision." 87 Fed. Reg. at 55,292.

18

117.    The VA presently advertises, "VA is able to offer abortion counseling, and—in certain cases—abortions to pregnant Veterans [and CHAMPVA beneficiaries]." Women Veterans Healthcare, VA, https://www.womenshealth.va.gov/WOMENSHEALTH/topics/abortion-services.asp (last visited Dec. 11, 2022).

118.    The Rule immediately changed the duties of VA health care professionals to include the provision of abortions in certain circumstances and abortion counseling for pregnant veterans and CHAMPVA beneficiaries.

119.    The Rule explained that it was "critical" that it take effect immediately to enable veterans and CHAMPVA beneficiaries to avoid delays due to travel and wait times when seeking abortion services. 87 Fed. Reg. at 55296.

120.    The Rule states that "[e]ach day," pregnant veterans "find themselves in need of abortion services." *Id.*

121.    The Rule asserted that it could not even delay abortion care for the time required for notice and comment rulemaking. *Id.*

122.    The Rule also purports to shield VA health care professionals from State law liability for performing or participating in abortions and abortion counseling. *Id.* at 55,294.

123.    The Rule "serves as notice" that "all VA employees," including health care professionals who provide care and those who schedule abortion procedures, may not be held liable under State or local abortion laws for reasonably performing their "Federal duties" to provide abortion services and counseling. *Id.*

124.    The Rule fails to explain any clear statutory or constitutional authority for the VA to supplant State licensure or health care laws.

125.    The Rule makes no mention of religious exemptions or accommodations to its requirements, despite the rule's obvious implications for religious health care professionals who cannot perform or counsel for abortions.

126.    The VA has no process for receiving religious exemption or accommodation requests from VA health care professionals.

127.    Even more than three months after promulgating the Rule, the VA has no policy for receiving accommodation requests from VA health care professionals.

**The Rule's Effect on Ms. Carter**

128.    Ms. Carter cannot perform, prescribe, or counsel for abortion services because of her sincerely held religious beliefs that unborn babies are created in the image of God and should be protected.

129.    Ms. Carter believes, for both religious and medical reasons, that abortion poses medical harms to the unborn child and mother.

130.    Because of her religious beliefs, Ms. Carter cannot work in a facility that performs abortions for reasons other than to save the life of the mother.

131.    Ms. Carter sees pregnant veterans in the performance of her official duties.

132.    As a VA nurse practitioner, Ms. Carter offers services under the veterans and CHAMPVA medical benefits packages and could receive a request for a chemical abortion or abortion counseling by a pregnant beneficiary at any time. Ms. Carter sees both men and women for routine visits, including pregnant women, in the course of her official duties.

133.    The VA emailed Ms. Carter on October 11, 2022, to advise that she and other primary care providers will prescribe medications "to end first trimester pregnancies under certain circumstances" if she does not have an approved reasonable accommodation.

134.    Ms. Carter wrote to her supervisor to request a religious accommodation via a Microsoft Teams message on October 18, 2022.

135.    Ms. Carter told her supervisor that she was contacting her regarding "the abortion topic." Ms. Carter said she had previously seen a link for submitting religious accommodation requests, but she could no longer find the link in her email. She asked her supervisor to resend the link and advised that she needs an accommodation.

136.    Ms. Carter's supervisor responded, "We cannot apply yet." She told Ms. Carter that she would let Ms. Carter and others know once she has information about how to request a religious accommodation.

137.    Later, on October 27, 2022, Ms. Carter emailed her supervisor again to say that she was requesting a religious accommodation "per this email." Ms. Carter wrote, "I need accommodation not to participate in abortion services because of my religious beliefs against performing, prescribing or counseling for an abortion."

138.    On October 28, 2022, Ms. Carter's supervisor responded, "No, this email will not suffice." She explained that she believed that employees would request accommodations directly with HR but that "the process is not in place yet." "Just wait," she told Ms. Carter.

139.    The VA regulates Ms. Carter and altered her duties by promulgating the Rule.

140.    The VA officials explained on October 11 that Ms. Carter would have to prescribe medications to end certain first trimester pregnancies if she did not have an approved religious accommodation.

141.    A pregnant veteran could request abortion services or counseling from Ms. Carter at any time.

142.    While the VA claims that the need to immediately provide essentially unlimited abortion services to veterans and CHAMPVA beneficiaries is so dire that following required rulemaking procedures under the APA was unnecessary, three months after first promulgating the Rule, the VA *still* has not created a process for receiving religious accommodation requests for medical providers who have religious objections to such activity.

143.    Ms. Carter risks prosecution and civil liability under Texas law for performing or assisting in abortions.

144.    Texas law prohibits abortions unless the abortion is to save the life of the mother or to prevent a serious risk of substantial impairment of a major bodily function. Tex. Health & Safety Code §170A.002(a)–(b).

