**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

**STEPHANIE CARTER,**

     Plaintiff,

     v.

**DENIS RICHARD MCDONOUGH**,
individually and in his official capacity as
United States Secretary of Veterans Affairs,
and the **UNITED STATES DEPARTMENT
OF VETERANS AFFAIRS**,

     Defendants.

Case No. 6:22-cv-01275

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

TABLE OF CONTENTS

Table of Authorities.............................................................................................. iv

Introduction............................................................................................................ 1

Statement of Facts................................................................................................. 4

   **I.**    Plaintiff Stephanie Carter ....................................................................... 4

   **II.**   The Department of Veterans Affairs and the Veterans Health Administration ............ 6

      A.  Care for Qualifying Veterans ........................................................... 6

      B.  Care for Qualifying Beneficiaries .................................................... 7

   **III.**  VA's Limitation on Performing Abortions ..................................... 8

      A.  The Veterans Health Care Act of 1992 and Section 106 ................ 8

      B.  Limitations on Abortions for CHAMPVA Recipients....................... 9

   **IV.**  The VA's Interim Final Rule for Reproductive Health Services ................ 10

      A.  The Rule provides abortions for veterans. ................................... 13

      B.  The Rule provides abortions for CHAMPVA recipients.................. 13

Argument ............................................................................................................ 14

   **I.**    Plaintiff Is Likely to Succeed on the Merits of Her Claims. ........................ 14

      A.  Defendants' enforcement of the Rule at the Temple VA facility and application of the Rule to Ms. Carter substantially burdens her sincerely held religious beliefs because it forces her to choose between her job and her religious convictions. ........................................................................... 14

      B.  Defendants do not have a compelling government interest that justifies burdening Ms. Carter's religious beliefs because the VA cannot demonstrate that the Secretary had the authority to issue the Rule. ................................. 17

         **1.**  The Secretary's underlying rulemaking actions are arbitrary, capricious, an abuse of discretion, or otherwise not accordance with law.................................. 18

            **a.**  The Rule violates Congress's thirty-year express prohibition on the VA performing abortion services for veterans. ................................. 18

            **b.**  The Rule violates the command that CHAMPVA benefits must be the same or similar to TRICARE Select benefits. ................................. 21

            **c.**  Defendants are acting in an arbitrary and capricious manner by enforcing a Rule that, as applied to Ms. Carter, exposes her to criminal and civil liability under Texas law. ................................. 22

         **2.**  The Secretary's actions are in excess of his statutory jurisdiction and authority because he does not have clear congressional authorization to impose a rule on such a profound issue of vast economic and political significance. ........................................................................... 25

**3.** The Secretary issued the Rule without observance of procedure required
by law. ...................................................................................................... 31

**II.** Ms. Carter Is Suffering Irreparable Injury. .................................................. 35

**III.** The Balance of Harms and the Public Interest in Protecting Civil Liberties
Weigh in Favor of an Injunction. ................................................................ 37

**IV.** The Court Should Waive the Requirement of a Security Bond. ................... 37

Conclusion ...................................................................................................................... 38

Certificate of Service ...................................................................................................... 39

## TABLE OF AUTHORITIES

**Cases**

*Arlington v. FCC*, 569 U.S. 290 (2013) ............................................................. 18

*Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897 (5th Cir. 1983) ............................... 31

*Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012) ......................................................... 37

*Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020) ...................................................... 15

*Brown v. U.S. Dep't. of Ed.*,
    No. 4:22-cv-0908-P, 2022 WL 16858525 (N.D. Tex. Nov. 10, 2022) ............................ 26, 31

*BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604 (5th Cir. 2021) ............................................. 35

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) .............................................. 15

*Byrum v. Landreth*, 566 F.3d 442 (5th Cir. 2009) ....................................................... 14

*Cap. Area Immigrants' Rts. Coal. v. Trump,* 471 F. Supp. 3d 25 (D.D.C. 2020) ........................... 34

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ............................. 18

*Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573 (D.C. Cir. 1981) ............................... 32

*Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022) ............................... 1, 27

*Elrod v. Burns*, 427 U.S. 347 (1976) .................................................................. 35

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) .......................................... 26

*Gordon v. Houston*, 79 F Supp. 3d 676 (S.D. Tex. 2015) ................................................. 38

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) ................................. 35

*Jackson Women's Health Org. v. Currier*, 760 F.3d 448 (5th Cir. 2014) ................................. 37

*Kaepa, Inc. v. Achilles Corps.*, 76 F.3d 624 (5th Cir. 1996) .......................................... 37

*King v. Burwell,* 576 U.S. 473 (2015) .................................................................. 26

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,* 140 S. Ct. 2367
    (2020) ......................................................................................... 15

*Louisiana v. Becerra,* 577 F. Supp. 3d 483 (W.D. La. 2022) .......................................... 32, 34

*Morton v. Mancari*, 417 U.S. 535 (1974) ................................................................ 18

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................................. 37

*Opulent Life Church v. Holly Springs*, 697 F.3d 279 (5th Cir. 2012) ................................... 35

*Phillips Petroleum Co. v. Johnson*, 22 F.3d 616 (5th Cir. 1994) ....................................... 31

*Planned Parenthood of Se. Pa. v. Casey,* 505 U.S. 833 (1992) .......................................... 27

*Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497 (1936) .............................................. 19

*Sambrano v. United Airlines, Inc.*, 19 F.4th 839 (5th Cir. 2021) .................................... 15, 36

*Sherbert v. Verner*, 374 U.S. 398 (1963) .............................................................. 15

*Sorenson Commc'ns Inc. v. FCC,* 755 F.3d 702 (D.C. Cir. 2014) ................................ 32

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981)............................. 15

*U.S. Navy SEALs 1–26 v. Biden*, 578 F. Supp. 3d 822 (N.D. Tex. 2022) ........................ 14, 36, 37

*U.S. Telecom Ass'n. v. FCC*, 855 F.3d 381 (D.C. Cir. 2017) .................................... 25

*U.S. v. Johnson,* 632 F.3d 912 (5th Cir. 2011) ............................................... 32

*Util. Air Regul. Grp. v. EPA,* 573 U.S. 302 (2014) ........................................... 25

*W&T Offshore, Inc. v. Bernhardt*, 946 F.3d 227 (5th Cir. 2019)................................ 31

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022) ............................................... 25, 26

*Whitman v. Am. Trucking Ass'ns., Inc.*, 531 U.S. 457 (2001) .................................. 26

**Statutes**

38 U.S.C. § 1705 ............................................................................ 7

38 U.S.C. § 1710 ............................................................................ 6, 7

38 U.S.C. § 1781 ............................................................................ 7, 9, 13, 21

5 U.S.C. § 553 .............................................................................. 12, 31, 32

5 U.S.C. § 706 .............................................................................. 17

Ark. Code § 5-61-304 ....................................................................... 10

National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239 § 704, 126
   Stat. 1632 (2013)....................................................................... 8, 9, 21

Okla. Stat. tit. 21, § 861 .................................................................. 10, 29

Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb–2000bb-4 ............................. 1, 14, 15, 17

Tex. Health & Safety Code § 171 ............................................................ 23

Tex. Health & Safety Code §170A ............................................................ 10, 22, 23, 29, 36

Tex. Occ. Code § 301 ....................................................................... 24, 25, 36

Veterans Health Care Act of 1992, Pub. L. No. 102-585, 106 Stat. 4943 (1992)................ 8, 9, 18

Veterans' Health Care Eligibility Reform Act of 1996, Pub. L. No. 104-262 § 104, 110
   Stat. 3177 (1996)....................................................................... 7

**Regulations**

32 C.F.R. § 199.17 ......................................................................... 7

32 C.F.R. § 199.4 .......................................................................... 8, 9, 21

38 C.F.R. § 17.270 ......................................................................... 7, 8

38 C.F.R. § 17.272 ......................................................................... 9, 13, 31

38 C.F.R. § 17.38 .......................................................................... 7, 13, 31

Civilian Health and Medical Program of the Department of Veterans Affairs
(CHAMPVA),
63 Fed. Reg. 48,100 (Sept. 9, 1998) ............................................................. 8, 9, 13

Civilian Health and Medical Program of the Department of Veterans Affairs,
87 Fed. Reg. 41,594 (Jul. 13, 2022) ...................................................................... 9

Enrollment—Provision of Hospital and Outpatient Care to Veterans,
64 Fed. Reg. 54,207 (Oct. 6, 1999) .............................................................. 7, 9, 18

Reproductive Health Services,
87 Fed. Reg. 55,287 (Sept. 9, 2022) ........1, 2, 11, 12, 13, 14, 16, 19, 20, 21, 22, 29, 32, 33, 34

**Other Authorities**

Alex Gangitano, *Harris says administration isn't discussing abortion services on federal
land*, The Hill (Jun. 27, 2022, 5:03 PM),
https://thehill.com/homenews/administration/3538718-harris-says-administration-
isnt-discussing-abortion-services-on-federal-land/ ................................................. 10

Attorneys General of California, Colorado, Connecticut, Delaware, District of Columbia,
Hawaii, Illinois, Iowa, Maine, Maryland, Massachusetts, Michigan, Minnesota,
Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania,
Rhode Island, Vermont, and Washington, Comment Letter on Interim Final Rule,
Improving Access to Abortion and Abortion Counseling for Veterans and CHAMPVA
Beneficiaries 5 (Oct. 11, 2022), https://downloads.regulations.gov/VA-2022-VHA-
0021-53367/attachment_1.pdf ............................................................................ 30

Courtney Kube, *VA performs its first abortion weeks after saying it would in certain
cases*, NBCNews.com (Sept. 22, 2022, 1:58 PM),
https://www.nbcnews.com/health/health-news/va-performs-first-abortion-weeks-
saying-certain-cases-rcna49007 ........................................................................... 12

George Orwell, *1984* (HarperCollins 1949) ............................................................ 21

Intergovernmental Immunity for the Department of Veterans Affairs and Its Employees
When Providing Certain Abortion Services, 46 Op. O.L.C. _(slip op.) (Sept. 21, 2022)....... 23

Josh Gerstein and Alexander Ward, *Supreme Court has voted to overturn abortion rights,
draft opinion shows*, Politico (May 2, 2022, 8:32 PM; updated May 3, 2022, 2:14
PM), https://www.politico.com/news/2022/05/02/supreme-court-abortion-draft-
opinion-00029473 ............................................................................................. 10