145.    In Texas, a person may not "knowingly perform, induce, or attempt" any other abortion. *Id*.

146.    A person who violates this provision of law commits a first-degree felony if the unborn child dies as a result. Tex. Health & Safety Code § 170A.004.

147.    In addition, that person incurs civil penalties of not less than $100,000 for each violation. *Id.* at § 170A.005.

148.    Texas law authorizes private citizens to sue persons who perform, induce, or aid and abet in an abortion. Tex. Health & Safety Code § 171.208(a).

149.    The Attorney General of Texas has advised that he will "strictly enforce this law." Tex. Att'y Gen., Advisory on Texas Law upon Reversal of *Roe v. Wade*, https://www.texasattorneygeneral.gov/sites/default/files/images/executive-management/Post-Roe%20Advisory.pdf.

150.    In response to the Rule, the Attorney General of Texas signed onto a letter with 15 other state attorneys general written to the VA warning that, "[t]hose who perform abortions based on the interim final rule—and in defiance of State or Federal laws—do so at their own risk." Letter from Lynn Fitch, Att'y Gen. of Miss., to Secretary McDonough, Dep't of Veterans Affs. 5 (Nov. 17, 2022) (https://files.constantcontact.com/6b6ea99f701/b8bc7f90-39b4-4085-bc66-64b3fa5ae8a7.pdf?utm_medium=email&utm_campaign=855206&refcd=855206&utm_source=RelevantResources&seid=10576876).

151.    Ms. Carter is licensed by the State of Texas as a nurse practitioner.

152.    The Texas Board of Nursing ("the Board") oversees a criminal investigations unit to investigate suspected criminal acts related to the practice of nursing, and it may assist federal, State, or local law enforcement agencies in the investigation and prosecution of crimes related to the practice of nursing. Tex. Occ. Code § 301.161.

153.    Nurses are mandatory reporters. Tex. Occ. Code § 301.402.

154.    A nurse must report to the Board any incident in which that nurse has reasonable cause to suspect that another nurse has violated a board rule, contributed to the death or serious injury of a patient, or that constitutes abuse or violation of professional boundaries. Tex. Occ. Code § 301.401.

155.    If a nurse licensed in Texas fails to report conduct subject to reporting, the Board may take punitive action against that nurse. Tex. Occ. Code § 301.411.

156.    A licensed nurse who engages in unprofessional conduct in the practice of nursing that is "*likely to injure a patient or the public*" constitutes grounds for disciplinary action by the Board of Nursing. Tex. Occ. Code § 301.452(b)(10) (emphasis added).

157.    A person who engages in such conduct is subject to denial of a license or other disciplinary action. *Id*.

158.    Ms. Carter must comply with the Rule, but also must comply with Texas law because the Temple VA facility is under the concurrent jurisdiction of the federal government and the State of Texas.

159.    Ms. Carter fears losing her job, losing her nurse practitioner's license, violating her religious beliefs, and violating Texas law.

160.    Ms. Carter experiences these irreparable injuries each and every day the Rule remains enforceable at the Temple VA facility.

## CAUSES OF ACTION

### COUNT I
### Violation of the Religious Freedom Restoration Act

161.    Ms. Carter incorporates by reference all preceding paragraphs.

162.    The Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb–2000bb-4. ("RFRA"), states that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1.

163.    The act broadly defines "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2(4) (citing 42 U.S.C. § 2000cc-5(7)(A)).

164.    In *Burwell v. Hobby Lobby Stores*, the Supreme Court stated that the exercise of religion involves "not only belief and profession but the performance of (or abstention from) physical acts that are engaged in for religious reasons." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 710 (2014) (citing *Emp. Div., Dep't of Hum. Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990)).

24

165.    The Supreme Court has articulated repeatedly that courts may not question whether sincerely held religious beliefs are reasonable. *Hobby Lobby*, 573 U.S. at 724.

166.    RFRA imposes strict scrutiny on all actions of the federal government that "substantially burden a person's exercise of religion." 42 U.S.C. § 2000bb-1(b).

167.    Ms. Carter's sincerely held religious beliefs prohibit her from offering abortion services and providing counseling required by application of the Rule.

168.    Ms. Carter cannot perform, prescribe, or counsel for abortions because of her religious beliefs that unborn babies are created in the image of God and should be protected.

169.    Ms. Carter cannot work at a facility that performs abortions for reasons other than to save the life of the mother because of her sincerely held religious beliefs. Ms. Carter's compliance with her beliefs about abortion is a religious exercise.