Leo Shane III, *No plans to increase abortion services at VA after Supreme Court ruling*,
Military Times (Jun. 29, 2022),
https://www.militarytimes.com/veterans/2022/06/29/no-plans-to-increase-abortion-
services-at-va-after-supreme-court-ruling/ ............................................................. 10

Leo Shane III, *Republicans threaten lawsuits, budget penalties over VA abortion move*,
Federal Times (Sept. 15, 2022),
https://www.federaltimes.com/veterans/2022/09/15/republicans-threaten-lawsuits-
budget-penalties-over-va-abortion-move. ............................................................... 27

Leo Shane III, *VA stands by abortion policy after legal threats from state leaders*, Military Times (Nov. 22, 2022), https://www.militarytimes.com/veterans/2022/11/22/va-stands-by-abortion-policy-after-legal-threats-from-state-leaders/ ...................................................................................... 2

Letter from Lynn Fitch, Att'y Gen. of Miss., to Secretary McDonough, Dep't of Veterans Affs. 5 (Nov. 17, 2022) (https://files.constantcontact.com/6b6ea99f701/b8bc7f90-39b4-4085-bc66-64b3fa5ae8a7.pdf?utm_medium=email&utm_campaign=855206&refcd=855206&utm_source=RelevantResources&seid=10576876) .......................................................... 24, 28

Letter from Sen. James Lankford of Okla. to Secretary McDonough, Dep't of Veterans Affs. (Aug. 26, 2022) (https://www.lankford.senate.gov/download/2022-08-26-letter-to-mcdonough-ifr) ................................................................................................... 29

Letter from United States Senators to Secretary McDonough, Dep't. of Veterans Affs, (Jul. 28, 2022), https://www.hirono.senate.gov/imo/media/doc/07.28.2022_MKH_Letter%20to%20VA%20re_%20Abortion_Final.pdf ................................................................................... 11

Majority Staff of the House Committee on Veterans' Affairs, Report on Reproductive Healthcare for Veterans (Nov. 7, 2022), https://veterans.house.gov/imo/media/doc/report_on_reproductive_healthcare_for_veterans.pdf ............................................................................................................ 22, 23

Patricia Kime, *VA Considers Providing Abortions as it Monitors States' Responses to Supreme Court Ruling*, Military.com (Jul. 21, 2022), https://www.yahoo.com/video/va-considers-providing-abortions-monitors-182927345.html ............................................................................................................. 11

Press Release, U.S. Dep't of Veterans Affs., VA will offer abortion counseling and—in certain cases—abortions to pregnant Veterans and VA beneficiaries, (Sept. 2, 2022) (https://www.va.gov/opa/pressrel/pressrelease.cfm?id=5820) ................................... 11

Rachel N. Morrison, O. Carter Snead, and Natalie Dodson, Comment Letter on Interim Final Rule, Improving Access to Abortion and Abortion Counseling for Veterans and CHAMPVA Beneficiaries 3–6 (Oct. 11, 2022), https://downloads.regulations.gov/VA-2022-VHA-0021-57904/attachment_1.pdf ...................................................... 33

S. Rep. No. 102-409 (1992) ......................................................................................... 9

Sen. James Lankford and Members of Congress, Comment Letter on Interim Final Rule, Improving Access to Abortion and Abortion Counseling for Veterans and CHAMPVA Beneficiaries 1 (Oct. 11, 2022), https://downloads.regulations.gov/VA-2022-VHA-0021-57729/attachment_1.pdf .......................................................................... 28

Test. of Kayla M. Williams, Comm. on Veterans' Affs (Sept. 15, 2022), https://www.rand.org/content/dam/rand/pubs/testimonies/CTA2300/CTA2350-1/RAND_CTA2350-1.pdf ................................................................................... 26

Tex. Att'y Gen., Advisory on Texas Law upon Reversal of *Roe v. Wade*, https://www.texasattorneygeneral.gov/sites/default/files/images/executive-management/Post-Roe%20Advisory.pdf .................................................................. 24

Tex. Att'y Gen., Updated Advisory on Texas Law Upon Reversal of *Roe v. Wade* (July 27, 2022), https://texasattorneygeneral.gov/sites/default/files/images/executive-management/Updated%20Post-Roe%20Advisory%20Upon%20Issuance%20of%20Dobbs%20Judgment%20(07.27.2022).pdf ................................................................................................. 23, 36

VA History, VA History Office, https://www.va.gov/HISTORY/VA_History/Overview.asp (last visited Dec. 4, 2022) ..................................................................................................... 6

Plaintiff Stephanie Carter, by and through counsel and pursuant to Federal Rule of Civil Procedure 65, respectfully moves this Court for a preliminary injunction under the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb–2000bb-4 ("RFRA"), enjoining Defendants from requiring Ms. Carter to perform, counsel for, or prescribe medications for abortions and enjoining Defendants from applying Defendants' interim final rule titled Reproductive Health Services, 87 Fed. Reg. 55,287 (Sept. 9, 2022) (to be codified at 38 C.F.R. pt. 17) (the "Rule") at the Olin E. Teague Veterans' Center, in Temple, Texas ("Temple VA facility"), and in support whereof would show the Court as follows:

## INTRODUCTION

On June 24, 2022, Stephanie Carter breathed a sigh of relief. On that day, the Supreme Court released its decision in *Dobbs v. Jackson Women's Health Organization,* explicitly overturning *Roe v. Wade*, and ruling that abortion was no longer a fundamental right under the United States Constitution. *See* 142 S. Ct. 2228, 2284 (2022). For Ms. Carter, a Texas resident, the *Dobbs* decision meant that women in her state would no longer be able to abort pregnancies in the absence of the threat to the life of the mother. As a woman who has felt the pain of abortion herself and sought forgiveness from the Lord, Ms. Carter has a sincerely held religious belief that, as a nurse and a nurse practitioner, she is not to use her God-given skills to perform an abortion, prescribe medication to cause an abortion, counsel for abortions, or work in a facility that performs abortions for reasons other than to save the life of the mother.

For approximately twenty-three years, this was possible. An Army Veteran herself, serving her fellow veterans at Department of Veterans Affairs ("VA") hospitals and clinics fulfilled her calling to continue her service to her country. And, because the VA is statutorily prevented from performing abortions and abortion counseling, it fulfilled her calling from God to refrain from

1

practicing medicine anywhere that abortions could be performed. Throughout her career at the VA, her conscience was clear. She assumed the *Dobbs* decision would further that.

She was wrong. On September 9, 2022, the VA issued the Rule. Suddenly, Ms. Carter found herself in a crisis of conscience. To continue serving veterans, Ms. Carter needed a religious accommodation, but the text of the Rule itself offers no opportunity for a religious exemption, and Ms. Carter's supervisor repeatedly refused to recognize Ms. Carter's written requests for a religious accommodation.

The Rule allows for the VA to offer abortions and abortion counseling to veterans and certain qualifying beneficiaries. The VA determined that this action was necessary "because . . . providing access to abortion-related medical services is needed to protect the lives and health of veterans." 87 Fed. Reg. at 55,288. The Rule itself was brought about suddenly, in violation of required statutory procedures, without action from Congress, and against the public statements of federal officials. Yet, immediately after publication, the VA began performing essentially unrestricted abortion services without consideration for gestational age limitations for veterans and Civilian Health and Medical Program of the Department of Veteran's Affairs ("CHAMPVA") beneficiaries, in spite of a statutory prohibition on such activity. To date, the VA has already performed several abortions.[1]

Because the VA's application of the Rule forces Ms. Carter to choose between leaving what *should* be the perfect job for her and violating her religious beliefs, Ms. Carter's sincerely-held religious beliefs are being substantially burdened. Under RFRA, the VA cannot substantially burden Ms. Carter's sincerely-held religious beliefs unless it can show that it is doing so *both* in

---

[1]"The department has conducted several abortions since the decision, although officials did not provide specific numbers or locations." App. 0029; Leo Shane III, *VA stands by abortion policy after legal threats from state leaders*, Military Times (Nov. 22, 2022), https://www.militarytimes.com/veterans/2022/11/22/va-stands-by-abortion-policy-after-legal-threats-from-state-leaders/.

furtherance of a compelling governmental interest in requiring the particular religious objector to violate her religious convictions and that the way it is doing so is the least-restrictive means of furthering that compelling interest. Here, the VA cannot demonstrate that it has a compelling interest in applying the regulation to the Temple VA facility because the VA did not follow the law when it issued the Rule.

The VA's enforcement of the Rule at the Temple VA facility is particularly problematic for Ms. Carter, because that facility is not under the exclusive jurisdiction of the federal government but under concurrent jurisdiction with the State of Texas—a situation not contemplated by the Rule and subjecting Ms. Carter to civil and criminal liability. Furthermore, because the VA cannot demonstrate that the Rule was lawfully adopted, there is no federal preemption. In Texas, abortion is illegal except in very narrow circumstances that do not conflict with Ms. Carter's religious convictions. Violations of the Texas abortion law are significant, including felony convictions and steep civil penalties, and *anyone* can bring legal action to report such activity.

Every moment that Ms. Carter is forced to perform abortion services and work in a facility in which abortions are or could be performed for reasons other than to save the life of the mother is an irreparable harm under RFRA, which protects Ms. Carter's free-exercise rights. For the same reason that the VA lacks a compelling interest in requiring Ms. Carter to violate her religious beliefs—that the government has no interest in enforcing an invalidly-enacted regulation—the VA also has no interest that weighs against the issuance of this preliminary injunction. To bring an end to Ms. Carter's crisis of conscience, she respectfully requests that the VA be enjoined from requiring her to perform, counsel for, or prescribe medications for abortions and enforcing the Rule at the Temple VA facility so that Ms. Carter can continue to faithfully dedicate herself to serving our Nation's veterans.