170.    By the VA's enforcing the Rule at the Temple VA facility and requiring all VA medical professionals to provide abortions and abortion counseling in its facilities, the Rule coerces Ms. Carter to change or violate her religious beliefs.

171.    The Rule exposes Ms. Carter to termination from her job because of her sincere religious beliefs and exercise.

172.    The Rule directs Ms. Carter to perform, prescribe, or counsel for abortions and exposes her to criminal and civil liability under Texas law.

173.    The Rule exposes Ms. Carter to a possible loss of her nurse practitioner license in Texas.

174.    The Rule imposes a substantial burden on Ms. Carter's religious exercise.

175.    The Rule, as-applied, furthers no compelling governmental interest.

176.     The Rule, as-applied, is not the least restrictive means of furthering Defendants' stated interests.

177.     The Rule, as-applied, violates Ms. Carter's rights under the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb–2000bb-4.

178.     Ms. Carter has no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

179.     Ms. Carter has no adequate remedy at law.

180.     Absent injunctive and declaratory relief against the application of the Rule, Ms. Carter has been and will continue to suffer irreparable injury.

## COUNT II
### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause

181.     Ms. Carter incorporates by reference all preceding paragraphs.

182.     The First Amendment's Free Exercise Clause prohibits the government from enacting non-neutral and non-generally applicable laws or policies unless they are narrowly tailored to a compelling government interest.

183.     The original public meaning of the Free Exercise Clause is that the government may not burden a sincerely held religious belief unless the government can demonstrate a compelling interest and that the law or policy burdening religious exercise is the least restrictive means to achieve that compelling interest.

184.     Ms. Carter has a sincere religious belief against performing, prescribing, counseling for, or working in a facility that performs abortion services for reasons other than to save the life of the mother.

185.    The Rule, as-applied, imposes a substantial burden on Ms. Carter by forcing her to choose between her livelihood as a health care professional and her exercise of religion.

186.    The Rule makes no mention of a possible exemption or accommodation for religious health care professionals who cannot participate in, counsel for, or work in a facility that performs abortions because of their sincerely held religious beliefs.

187.    The Rule, meanwhile, permits health care professionals to decline to perform or counsel for abortion for secular reasons (in the exercise of "medical judgment," 87 Fed. Reg. at 55,289), while refusing to permit health care professionals to decline to perform or counsel for abortion for religious reasons.

188.    Thus, the Rule, as-applied, seeks to suppress the religious practice of individuals such as Ms. Carter, while allowing for similar secular conduct. The Rule is therefore neither neutral nor generally applicable.

189.    The application of the Rule is not justified by a compelling governmental interest.

190.    Even if the VA has a compelling interest, the Rule is not narrowly tailored to achieve that interest.

191.    Defendants' actions violate Ms. Carter's rights secured to her by the Free Exercise Clause of the First Amendment of the United States Constitution.

192.    Ms. Carter has no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

193.    Ms. Carter has no adequate remedy at law.

194.    Absent injunctive and declaratory relief against the Regulation, Ms. Carter has been and will continue to be harmed.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff Stephanie Carter prays the Court:

A.　　Declare that the Rule, as-applied, violates Plaintiff's rights under the Religious

Freedom Restoration Act;

B.　　Declare that the Rule, as-applied, violates Plaintiff's rights under the First

Amendment to the United States Constitution;

C.　　Issue a preliminary and permanent injunction enjoining Defendants from applying

the Rule to Plaintiff;

D.　　Issue a preliminary and permanent injunction enjoining Defendants from

enforcing the Rule at the Temple VA facility;

E.　　Award Plaintiff the costs of this action and reasonable attorney's fees; and

F.　　Award such other and further relief as the Court deems equitable and just.

Respectfully submitted this 13 day of December, 2022.

/s/ Jeffrey C. Mateer

CHRISTINE K. PRATT*
  Florida Bar No. 0100351
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. NW
Suite 1410
Washington, DC 20004
(202) 921-4105
cpratt@firstliberty.org

JEFFREY C. MATEER
  Texas Bar No. 13185320
DAVID J. HACKER
  Texas Bar No. 24103323
MICHAEL D. BERRY
  Texas Bar No. 24085835
JUSTIN E. BUTTERFIELD
  Texas Bar No. 24062642
DANIELLE A. RUNYAN*
  New Jersey Bar No. 027232004
HOLLY M. RANDALL
  Texas Bar No. 24128002
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy., Ste. 1600
Plano, Texas 75075
(972) 941-4444
jmateer@firstliberty.org
dhacker@firstliberty.org
mberry@firstliberty.org
jbutterfield@firstliberty.org
drunyan@firstliberty.org
hrandall@firstliberty.org

*   Application for admission
    *pro hac vice* pending

*Attorneys for Plaintiff*