## STATEMENT OF FACTS

### I.      Plaintiff Stephanie Carter

Stephanie Carter is an Army veteran who left the rigors of active duty life after honorably serving our country for eight and a half years. App. 0002. In 1997, she began her career as a federal civilian employee with the VA and worked in both the Waco, Texas, VA facility and Temple VA facility until her retirement in 2019. *Id.* Sincerely believing the Lord was calling her to return to her work at the VA, Ms. Carter left the leisure of retirement and began working, once again, at the Temple VA facility in September 2021 as a licensed nurse practitioner. App. 0003. She believes that her work as a nurse practitioner fulfills a calling from God to bless and serve her fellow veterans. *Id.*

Ms. Carter is a devout Christian. *Id.* She worships at a local church in Waco and maintains a close relationship with her pastor and his wife. *Id.* Though she is currently strong in her faith, this was not always the case. *Id.* In her past, Ms. Carter was distant from the Lord. *Id.* During that time, Ms. Carter had abortions herself—experiences that she now describes as traumatizing. *Id.* In Christ, she found forgiveness and repented from engaging in a practice she now sees as sinful. App. 0004. Now, for her, an unborn baby is a person created in the image of God. App. 0003. Through conviction from the Lord, Ms. Carter believes that she now must abstain from any connection to abortion. App. 0004. Her religious conscience tells her that she cannot perform, prescribe, or counsel for abortion. *Id.* Ms. Carter also holds the religious conviction that she cannot work in a facility that provides abortions for reasons other than to protect the life of the mother. *Id.* In approximately twenty-three years of service at the VA, she never experienced a conflict between her duties as a nurse practitioner and her religious conscience. *Id.*

On September 9, 2022, the VA issued its new Rule authorizing abortions and abortion counseling at VA facilities, including the Temple VA facility. *Id.* On or around October 7, 2022,

Ms. Carter learned that VA leadership informed the Central Texas Veterans Health Care System staff that health care professionals at the Temple VA facility would be performing medical abortions. *Id.* On October 11, 2022, one of Ms. Carter's supervisors forwarded an email to her from a VA official in Washington, D.C., advising that primary care providers, like Ms. Carter, will prescribe medications "to end first trimester pregnancies under certain circumstances" unless there is an approved religious accommodation. App. 0005, 0010. Consistent with her sincerely held religious beliefs, Ms. Carter requested a religious accommodation from providing abortion services on both October 18, 2022, and October 27, 2022. App. 0005, 0012, 0014. Each time, Ms. Carter was told that the VA could not accept her religious accommodation request because there was no process in place for handling such requests. App. 0005–0006, 0012, 0014.

On October 18, 2022, Ms. Carter contacted her supervisor to ask for a link to apply for a religious accommodation. App. 0005, 0012. Ms. Carter's supervisor replied that more information was to follow, that a process was not in place yet, and that she would let Ms. Carter and others know once she had the information to share. *Id.*

On October 27, 2022, Ms. Carter, again, emailed her supervisor requesting a religious accommodation and stated that she needed "an accommodation not to participate in abortion services because of [her] religious beliefs against performing, prescribing or counseling for an abortion." App. 0005–006, 0014.  The next day, Ms. Carter's supervisor responded that the email would not suffice, and that "once the process is clarified, [the request] will be directly to HR, not from [her] . . . [b]ut the process is not in place yet. Just wait." *Id.* Since the supervisor's reply, Ms. Carter has heard nothing further about a process for seeking a religious accommodation. App. 0006.

However, with each day that passes, Ms. Carter experiences increased anxiety surrounding application of the Rule. App. 0006. Without a religious accommodation, Ms. Carter is forced to comply with the application of the Rule at the Temple VA facility or lose her job. She also may be called upon to prescribe chemical abortion drugs or offer abortion counseling at any time. *Id.* Because the Rule is already being effectuated, and abortions may now be performed in the Temple VA facility, yet no process for receiving a religious accommodation has been made available to Ms. Carter and the VA has provided no indication that it would provide a suitable accommodation for Ms. Carter's religious convictions, she is forced to bring her requests to this Court.

## II.    The Department of Veterans Affairs and the Veterans Health Administration

The VA currently operates under the leadership of Secretary Denis McDonough to meet the varied medical needs of our nation's veterans and eligible beneficiaries. App. 0038, 0041; VA History, VA History Office, https://www.va.gov/HISTORY/VA_History/Overview.asp (last visited Dec. 9, 2022). To do so, the VA operates hospitals, outpatient clinics, telemedicine, and community care. App. 0036. In total, the VA health care system operates approximately 1,600 health care facilities, including 144 VA Medical Centers and 1,232 outpatient sites, making it one of the largest health care systems in the world. App. 0036–0037. Its sphere of influence on the medical community is even greater; approximately sixty percent of all medical residents spend a portion of their time training in a specific discipline at a VA facility. App. 0036.

### A.    Care for Qualifying Veterans

Currently, Congress broadly requires that "[t]he [VA] Secretary . . . shall furnish hospital care and medical services which the Secretary determines to be needed" to veterans who meet a specific list of eligibility criteria. 38 U.S.C. § 1710(a)(1)–(3). In 1996, Congress passed the Veterans' Health Care Eligibility Reform Act ("VHCERA") to "improve administration of health care by the [VA]" and required the VA Secretary to "establish and operate a system of annual

patient enrollment" that articulated "needed" care. 38 U.S.C. §§ 1705, 1710; Veterans' Health Care

Eligibility Reform Act of 1996, Pub. L. No. 104-262 § 104, 110 Stat. 3177 (1996). Since 1999, the

VA has offered qualifying veterans a medical benefits package that reflects the care the Secretary

determines to be "needed" under § 1710. *See* 38 C.F.R. § 17.38; *see also* Enrollment—Provision

of Hospital and Outpatient Care to Veterans, 64 Fed. Reg. 54,207 (Oct. 6, 1999) (to be codified at

38 C.F.R. pt. 17).

     These regulations offer basic care, including outpatient, inpatient, pharmaceutical,

emergency, and palliative care, among others, as well as preventative care, including periodic

medical examinations, mental health services, immunizations, and vision testing, among others.

38 C.F.R. § 17.38(a). Care is only included in the medical benefits package "if it is determined by

appropriate health care professionals that the care is needed to promote, preserve, or restore the

health of the individual and is in accord with generally accepted standards of medical practice."

38 C.F.R. § 17.38(b). From its initial promulgation in October 1999 until September 2022, the

medical benefits package expressly excluded certain care, including abortions and abortion

counseling. 64 Fed. Reg. at 54,218.

    **B.**    **Care for Qualifying Beneficiaries**

     In a similar enrollment-based manner, the VA provides health care benefits to eligible

beneficiaries of veterans through CHAMPVA. 38 U.S.C. § 1781(b). Under this statute, the VA

shall provide for medical care to eligible beneficiaries "in the same or similar manner and subject

to the same or similar limitations" as the Department of Defense provides to eligible beneficiaries

under its TRICARE Select program. *Id.; see also* 38 C.F.R. § 17.270; 32 C.F.R. § 199.17. Like the

health care program for veterans, the scope of medical services offered to CHAMPVA beneficiaries

is defined through federal regulations. 38 C.F.R. §17.270. CHAMPVA-covered services include

"medical services and supplies that are medically necessary and appropriate for the treatment of a

condition and that are not specifically excluded under 17.272 (a)(1) through (84)." 38 C.F.R. § 17.270(b). From its promulgation in September 1998 until September 2022, the CHAMPVA medical benefits package expressly excluded "abortion, except when a physician certifies that the life of the mother would be endangered if the fetus were carried to term, [and] abortion counseling." CHAMPVA, 63 Fed. Reg. 48,100-01, 48,105 (Sept. 9, 1998) (to be codified at 38 C.F.R. pt. 17). TRICARE regulations allow for abortion when a physician certifies that the pregnancy was the result of rape or incest, National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239 § 704, 126 Stat. 1632 (2013), or where the life of the mother would be endangered if the fetus were carried to term, 32 C.F.R. § 199.4(e)(2).

## III.    VA's Limitation on Performing Abortions

### A.    The Veterans Health Care Act of 1992 and Section 106

Prior to enacting the 1996 VHCERA, in 1992, Congress passed the Veterans Health Care Act ("VHCA"). The Act devotes an entire Title to Women Veterans Health Programs. Veterans Health Care Act of 1992, Pub. L. No. 102-585 §§ 101–106, 106 Stat. 4943 (1992). Section 106 of the VHCA is expressly identified as a note to the VA Secretary's authority under 38 U.S.C § 1710 and reflects a congressional emphasis on providing reproductive health care and preventative gynecological cancer screenings.

<<38 U.S.C.A. § 1710 NOTE>>

*In furnishing hospital care and medical services under chapter 17 of title 38*, United States Code, the Secretary of Veterans Affairs may provide to women the following health care services: (1) Papanicolaou tests (pap smears), (2) [b]reast examinations and mammography, (3) [g]eneral reproductive health care, including the management of menopause, *but not including under this section infertility services, abortions,* or pregnancy care (including prenatal and delivery care), except for such care relating to a pregnancy that is complicated or in which the risks of complication are increased by a service-connected condition.

*Id.* at § 106 (emphasis added); *see also* App. 0048. In Section 106, Congress, having recognized the threat that gynecological cancers pose to our nation's veterans, sought to specifically support the Secretary in authorizing these services. *See* S. Rep. No. 102-409, at 40 (1992) ("The Committee believes that these additions would provide eligible woman veterans with counseling and services necessary to address an array of women veterans' health-care problems, particularly the apparently disproportionate incidence of reproductive cancers among women veterans."). Notably, Section 106 expressly prohibits the VA from performing abortions. Pub. L. No. 102-585 § 106. After the Congressional mandate in the VHCERA to create a benefits enrollment program, the VA promulgated a medical benefits package in 1999 that expressly excluded abortion, consistent with Section 106. 64 Fed. Reg. at 54,218.

### B.   Limitations on Abortions for CHAMPVA Recipients

As mentioned above, the VA Secretary is required to provide medical care to spouses in that same or similar manner to TRICARE Select. 38 U.S.C. § 1781(b). TRICARE Select currently covers abortions in three situations: rape, incest, and when the life of the mother would be endangered if the fetus were carried to term. 32 C.F.R. § 199.4(e)(2); Pub. L. No. 112-239 § 703. Similarly, CHAMPVA regulations previously provided for abortion "when a physician certifies that the life of the mother would be endangered if the fetus were carried to term." 63 Fed. Reg. at 48,105. In previous regulations, the VA has interpreted the "same or similar manner" phrase in 38 U.S.C. § 1781(b) not to require identical operation to TRICARE Select, instead giving themselves "flexibility to administer the program." CHAMPVA, 87 Fed. Reg. 41,594-02, 41,595 (Jul. 13, 2022) (to be codified at 38 C.F.R. pt. 17). In the past, minor differences have occurred in care, such as CHAMPVA's allowing for annual physical exams. 38 C.F.R. § 17.272(30)(xiii).

**IV.    The VA's Interim Final Rule for Reproductive Health Services**

On June 24, 2022, the Supreme Court of the United States issued its decision in *Dobbs*. 142 S. Ct. 2228. On May 2, 2022, a draft opinion of the *Dobbs* decision was leaked to Politico. App. 0084–0097; Josh Gerstein and Alexander Ward, *Supreme Court has voted to overturn abortion rights, draft opinion shows*, Politico (May 2, 2022, 8:32 PM; updated May 3, 2022, 2:14 PM), https://www.politico.com/news/2022/05/02/supreme-court-abortion-draft-opinion-00029473. In its official opinion, the Court held that the Constitution does not confer a right to abortion and overturned *Roe v. Wade* and *Planned Parenthood v. Casey. Dobbs,* 142 S. Ct. at 2284. With *Roe* and *Casey* no longer precedential, several states activated previously passed "trigger laws," which enacted restrictions on abortions and abortion counseling. *See e.g.* Okla. Stat. tit. 21, § 861; Ark. Code § 5-61-304; Tex. Health & Safety Code §170A.002. After the *Dobbs* decision, Democrat Senators began to pressure President Biden to use federal lands to provide abortion access in states where it was otherwise restricted. App. 0099–0101; Alex Gangitano, *Harris says administration isn't discussing abortion services on federal land*, The Hill (Jun. 27, 2022, 5:03 PM), https://thehill.com/homenews/administration/3538718-harris-says-administration-isnt-discussing-abortion-services-on-federal-land/. On June 29, 2022, Secretary McDonough offered that, "consistent with regulation, VA does not provide abortion services or travel assistance related to abortion procedures" and that at the time, there were no plans to change that. App. 0111.; Leo Shane III, *No plans to increase abortion services at VA after Supreme Court ruling,* Military Times (Jun. 29, 2022), https://www.militarytimes.com/veterans/2022/06/29/no-plans-to-increase-abortion-services-at-va-after-supreme-court-ruling/.

However, less than one month later, the Biden Administration's stance shifted. On July 20, 2022, Secretary McDonough stated that "[the VA is] closely watching what happens for our veterans and if we see that there is a diminution in access to services, or if we see that, because of

10

threatened legal jeopardy to our providers or confusion from our providers about what's allowable, and we think, therefore, that we need to change policy and make those rules, we will." App. 0117–0118; Patricia Kime, *VA Considers Providing Abortions as it Monitors States' Responses to Supreme Court Ruling*, Military.com (Jul. 21, 2022), https://www.yahoo.com/video/va-considers-providing-abortions-monitors-182927345.html. The Secretary noted that "[i]f [the VA is] going to offer [abortion or abortion counseling], we do that through the rules, and I have also said to Congress that we would not surprise them." App. 0118. One week later, twenty-three Democrat and two Independent members of the United States Senate sent a letter to Secretary McDonough, urging the VA to "begin rulemaking to allow veterans and eligible dependents to receive abortions and all abortion-related services." App. 0124; Letter from United States Senators to Secretary McDonough,      Dep't.      of      Veterans      Affs,      (Jul.      28,      2022), https://www.hirono.senate.gov/imo/media/doc/ 07.28.2022_MKH_Letter%20to%20VA%20re_%20Abortion_Final.pdf.

By September 2, 2022, an even more drastic change in the Biden Administration and the VA's stance occurred. The VA press office proudly announced that the Secretary submitted a new interim final rule to the Federal Register allowing the VA to "provide access to abortion counseling and—in certain cases—abortions to pregnant Veterans and VA beneficiaries." App. 0129; Press Release, U.S. Dep't of Veterans Affs., VA will offer abortion counseling and—in certain cases—abortions to pregnant Veterans and VA beneficiaries, (Sept. 2, 2022) (https://www.va.gov/opa/pressrel/pressrelease.cfm?id=5820). The Rule states that "abortion is essential health care," 87 Fed. Reg. at 55,291, and that abortions services are "a responsibility of the provider and a right of the pregnant veteran," *id.* at 55,292. As a VA employee, abortion services immediately became a "Federal dut[y]" for Ms. Carter. *Id.* at 55,294.

The Secretary determined that is was "critical that this rule be published and be made effective immediately." *Id.* at 55,296. To make this determination, the Rule makes a brief argument reciting the dangers of preganacy and childbirth: "pregnancy and childbirth in the United States can result in physical harm and even death for certain pregnant individuals," *id.* at 55,291, and makes misleading statements regarding abortion "bans" across America that cause "urgent risks to the lives and health" of qualifiying women, *id.* at 55,293. To support this evidence, the VA cites two newspaper articles. *Id.* at 55,295 n.38 and n.39. The Rule also cites common pregnancy-related health problems such as "hypertension," "hemorrhage," "newly diagnosed cancer requiring prompt treatment, … intrauterine infections," and others. *Id.* at 55,291.

Normally, the Administrative Procedure Act ("APA") requires agencies to publish new rules in the Federal Register and provide a thirty-day delay for public comment before the regulation becomes effective. 5 U.S.C. § 553. A Secretary may forgo this notice if there is good cause to find that compliance would be impracticable, unnecessary, or contrary to the public interest. 5 U.S.C. § 553(b)(B). The thirty-day delay may also be bypassed if the Secretary finds that good cause exists. 5 U.S.C. § 553(d)(3). In submitting the Rule for publication, Secretary McDonough found that soliciting public comment before the Rule was effective would be "impracticable and contrary to the public interest" and found that good cause was present to bypass the thirty-day delay. 87 Fed. Reg. 55,295. On September 9, 2022, the VA's Rule was published, immediately authorizing abortion services and counseling. 87 Fed. Reg. at 55,287. Less than two weeks after publication, the VA performed its first abortion. App. 0132; Courtney Kube, *VA performs its first abortion weeks after saying it would in certain cases*, NBCNews.com (Sept. 22, 2022, 1:58 PM), https://www.nbcnews.com/health/health-news/va-performs-first-abortion-weeks-saying-certain-cases-rcna49007.

By issuing the Rule, the Sectretary purports to preempt all state and local laws that regulate abortion services: "A State or local civil or criminal law that restricts, limits, or otherwise impedes a VA professional's provision of care permitted by this regulation would be preempted." 87 Fed. Reg. at 55,293–94.

### A.      The Rule provides abortions for veterans.

In the Rule, the VA determined that abortion access for veterans was "needed" under 38 U.S.C. § 1710 when the pregnancy threatens the life *or health* of the mother or is a result of rape or incest. 38 C.F.R. § 17.38(c)(1)(i)–(ii) (emphasis added). Further, the VA determined that abortion counseling was also "needed" and drafted the Rule to remove existing prohibitions on abortion counseling. 87 Fed. Reg. at 55,294. Under the Rule, "[a]ssessment of the conditions, injuries, illness, or diseases that will qualify for this care will be made by appropriate health care professionals on a case-by-case basis." *Id.* at 55,294. Abortions based on rape or incest are performed based on the veteran's self-reporting of the incident. *Id.*

### B.      The Rule provides abortions for CHAMPVA recipients.

The VA also decided that abortions and abortion counseling were "medically necessary and appropriate for treatment of a condition," 38 C.F.R. § 17.272, and inclusion in the benefits for CHAMPVA recipients would be the "same or similar" as the care included in TRICARE Select. 38 U.S.C. § 1781. Prior to the Rule, CHAMPVA beneficiaries could only receive abortions when it was certified that the life of the mother would be endangered, should the pregnancy be carried to term. 63 Fed. Reg. at 48,105. The Rule finds that abortions "must" be available to CHAMPVA recipients, 87 Fed. Reg. at 55,292, and thus amends the pertinent regulation to allow abortions when the health of the mother is endangered or the pregnancy is the result of rape or incest and removes the prohibition on abortion counseling. 87 Fed. Reg. at 55,294. The evidentiary standards

13

for abortions based on life or health of the mother, rape, or incest are the same as those for veterans. *Id.*

## ARGUMENT

The movant seeking a preliminary injunction must establish: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). Plaintiff satisfies each of these factors.

## I.     Plaintiff Is Likely to Succeed on the Merits of Her Claims.

Under RFRA, the VA "shall not substantially burden [Ms. Carter's] exercise of religion, even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1. The VA may only do so when "it demonstrates that application of the burden to the person is in furtherance of a compelling government interest[] and is the least restrictive means of furthering that . . . interest. *Id.* By enforcing the Rule at the Temple VA facility, (A) the government's application of the Rule to Ms. Carter is substantially burdening her religious conscience. Therefore, the VA must prove that is has a compelling interest in doing so. However, (B) because the VA cannot demonstrate that the Rule was properly implemented under the APA, it is impossible to prove that interest.[2]

### A.     Defendants' enforcement of the Rule at the Temple VA facility and application of the Rule to Ms. Carter substantially burdens her sincerely held religious beliefs because it forces her to choose between her job and her religious convictions.

As described above, Ms. Carter sincerely believes that it would be a sin for her to perform, prescribe, or counsel for abortions or work in a facility that performs abortions for reasons other

---

[2] Because the VA is unable to prove its compelling government interest, no analysis of least restrictive means is needed in this brief. *See U.S. Navy SEALs 1–26 v. Biden*, 578 F. Supp. 3d 822, 837 (N.D. Tex. 2022) ("Without a compelling interest, the Court need not address whether Defendants have used the least restrictive means.")

than to save the life of the mother. Defendants may not question the reasonableness of her religious beliefs. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724–25 (2014) (stating the Court's "narrow function" is "not for us to say that their religious beliefs are mistaken or insubstantial" but "to determine whether the line drawn reflects an honest conviction") (cleaned up); *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715 (1981) ("We see, therefore, that [Plaintiff] drew a line, and it is not for us to say that the line he drew was an unreasonable one. Courts should not undertake to dissect religious beliefs . . . ).

Further, the VA is always bound to implement federal law consistent with RFRA, which is a "super statute, displacing the normal operation of other federal laws." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1754 (2020); *see* 42 U.S.C. § 2000bb-3(a) (providing that RFRA applies to "implementation" of "all Federal law"); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,* 140 S. Ct. 2367, 2389 (2020) (Alito, J., concurring) (noting that HHS, as a federal agency, is "obligated to" implement federal law "in a manner that complies with RFRA"). Accordingly, the VA must show that it is absolutely clear that it will not enforce or apply the Rule in a manner that places a substantial burden on Ms. Carter's sincerely held religious beliefs.

Presently, the VA's application of the Rule substantially burdens Ms. Carter's exercise of religion by putting "substantial pressure" on her to "to modify [her] behavior and to violate [her] beliefs." *Thomas,* 450 U.S. at 718. Courts have recognized the heavy burden government imposes on religious exercise when it forces a person to choose between her job and her religious beliefs, as Ms. Carter must now do. *See Sherbert v. Verner*, 374 U.S. 398, 404 (1963); *see also Sambrano v. United Airlines, Inc.*, 19 F.4th 839, 841 (5th Cir. 2021) (Ho, J., dissenting) ("Forcing individuals to choose between their faith and their livelihood imposes an obvious and substantial burden on

religion."). Because the VA's application of the Rule requires Ms. Carter to counsel for and provide abortion services and to work in a facility that participates in abortion for reasons other than to save the life of the mother, it forces her to decide whether to lose her livelihood or violate her sincerely held religious beliefs. Because she will not compromise her religious beliefs about abortion, Ms. Carter faces the possibility of discipline or termination, as well as criminal and civil liability under Texas law, which is discussed more fully in Section I.B.1.c, below.

As a VA Nurse Practitioner, Ms. Carter must follow the VA's rules and regulations. The Rule makes it clear that abortion counseling is "a responsibility of the provider and a right of the pregnant veteran." 87 Fed. Reg. at 55,292. Abortion counseling "will be provided," "just as counseling is offered or covered by VA regarding any other health care decision." *Id.* The Rule states that "abortion is essential health care," *id.* at 55,291, and that abortion services are a "Federal dut[y]" for VA employees, *id.* at 55,294. Currently, Ms. Carter's work requires her to see both men and women for routine visits, including pregnant women, in the course of her official duties. App. 004. She must follow all VA rules about care for pregnant veterans, including conducting pregnancy testing and prescribing relevant medications. App. 0004–0006. On any given day, her clinical privileges allow her to see a pregnant woman; therefore, she is compelled by the Rule's application to offer abortion counseling or prescribe abortifacients. App. 0004. For Ms. Carter, this is something she simply cannot do.

On October 11, Ms. Carter received an email advising her that she and other primary care providers will prescribe medications "to end first trimester pregnancies under certain circumstances" if she does not have an approved religious accommodation. App. 0005, 0010. And yet, the Rule makes no mention of religious exemptions or accommodations to its requirements, despite its obvious implications for religious health care professionals who cannot perform,

prescribe, or counsel for abortions. Alarmed by this email, twice Ms. Carter requested a religious accommodation not to perform, prescribe, or counsel for abortion—on October 18 and 27. App. 0005-0006, 0012, 0014. Each time, her supervisor told her there is no process to request a religious accommodation and "No, this email will not suffice . . . the process is not in place yet." *Id.*

As of today, Ms. Carter cannot request a religious accommodation. App. 0006. To Ms. Carter's knowledge, the VA still has not formed a process for receiving such requests, more than three months after implementing the Rule, and the VA has given no indication that it would be willing to refrain from performing abortions at the Temple VA facility. *Id.*

**B.    Defendants do not have a compelling government interest that justifies burdening Ms. Carter's religious beliefs because the VA cannot demonstrate that the Secretary had the authority to issue the Rule.**

Because the Rule, as applied, substantially burdens Ms. Carter's religious conscience, the burden of proof shifts to the VA to demonstrate they have a compelling government interest in applying the Rule to Ms. Carter. 42 U.S.C. § 2000bb-1. However, any assertion of a compelling government interest must fail because the VA has no interest in enforcing improperly-issued regulations and the VA cannot demonstrate that the issuance of the Rule was a lawful exercise of authority by the Secretary. Under 5 U.S.C. § 706, a rule is invalid if it is "[1] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . [2] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . [or 3] without observance of procedure required by law." 5 U.S.C. § 706(2). Using the framework of § 706 as a guide, the VA simply cannot demonstrate a compelling interest in applying an unlawful rule in a manner that violates Ms. Carter's sincerely held religious beliefs.

1.    **The Secretary's underlying rulemaking actions are arbitrary, capricious, an abuse of discretion, or otherwise not accordance with law.**

a.    **The Rule violates Congress's thirty-year express prohibition on the VA performing abortion services for veterans.**

"[A]pplying the ordinary tools of statutory construction," it is clear that "Congress has directly spoken to the precise question at issue" in the Rule. *Arlington v. FCC*, 569 U.S. 290, 296 (2013). While 38 U.S.C. § 1710 provides the Secretary with broad authority to furnish specified veterans with "hospital care and medical services which the Secretary determines to be needed," Section 106 of the VHCA, enacted as a note to § 1710, expressly limits that authority by disallowing abortion services. Pub. L. No. 102-585 § 106. This clear and unambiguous prohibition was reinforced when it was reflected in the medical benefits packages promulgated for veterans pursuant to the VHCERA. 64 Fed. Reg. at 54,218. Because the "intent of Congress [over the past three decades has been] clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Arlington*, 569 U.S. at 296 (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-843 (1984)).

Additional tools of statutory construction further support this view. The VHCA "is a specific provision applying to a very specific situation" and 38 U.S.C. § 1710, "on the other hand, is of general application. Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974). "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Id*. at 551. Because 38 U.S.C. § 1710 and Section 106 of the VHCA have harmoniously and effectively co-existed for the past thirty years, absent Congress' expressly providing the

Secretary with the specific grant of authority that he now proclaims, the VA is unable to demonstrate that the Rule has any effect.

In the Rule, the Secretary makes two large presumptions to avoid conflict with Section 106: (1) that the "[VHCERA] effectively overtook section 106 of the [VHCA]" when the VA provided for pregnancy and certain infertility services as part of the establishment of the veterans benefits package in 1999 and (2) that "the Deborah Sampson Act of 2020 did not reference section 106 of the VHCA and only referenced VA's medical benefits package[, implying] that Congress did not interpret section 106 of the VHCA as a limitation on VA's authority to provide care to 'women veterans.'"[3] 87 Fed. Reg. at 55,289. Not only are these and other similar statements made in the Rule unpersuasive, but the Secretary's argument on this point fails as a matter of law.

"The cardinal rule is that repeals by implication are not favored. Where there are two acts upon the same subject, effect should be given to both, if possible." *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936). "[T]he intention of the legislature to repeal must be clear and manifest; otherwise, at least as a general thing, the later act is to be construed as a continuation of and not a substitute for, the first act and will continue to speak, so far as the two acts are the same, from the time of first enactment." *Id*. The VA cites no clear evidence in the Rule that Congress repealed Section 106.

The fact that the VA provided for pregnancy and certain infertility services as part of the establishment of the veterans' medical benefits package in 1999 does not render their decision to provide for abortions proper. The Rule states that "a veteran in 1992 was only eligible for

---

[3] "[W]hen Congress enacted the Deborah Sampson Act of 2020, Public law 116-315, tit. V (2021), it created a central office to, inter alia, 'monitor[ ] and encourag[e] the activities of the Veterans Health Administration with respect to the provision, evaluation, and improvement of health care services provided to women veterans by the Department.' 38 U.S.C. 7310(b)(1). Congress defined 'health care' for the purposes as '*the health care and services included in the medical benefits package* provided by the Department *as in effect on the day before the date of the enactment of this Act [Jan 5. 2021].*' 38 U.S.C. 7310 note." 87 Fed. Reg. at 55,289 (emphasis added).

pregnancy and delivery care under section 106 if the pregnancy was complicated or the risks of complication were increased by a service-connected condition." 87 Fed. Reg. at 55,289. But when the Secretary later established the medical benefits package for veterans, general pregnancy and delivery services and certain infertility services were included, despite Section 106's express prohibition on such services. *Id*. Accordingly, the Secretary believes that the VA may likewise disregard Section 106's prohibition on the provision of abortions. *Id*. But that the provision of uncontroversial benefits prohibited by Section 106 went unchallenged does not mean that the VA has authority to provide abortions in the face of Congress's opposition.

The Secretary's additional assertion that Section 106 is somehow without legal effect because it was not referenced in the Deborah Sampson Act should also be disregarded. When the Deborah Sampson Act was enacted, Congress defined "health care" as "the health care and services included in the medical benefits package provided by the Department as in effect on the day before the date of the enactment of this Act [Jan. 5, 2021]." *Id*. As the VA directly points out in the Rule, "[a]mong other services, '[a]bortions and abortion counseling' are currently excluded from the medical benefits package, with no exceptions," and have been excluded for the past thirty years. *Id*. at 55,288. To assume that the Deborah Sampson Act did not account for Congress' abortion exclusion would be contrary to a plain reading of the veterans' medical benefits package that was in effect before January 5, 2021.

Therefore, because of Section 106's express prohibition on abortion services, the VA cannot demonstrate a compelling interest that justifies enforcing the Rule and applying it to Ms. Carter in a manner that substantially burdens her religious beliefs.

**b.     The Rule violates the command that CHAMPVA benefits must be the same or similar to TRICARE Select benefits.**

The VA is required by law to administer CHAMPVA benefits in "the same or similar manner" as DoD's TRICARE Select. 38 U.S.C. § 1781. TRICARE Select covers abortions in instances of rape or incest, and provides for healthcare when the life of the mother is endangered by the pregnancy. Pub. L. No. 112-239 § 704; 32 C.F.R. § 199.4(e)(2). By the VA's own interpretation, "same or similar" in § 1781 does not require identicality. 87 Fed. Reg. at 55,290. Before the Rule, the only difference between CHAMPVA benefits and TRICARE benefits was the performance of abortion in the limited circumstances of rape and incest. Now instead of more similarly aligning CHAMPVA and TRICARE benefits, the VA creates an even larger disparity between the benefits than that which existed before. Congressional and state leaders have publicly criticized the Secretary for the real purpose of the Rule—allowing the VA to perform abortions if the *health* of the mother would be endangered. App. 0174–0181; 0196–0205; 0206–0207. But, the term "health" is Orwellian doublethink.[4] Discussed in depth in part I.B.2, *supra*, allowing abortions when the *health* of the mother is at risk without defining the term "heath" nor providing express gestational limits is the equivalent of abortion on demand—far different from TRICARE's limited offering. In its Rule, the VA provides examples of deviations between TRICARE and CHAMPVA, arguing that in some circumstances, CHAMPVA care "goes beyond the benefits offered by TRICARE (Select)." 87 Fed. Reg. at 55,290. However, these examples, such as CHAMPVA providing for annual physical exams and waiving Medicare beneficiary costs associated with preventative costs where TRICARE does not, are miniscule when compared to the

---

[4] According to George Orwell's *1984* protagonist, Winston Smith, "doublethink" is [t]o know and not to know, to be conscious of complete truthfulness while telling carefully constructed lies, . . . to use logic against logic, to repudiate morality while laying claim to it . . . ." George Orwell, *1984* 22 (HarperCollins 1949). For example, "War is Peace," "Freedom is Slavery," "Ignorance is Strength," or abortion is healthcare.

offering of unrestricted abortion. *Id.* What the VA claims to be "aligning" is better phrased as "expanding." For that reason, the Rule violates the command that CHAMPVA benefits must be the same or similar to TRICARE benefits and is therefore an arbitrary and capricious expansion of CHAMPVA benefits that is not in accordance with law. Thus, the VA simply cannot demonstrate a compelling interest that justifies applying the Rule to Ms. Carter in a manner that substantially burdens her religious beliefs.

> **c.   Defendants are acting in an arbitrary and capricious manner by enforcing a Rule that, as applied to Ms. Carter, exposes her to criminal and civil liability under Texas law.**

Because the VA cannot demonstrate that the Rule was issued in accordance with the law, the VA has made the arbitrary and capricious determination that state laws prohibiting abortions do not apply to the VA's enforcement of the Rule at facilities that operate under concurrent jurisdiction with the state, such as the Temple VA facility. This determination is patently false because, as the Majority Staff of the House Committee on Veterans Affairs' Report on Reproductive Healthcare for Veterans determined, the facility in which Ms. Carter works does not have "exclusive federal law enforcement jurisdiction, and it remains to be seen how this [concurrent jurisdiction] status will come into play in states that have enacted criminal laws or civil penalties related to abortion." App. 0147; Majority Staff of the House Committee on Veterans' Affairs, Report on Reproductive Healthcare for Veterans 12 (Nov. 7, 2022), https://veterans.house.gov/imo/media/doc/report_on_reproductive_healthcare_for_veterans.pdf.

Ms. Carter risks prosecution and civil liability under Texas law for performing or assisting in abortions. Texas law presently prohibits abortions unless the abortion is to save the life of the mother or to prevent a serious risk of substantial impairment of a major bodily function. Tex. Health & Safety Code § 170A.002. Under the Texas Human Life Protection Act, which was triggered by the decision in *Dobbs,* "[a] person who violates the Act commits a first-degree felony

if an unborn child dies as a result, a second-degree felony if the child lives, incurs civil penalties of no less than $100,000 for each violation, and may lose his or her professional license." App. 0158; Tex. Att'y Gen., Updated Advisory on Texas Law Upon Reversal of *Roe v. Wade* (July 27, 2022),

https://texasattorneygeneral.gov/sites/default/files/images/executive-management/Updated%20P ost-Roe%20Advisory%20Upon%20Issuance%20of%20Dobbs%20Judgment%20(07.27.2022).p df; Tex. Health & Safety Code § 170A.004–.007. Under the Texas Heartbeat Act, which was enacted prior to the *Dobbs* decision and prohibits abortions when a physician can detect a fetal heartbeat, "any person . . . may bring a civil action against any person who: performs or induces an abortion . . . [or] knowingly engages in conduct that aids or abets the performance or inducement of abortion." Tex. Health & Safety Code § 171.208.

      While the Department of Justice heralded that "states may not restrict VA and its employees acting within the scope of their federal authority from providing abortion services as authorized by federal law, including VA's rule," this opinion is entirely speculative and presumes the Rule was adopted in accordance with the law. App. 0170; Intergovernmental Immunity for the Dep't of Veterans Affs. and Its Emps. When Providing Certain Abortion Servs., 46 Op. O.L.C.    (slip op.) (Sept. 21, 2022). As noted in the Report on Reproductive Healthcare for Veterans, "none of the VA medical facilities [are] aware of the extent to which they could prevent employees from being targeted by local or state authorities seeking to enforce state laws, even if VA employees were involved in providing abortions within the scope of their federal employment." App. 0147; Report on Reproductive Healthcare for Veterans, *supra,* at 12. Therefore, Defendants' application of the Rule has placed Ms. Carter into a Hobson's choice: lose her job or violate her sincerely held

religious beliefs while potentially incurring criminal and civil liability. During her proud tenure at the VA, Ms. Carter has never been faced with such an untenable crisis of conscience. App. 0004.

And the threat of consequences is serious. The Attorney General of Texas has advised that he will "strictly enforce [abortion] law." App. 0173; Tex. Att'y Gen., Advisory on Texas Law upon Reversal of *Roe* *v.* *Wade*, https://www.texasattorneygeneral.gov/sites/default/files/images/executive-management/Post-Roe%20Advisory.pdf. In response to the Rule, the Attorney General of Texas signed onto a letter with fifteen other states' Attorneys General written to the VA, warning that "[t]hose who perform abortions based on the [Rule]—and in defiance of state or federal laws—do so at their own risk." App. 0179; Letter from Lynn Fitch, Att'y Gen. of Miss., to Secretary McDonough, Dep't of Veterans Affs. 5 (Nov. 17, 2022) (https://files.constantcontact.com/6b6ea99f701/b8bc7f90-39b4-4085-bc66-64b3fa5ae8a7.pdf?utm_medium=email&utm_campaign=855206&refcd=855206&utm_source=RelevantResources&seid=10576876). By signing this letter, Attorney General Paxton agreed that he "will not allow [the VA] to use this rule to erect a regime of elective abortions that defy state law." *Id.*

Ms. Carter is licensed by the State of Texas as a nurse practitioner. *Id.* The Texas Board of Nursing ("the Board") oversees a criminal investigations unit to investigate suspected criminal acts related to the practice of nursing, and it may assist Federal, State, or local law enforcement agencies in the investigation and prosecution of crimes related to the practice of nursing. Tex. Occ. Code § 301.161. Nurses are mandatory reporters, Tex. Occ. Code § 301.402, meaning a nurse must report to the Board any incident in which that nurse has reasonable cause to suspect that another nurse has violated a Board rule and contributed to the death or serious injury of a patient, or that

constitutes abuse or violation of professional boundaries, Tex. Occ. Code § 301.401. If a nurse licensed in Texas fails to report conduct subject to reporting, the Board may take punitive action against that nurse. Tex. Occ. Code § 301.411. A licensed nurse who engages in unprofessional conduct in the practice of nursing that is *likely to injure a patient or the public* constitutes grounds for disciplinary action by the Board. Tex. Occ. Code § 301.452(b)(10) (emphasis added). A person who engages in such conduct is subject to denial of a license or other disciplinary action. *Id*.

Defendants' application of the Rule to Ms. Carter requires her compliance. But because the VA cannot demonstrate a compelling interest that justifies applying the Rule to Ms. Carter, she is subject to severe penalties under Texas law.

> **2.    The Secretary's actions are in excess of his statutory jurisdiction and authority because he does not have clear congressional authorization to impose a rule on such a profound issue of vast economic and political significance.**

Given "both separation of powers principles and a practical understanding of legislative intent," the Secretary must "point to 'clear congressional authorization' for the authority [he] claims." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (quoting *Util. Air Regul. Grp. v. EPA,* 573 U.S. 302, 324 (2014)). Precedent reminds us that "Congress intends to make major policy decisions itself," and does "not leave those decisions to agencies." *U.S. Telecom Ass'n. v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc). "Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *West Virginia*, 142 S. Ct. at 2609 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). Congress does not typically use "oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme." *Id*. (quoting *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co*., 512 U.S 218, 229 (1994)).

Even if the Rule had a "colorable textual basis," this is the extraordinary case "in which the 'history and the breadth of the authority that [the Secretary] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *West Virginia,* 142 S. Ct. at 2608–09 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000)). As the Supreme Court has recognized, "Congress . . . does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns., Inc.*, 531 U.S. 457, 468 (2001).

Yet, the VA has discovered the elephant of abortion rights in the mouseholes of 38 U.S.C. §§ 1710 and 1781. Despite express prohibition for veterans and limiting circumstances for CHAMPVA beneficiaries, the VA must now rapidly adjust course to accommodate the Secretary's political whim and provide nearly unlimited abortion services to hundreds of thousands qualifying veterans and CHAMPVA beneficiaries across one of the largest health care systems in the world.

While "[i]t is unclear what exactly constitutes 'vast economic significance' . . . courts have generally considered an agency action to be of vast economic significance if it requires 'billions of dollars in spending.'" *Brown v. U.S. Dep't. of Ed.*, No. 4:22-cv-0908-P, 2022 WL 16858525, at *11 (N.D. Tex. Nov. 10, 2022) (quoting *King v. Burwell,* 576 U.S. 473, 485 (2015)). In *BST Holdings, L.L.C. v. OSHA*, the Fifth Circuit "held that $3 billion in compliance costs was enough to trigger the major-questions doctrine." *Brown* at *11. Considering the sheer magnitude of the VA health care system, with Congress appropriating $336.14 billion in budgetary resources to the VA in fiscal year 2022,[5] there is no question that the Secretary's newly proclaimed authority to provide

---

[5] Although the VA has not explained the economic impact the Rule will have on fiscal year 2023 budgetary spending, RAND researcher Kayla Williams (the former director of the Center for Women Veterans at the VA) said during her testimony before the U.S. House of Representatives Committee on Veterans' Affairs on September 15, 2022, that about 260,000 women veterans of reproductive age currently live in states with significant abortion restrictions. App. 0186;   Test.   of   Kayla   M.   Williams,   Comm.   on   Veterans'   Affs   (Sept.   15,   2022),

abortion services is one that will have vast economic significance for veterans, their qualifying beneficiaries, and ultimately, the American taxpayer.

The Rule is also an issue of incredible political significance. The *Dobbs* majority acknowledges this very fact: "[i]t is time to heed the Constitution and return the issue of abortion to the people's elected representatives. 'The permissibility of abortion, and the limitations upon it, are to be resolved like the most important questions in our democracy: by citizens trying to persuade one another and then voting.'" *Dobbs*, 142 S. Ct. at 2243 (quoting *Planned Parenthood of Se. Pa. v. Casey,* 505 U.S. 833, 979 (1992) (Scalia, J., concurring in judgment in part and dissenting in part)). The *Dobbs* majority recognized the political import of abortion:

> Abortion presents a profound moral issue on which Americans hold sharply conflicting views. Some believe fervently that a human person comes into being at conception and that abortion ends an innocent life. Others feel just as strongly that any regulation of abortion invades a woman's right to control her own body and prevents women from achieving full equality. Still others in a third group think that abortion should be allowed under some but not all circumstances, and those within this group hold a variety of views about the particular restrictions that should be imposed.

*Dobbs,* 142. S. Ct. at 2240.

Understandably, the Rule itself has become a hot topic of political debate among federal lawmakers and states' Attorneys General who have publicly weighed in on the Rule's legality and what constitutes abortion as a "health-related" service. On October 11, 2022, Senator James Lankford, along with thirty-eight other Congressional leaders, wrote "in strong opposition to the

---

https://www.rand.org/content/dam/rand/pubs/testimonies/CTA2300/CTA2350-1/RAND_CTA2350-1.pdf. An estimated 70,000 VA patients may be affected by the rule changes. App. 0192; Leo Shane III, *Republicans threaten lawsuits, budget penalties over VA abortion move*, Federal Times (Sept. 15, 2022), https://www.federaltimes.com/veterans/2022/09/15/republicans-threaten-lawsuits-budget-penalties-over-va-abortion-move. "[Dr. Shereef Elnahal, VA's Under Secretary for Health also] told lawmakers that he expects about 1,000 abortions to be performed by VA annually. App. 0193. But he also noted the number could rise as the number of women veterans in America grows in coming years. *Id.* To implement the Rule, the Secretary announced that the "VA will ensure that all necessary staffing and equipment are available at sites. App. 0192. Provider guidance and training, to the extent training is necessary, also are being finalized." *Id.*

[Rule]" explaining in detail the reasons why it "directly violates the VA's explicit statutory prohibition on abortion that has governed the VA for more than 30 years and has never been repealed." App. 0197; Sen. James Lankford and Members of Congress, Comment Letter on Interim Final Rule, Improving Access to Abortion and Abortion Counseling for Veterans and CHAMPVA Beneficiaries 1 (Oct. 11, 2022), https://downloads.regulations.gov/VA-2022-VHA-0021-57729/attachment_1.pdf. The public comment advised the Secretary that the "VA does not have the power to override an Act of Congress to impose its preferred policy of taxpayer-funded abortion on demand until birth" and that, "[t]ragically, the [Rule] is the latest in a long string of actions the Biden Administration has taken to promote the killing of unborn children through abortion in the aftermath of the Supreme Court's decision in *Dobbs*." *Id*. The public comment further demanded that the Secretary "immediately rescind the [Rule] and revert the VA's policies to the long-standing prior regulation excluding abortion and abortion counseling from the VA's medical benefits package as well as the CHAMPVA program, in conformity with the law and Congressional intent." *Id*.

One month later, on November 17, 2022, fifteen states' Attorneys General wrote a similar letter, advising the Secretary that the Rule "is deeply flawed . . . [and] rests on a claim of legal authority that the VA does not have and it purports to override duly enacted state laws on matters within traditional state authority." App. 0176; Letter from Lynn Fitch, *supra,* at 2. This letter also points out the "real motivation" behind the VA's rule: "And the fact that States already soundly legislate on [abortion and exceptions for the life of the mother] tends to confirm that the real motivation behind the rule is to create a mechanism for allowing purely elective abortions that States have appropriately prohibited or to send a political signal to the Administration's political base—or both." App. 0178; *Id.* at 4.

While the Rule claims that, "[a]fter *Dobbs*, certain States have begun to enforce existing abortion bans and restrictions on care, and are proposing and enacting new ones, creating urgent risks to the lives and health of pregnant veterans and CHAMPVA beneficiaries in these States," this is largely farcical. 87 Fed. Reg. at 55,288. Post-*Dobbs*, all fifty states with abortion restrictions continue to recognize that removal of a fetus is a legal medical procedure when the life of the mother is endangered. *See, e.g.,* Tex. Health & Safety Code § 170A.002, Okla. Stat. tit. 21, § 861. And while many states permit abortion in the instance of rape or incest, the Secretary is clearly seeking to arbitrarily expand the definition of abortion services to include *for any health-related reason*, which is excessively broad, contrary to the religious objections of many VA employees, and far outside the scope of any authority Congress would have ever delegated, either explicitly or impliedly.[6] In a letter, Senator Lankford points out the oxymoronic nature of the VA offering abortions as health care: "Healthcare protects life. Abortion takes life. Instead of promoting the taking of human life, I would challenge you, and others within the VA, to respect the dignity of our veterans and all of their family members, including unborn children, by ensuring services provided and funded by the VA are focused on true healthcare consistent with federal law." App. 0207; Letter from Sen. James Lankford of Okla. to Secretary McDonough, Dep't of Veterans Affs. (Aug. 26, 2022) (https://www.lankford.senate.gov/download/2022-08-26-letter-to-mcdonough-ifr).

While the Rule does not provide a comprehensive criteria of how the *health* of a pregnant veteran or CHAMPVA beneficiary could be endangered if abortion services were not provided, a broad definition of "health" can be gleaned from the public comment of twenty-three states'

---

[6] The Secretary asserts that veterans and CHAMPVA beneficiaries "will be able to obtain abortions, if determined needed by a healthcare professional, when the life or the *health* of the pregnant veteran [or beneficiary] would be endangered if the pregnancy were carried to term or the pregnancy is the result of an act of rape or incest." 87 Fed. Reg. at 55,288 (emphasis added).

Attorneys General representing the Administration's political base who lauded the Secretary for providing abortion services as "healthcare." App. 0213; Attorneys General of California, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Illinois, Iowa, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington, Comment Letter on Interim Final Rule, Improving Access to Abortion and Abortion Counseling for Veterans and CHAMPVA Beneficiaries 5 (Oct. 11, 2022), https://downloads.regulations.gov/VA-2022-VHA-0021-53367/attachment_1.pdf. The examples and reasoning for permitting abortions in those instances were astounding: "[c]hildren born as a result of abortion denial are more likely to live below the federal poverty level than children born from a subsequent pregnancy to women who received the abortion," "for those pregnant individuals who already have other children, research has shown that denying these pregnant individuals the abortion they seek leads all of their children to have lower mean child development scores and being more likely to live below the poverty line than children whose parent received a wanted abortion," "[p]hysical violence is a further risk, because carrying an unwanted pregnancy to term can cause a pregnant person to remain in contact with a violent partner," and "[l]ack of access to abortion also results in poorer socioeconomic outcomes, including lower rates of full-time employment and increased reliance on publicly funded safety-net programs." App. 0211–212; *Id.* at 3–4. Although the Secretary claims the VA will not participate in elective abortions, the plain text of the Rule includes no such statement and the term "health" is so broad as to effectively constitute elective abortion. The Rule also does not include an express gestational age limitation on the abortions it plans to provide.

Therefore, because the VA cannot demonstrate that 38 U.S.C. §§ 1710 and 1781 provide the Secretary with clear congressional authority to regulate an issue of such economic and political

30

significance as abortion, the VA has no compelling interest in Defendants' applying the Rule to

Ms. Carter in a manner that substantially burdens her religious beliefs.

### 3.    The Secretary issued the Rule without observance of procedure required by law.

The Rule violates the APA's and VA's own procedural rulemaking requirements because it

is a substantive rule that did not go through the required notice and comment process before

implementation. 5 U.S.C. § 553. Substantive rules "grant rights, impose obligations, or produce

other significant effects on private interests." *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715

F.2d 897, 908 (5th Cir. 1983) (citation omitted); *see also Phillips Petroleum Co. v. Johnson*, 22

F.3d 616, 619 (5th Cir. 1994). Pursuant to 5 U.S.C. § 553(b), "[g]eneral notice of proposed rule

making shall be published in the Federal Register." Notice is not required "when the agency for

good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or

contrary to the public interest." 5 U.S.C. § 553(b)(B). "After notice . . . the agency shall give

interested persons an opportunity to participate in the rulemaking through submission of

[comments]." 5 U.S.C. § 553(c). Thereafter, "[t]he required publication of a substantive rule shall

be made not less than 30 days before its effective date," unless certain circumstances apply. 5

U.S.C. § 553(d). A substantive rule may not be enforced against a party if it does not undergo

notice and comment. *See Brown*, 2022 WL 16858525; *see also Phillips Petroleum*, 22 F.3d at 621.

The Rule is substantive because it "grant[s] rights, impose[s] obligations, [and] produce[s]

other significant effects on private interests." *W&T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 237

(5th Cir. 2019) (quoting *Phillips Petroleum*, 22 F.3d at 621). First, by removing the previous

abortion exclusions in its medical benefits package regulations, it creates a legal right to abortion

and abortion counseling for qualifying veterans and beneficiaries. 38 C.F.R. §§ 17.38, 17.272. The

Rule goes so far as to use rights and obligations language: "Access to abortions is 'needed'";

"access to abortion . . . *must* be available to CHAMPVA beneficiaries"; "[a]bortion counseling is a . . . *responsibility* of the provider and a *right* of the pregnant veteran." 87 Fed. Reg. at 55,291–92 (emphasis added). Second, the Rule purports to preempt state and local laws that would prevent VA health care professionals from performing abortion services: "A State or local civil or criminal law that restricts, limits, or otherwise impedes a VA professional's provision of care permitted by this regulation would be preempted." *Id.* at 55,293–94. An agency rule that displaces state laws on a matter of great public interest, such as abortion, qualifies as a rule that imposes obligations and produces "significant effects" on private interests. Accordingly, the Rule is a substantive rule that should have gone through notice and comment rulemaking.

Notably, the Rule never denies that it is a substantive rule. Instead, it sidesteps the notice and comment requirement by claiming to have "good cause" to do so, 5 U.S.C. § 553(b)(B), because it would be "impractical and contrary to the public interest" to do notice and comment. 87 Fed. Reg. at 55,296.

An agency has good cause to bypass notice and comment when it would be "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). The standard for the good cause exception is "stringent," *See Louisiana v. Becerra,* 577 F. Supp. 3d 483, 500 (W.D. La. 2022), and circumstances justifying the exception are "rare," *Council of S. Mountains, Inc. v. Donovan,* 653 F.2d 573, 580 (D.C. Cir. 1981). Courts should "read narrowly" the good cause exception to avoid giving agencies "an escape clause" from Congress' statutory requirements for rulemakings. *U.S. v. Johnson,* 632 F.3d 912, 928 (5th Cir. 2011) (holding that the need for immediate guidance under the Sex Offender Registration and Notification Act and in prior attempts to protect the public were not good cause). And the exception should be invoked only in true "emergency situations." *See Sorenson Commc'ns Inc. v. FCC,* 755 F.3d 702, 706 (D.C. Cir. 2014).

32

The Rule, however, relies upon specious and general allegations of harm and urgency, and fails to allege sufficient facts showing how the normal rulemaking process would have been "impractical and contrary to the public interest," as it claims. 87 Fed. Reg. 55,296.

First, the VA asserts that the Rule must go into effect immediately to provide urgent, lifesaving care to qualifying women, but it offers only scant factual support for its dire claims. 87 Fed. Reg. 55,288. The Rule warns, "pregnancy and childbirth in the United States can result in physical harm and even death for certain pregnant individuals." *Id.* at 55,291. The Rule points to state laws regulating abortion in the days following *Dobbs* that the Rule repeatedly and misleadingly describes as "bans." *Id.* at 55,293. However, they are not bans, because all fifty states permit health care providers to end a pregnancy to save the life of the mother. *See* App. 0223–0226; Rachel N. Morrison, O. Carter Snead, and Natalie Dodson, Comment Letter on Interim Final Rule, Improving Access to Abortion and Abortion Counseling for Veterans and CHAMPVA Beneficiaries 3–6 (Oct. 11, 2022), https://downloads.regulations.gov/VA-2022-VHA-0021-57904/attachment_1.pdf. The Rule neglects to disclose this crucial fact and conveniently colors the issue by asserting that state abortion laws pose "urgent risks to the lives and health" of qualifying women. 87 Fed. Reg. 55,288. Doctors, the VA claims, will refuse to provide lifesaving care—already established here to be lawful in every state—either because of confusion about what care is legal or because the provider will fear state reprisal. *Id.* at 55,293, 55,295.

The Rule attempts to establish that doctors will refuse lifesaving care by citing to a *Washington Post* article to prove that providers are confused about abortions in states where abortion is more heavily regulated. *Id.* at 55,295 n.38. To support the claim that doctors fear reprisals, the VA cites a single *New York Times* news article. *Id.* at 55,295 n.39. But a "newspaper article alone does not provide good cause to bypass notice-and-comment rulemaking procedures,"

even when the article supports the agency's reasoning. *Cap. Area Immigrants' Rts. Coal. v. Trump,* 471 F. Supp. 3d 25, 46 (D.D.C. 2020).

Second, the VA undercut its own claims of urgency when it took two-and-a-half months to publish the Rule from when *Dobbs* was published on June 24, 2022. *See Louisiana,* 577 F. Supp. 3d at 500, (holding that HHS could not successfully invoke the good cause exception after waiting less than three months—82 days—before implementing an interim final rule). The agency's delay is more pronounced when timing the Rule from the leaked draft majority opinion, which announced that the Court likely planned to overturn *Roe* on May 2, 2022. From that date, the VA took 130 days, almost four-and-a-half months, to publish the Rule. And although the VA had ample time to gather facts to show a true emergency, it failed to identify in the Rule a single instance of a woman who was denied a medically necessary abortion during those months. Thus, the VA alleges an emergency where there is none, and its warnings about possible loss of life fall flat when viewing more facts than just those that are politically expedient.

Third, the Rule presents abortion as an urgent solution for certain health risks without providing sufficient evidentiary support for that claim in the Rule. The VA insists that abortion is immediately needed because some veterans and beneficiaries will experience common pregnancy-related health problems such as "hypertension," "hemorrhage," "newly diagnosed cancer requiring prompt treatment, . . . intrauterine infections," and others. 87 Fed. Reg. 55,291. But the Rule never explains why those health problems should be, or can only be, addressed by abortion. Moreover, the VA never identifies a single instance where abortion is the only possible treatment for that particular health condition. The VA's failure to substantiate its urgent claims about the need for abortions further demonstrates that the agency lacks good cause to circumvent the notice and comment process.

Because the VA cannot demonstrate that the Secretary complied with the APA's required rulemaking procedure, the VA has no compelling interest in applying the Rule to Ms. Carter and the Temple VA facility.

## II.     Ms. Carter Is Suffering Irreparable Injury.

Ms. Carter has established that she is presently suffering irreparable injury. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The same is true of the loss of RFRA rights. *See Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) ("[The *Elrod v. Burns*] principle applies with equal force to the violation of RLUIPA rights because RLUIPA enforces First Amendment freedoms, and the statute requires courts to construe it broadly to protect religious exercise. . . . In the closely related RFRA context (the predecessor statute to RLUIPA), courts have recognized that this same principle applies."); *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013) ("Hobby Lobby and Mardel have established a likely violation of RFRA. We have explicitly held—by analogy to First Amendment cases—that establishing a likely RFRA violation satisfies the irreparable harm factor.").

The VA's application of the Rule to Ms. Carter substantially burdens her liberty interests and puts her to a choice between her job and violating her sincerely held religious beliefs. *See BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). Ms. Carter's religious conscience tells her that she cannot participate in, prescribe, or counsel for abortion; nor can she work in a facility that participates in or endorses such practices for reasons other than to save the life of the mother. App. 0004. Because the VA is applying the Rule to Ms. Carter without consideration for her religious objections, the VA is infringing on Ms. Carter's religious liberty rights under RFRA and the First Amendment, which is an irreparable injury as a matter of law. *See id*. at 618 (citing *Elrod*, 427 U.S. at 373). "Forcing individuals to choose between their faith and their livelihood

imposes an obvious and substantial burden on religion." *Sambrano*, 19 F.4th at 841 (Ho, J., dissenting).

Ms. Carter's irreparable injury is exacerbated by the fact that the Rule, as applied, subjects her to criminal and civil liability under Texas law. "[B]ecause these injuries are inextricably intertwined with [Ms. Carter's] loss of constitutional rights, this Court must conclude that [Ms.Carter has] suffered irreparable harm." *U.S. Navy SEALs 1–26 v. Biden*, 578 F. Supp. 3d at 839 (N.D. Tex. Jan. 3, 2022). As explained in Section I.B.1.c. above, the Temple VA facility is not presently operating under exclusive federal jurisdiction. The State of Texas has a legal interest in that facility, thereby establishing concurrent jurisdiction with the federal government. Texas Attorney General Ken Paxton has publicly stated that his office is "specifically authorized to pursue and recover civil penalties for violations of the [Texas Human Life Protection Act]" and that he is "ready to assist any local prosecutor who pursues criminal charges." App. 0159; Updated Advisory on Texas Law, *supra.* State licensing authorities are also ready to act and "shall revoke the license, permit, registration, certificate, or other authority of a physician or other health care professional who performs, incudes, or attempts an abortion in violation of' the Act." *Id.* (quoting Tex. Health & Safety Code § 170A.007). As a nurse, Ms. Carter must report to the Board of Nursing any incident in which that nurse has reasonable cause to suspect that another nurse has violated a board rule and contributed to the death or serious injury of a patient, or that constitutes abuse or violation of professional boundaries. Tex. Occ. Code § 301.401. If a nurse licensed in Texas fails to report conduct subject to reporting, the Board of Nursing may take punitive action against that nurse. Tex. Occ. Code § 301.411.

During her proud tenure at the VA, Ms. Carter has never been faced with such an untenable crisis of conscience. App. 0004. It is impossible to imagine a world where Ms. Carter can continue

to perform her daily duties in a manner that not only substantially burdens her religious beliefs, but also imposes the threat of criminal prosecution and civil State action. All of these injuries cannot be remedied by a later-issued court and are irreparable as a matter of law.

**III.    The Balance of Harms and the Public Interest in Protecting Civil Liberties Weigh in Favor of an Injunction.**

The balance of harms and public interest likewise strongly favor an injunction. "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). An injunction will not disserve the public interest where "it will prevent constitutional deprivations." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (citing *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.")). Here, there is no question that Ms. Carter is being deprived of her RFRA and First Amendment rights and that such injury, in conjunction with the prospect of being subjected to criminal prosecution and civil liability under Texas law for compliance with the Rule, as applied, is irreparable and worthy of injunctive relief. Ms. Carter's "loss of religious liberties outweighs any forthcoming harm to the [VA]. Even the direst circumstances cannot justify the loss of constitutional rights." *U.S. Navy SEALs 1–26*, 578 F. Supp. 3d at 840. There is no public interest served by the VA's application of the Rule to Ms. Carter and the Temple VA facility. Thus, injunctive relief should follow.

**IV.    The Court Should Waive the Requirement of a Security Bond.**

The Court should waive any bond required by Federal Rule of Civil Procedure 65(c) as these issues involve the free exercise of religion, there is no money at stake in issuance of the injunction, and no financial impact on the Defendants. *See Kaepa, Inc. v. Achilles Corps.*, 76 F.3d 624, 628 (5th Cir. 1996) (recognizing district courts have discretion to waive the bond requirement

of Rule 65(c)); *see also Gordon v. Houston*, 79 F Supp. 3d 676, 695 (S.D. Tex. 2015) (waiving

Rule 65 bond in a First Amendment lawsuit).

## CONCLUSION

Wherefore, this Court should grant this Motion for a Preliminary Injunction.

Respectfully submitted this 13th day of December, 2022.

CHRISTINE PRATT*
  Florida Bar No. 0100351
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. NW
Suite 1410
Washington, DC 20004
(202) 921-4105
cpratt@firstliberty.org

*/s/ Jeffrey C. Mateer*
JEFFREY C. MATEER
  Texas Bar No. 13185320
DAVID J. HACKER
  Texas Bar No. 24103323
MICHAEL D. BERRY
  Texas Bar No. 24085835
JUSTIN E. BUTTERFIELD
  Texas Bar No. 24062642
DANIELLE A. RUNYAN*
  New Jersey Bar No. 027232004
HOLLY M. RANDALL
  Texas Bar No. 24128002
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy., Ste. 1600
Plano, Texas 75075
(972) 941-4444
jmateer@firstliberty.org
dhacker@firstliberty.org
mberry@firstliberty.org
jbutterfield@firstliberty.org
drunyan@firstliberty.org
hrandall@firstliberty.org

* Application for admission
  *pro hac vice* pending

## CERTIFICATE OF CONFERENCE

Plaintiff's counsel were unable to conference this motion with Defendants' counsel because no counsel has appeared for Defendants. However, once counsel for Defendants file appearance, Plaintiffs' counsel will confer with them.

*/s/ Jeffrey C. Mateer*
JEFFREY C. MATEER

**CERTIFICATE OF SERVICE**

I hereby certify that on December 13, 2022, I electronically filed the foregoing document through the Court's ECF system and will serve a copy on each of the Defendants according to the Federal Rules of Civil Procedure.

*/s/ Jeffrey C. Mateer*
JEFFREY C. MATEER