**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

STEPHANIE CARTER,

      Plaintiff,

v.                                                                                                No. 6:22-cv-1275-A

DENIS RICHARD MCDONOUGH, in his
official capacity as United States Secretary of
Veterans Affairs, and the UNITED STATES
DEPARTMENT OF VETERANS AFFAIRS,

      Defendants.

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................3

I.      Statutory and Regulatory Background..........................................................................3

     A.     Congress's Comprehensive Personnel Scheme Governing VA Employees.................3

     B.     Provision of Medical Care Through the Veterans Health Administration ...................4

     C.     VA's Interim Final Rule Regarding Reproductive Health Services..............................5

     D.     VA's Practice of Accommodating Religious Beliefs .......................................................6

II.     Factual Background ........................................................................................................8

III.    Procedural History .......................................................................................................10

LEGAL STANDARD ..........................................................................................................10

ARGUMENT .......................................................................................................................11

I.      This Court Lacks Jurisdiction Over Plaintiff's Claims..............................................11

     A.     Ms. Carter Has Been Granted an Accommodation that Permits Her to Abstain From Performing Any Abortion Care or Counseling, and Her Remaining Facility-Wide Claim Is Not Ripe. .....................................................................11

     B.     Plaintiff's Claims are Barred by VA's Comprehensive Personnel System and the Civil Service Reform Act. .....................................................................................15

     C.     Pursuant to 38 U.S.C. § 502, This Court Lacks Jurisdiction Over Plaintiff's Claim......................................................................................................................16

II.     Plaintiff Is Virtually Certain Not to Succeed on the Merits of Her RFRA Claim....................20

     A.     Plaintiff Has Not Demonstrated that VA's Independent Provision of Abortion Care Substantially Burdens Her Religious Exercise. ......................................22

          1.     Plaintiff's Objection to the Government's Independent Provision of Abortion Services Does Not Establish a Cognizable Substantial Burden Under RFRA......................................................................................22

          2.     The VA IFR Does Not Require that Plaintiff Engage in Conduct that Substantially Burdens Her Religious Exercise. ....................................................26

     B.     The Provision of Abortion Services, Including at the Temple Facility, Serves Compelling Interests, and Offering the Services at Issue while Providing Ms.

Carter with an Individual Accommodation is the Least Restrictive Means of Achieving those Interests. ...................................................................................28

    1.    VA Has Compelling Interests ...............................................................29

    2.    Personally Accommodating Ms. Carter Is the Least Restrictive Means of Furthering VA's Compelling Interests. ..........................................31

C.    The Interim Final Rule Was Lawfully Promulgated, and Implementing It Is a Compelling Government Interest. ...............................................................33

    1.    It Is Within the Secretary's Authority to Determine Which Medical Services Are "Needed" in the Medical Benefits Package..............................34

    2.    The IFR Was Validly Promulgated Pursuant to the Secretary's Authority to Provide Medical Benefits to CHAMPVA Beneficiaries............39

    3.    The Major Questions Doctrine is Inapplicable. .................................40

    4.    The Interim Final Rule Is Not Arbitrary or Capricious Because It Does Not Expose Plaintiff to Civil or Criminal Liability Under Texas Law.............................................................................................42

    5.    The Secretary Had Good Cause to Forgo Notice and Comment and Make the Interim Final Rule Effective Immediately. ........................43

III.    Plaintiff Cannot Satisfy the Balance of Harms or Public Interest Prongs................44

CONCLUSION..........................................................................................................45

# TABLE OF AUTHORITIES

**Cases**

*Abbott Lab'y v. Gardner,*
387 U.S. 136 (1967) ............................................................................................................14

*Adorers of the Blood of Christ ("ABC") v. FERC,*
897 F.3d 187 (3d Cir. 2018) ..............................................................................................18

*Alabama Ass'n of Realtors v. HHS,*
141 S. Ct. 2485 (2021) ......................................................................................................41

*Arizonans for Off. English v. Arizona,*
520 U.S. 43 (1997) ............................................................................................................12

*Astrue v. Capato ex rel. B.N.C.,*
566 U.S. 541 (2012) ..........................................................................................................34

*Austin v. U.S. Navy SEALs 1-26,*
142 S. Ct. 1301 (2022) ......................................................................................................29

*Biden v. Missouri,*
142 S. Ct. 647 (2022) ........................................................................................................44

*Bowen v. Roy,*
476 U.S. 693 (1986) ..............................................................................................22, 23, 24

*Bright v. Lehman,*
725 F.2d 788 (D.C. Cir. 1984) ..........................................................................................20

*BST Holdings, L.L.C. v. OSHA,*
17 F.4th 604 (5th Cir. 2021) ..............................................................................................45

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) ....................................................................................................*passim*

*Byrum v. Landreth,*
566 F.3d 442 (5th Cir. 2009) ........................................................................................44, 45

*Chinnock v. Turnage,*
995 F.2d 889 (9th Cir. 1993) ............................................................................................17

*City of Austin v. Kinder Morgan Tex. Pipeline, LLC,*
447 F. Supp. 3d 558 (W.D. Tex. 2020) ............................................................................10

*City of Tacoma v. Taxpayers of Tacoma,*
357 U.S. 320 (1958) ..........................................................................................................17

*Cochran v. SEC,*
 20 F.4th 194 (5th Cir. 2021)................................................................................14

*Council of S. Mountains, Inc. v. Donovan,*
 653 F.2d 573 (D.C. Cir. 1981)...........................................................................44

*Cutter v. Wilkinson,*
 544 U.S. 709 (2005)................................................................................... 32, 33

*Davis v. United States,*
 495 U.S. 472 (1990)................................................................................... 35, 39

*Dierlam v. Trump,*
 977 F.3d 471 (5th Cir. 2020)...............................................................................12

*DM Arbor Ct., Ltd. v. City of Houston,*
 988 F.3d 215 (5th Cir. 2021)...............................................................................14

*Dobbs v. Jackson Women's Health Organization,*
 142 S. Ct. 2228 (2022)...........................................................................................6

*Drummond Coal Co. v. Watt,*
 735 F.2d 469 (11th Cir. 1984).............................................................................17

*E. Paralyzed Veterans Ass'n, Inc. v. Sec'y of Veterans Affs.,*
 257 F.3d 1352 (Fed. Cir. 2001)............................................................34, 36, 38

*E. Tex. Baptist Univ. v. Burwell,*
 793 F.3d 449 (5th Cir. 2015)...............................................................................21

*Elgin v. Dep't of Treas.,*
 567 U.S. 1 (2012) ..........................................................................................3, 15, 16

*Elrod v. Burns,*
 427 U.S. 347 (1976)..............................................................................................45

*Emp. Div. v. Smith,*
 494 U.S. 872 (1990)..............................................................................................24

*FDA v. Brown & Williamson Tobacco Corp.,*
 529 U.S. 120 (2000)..............................................................................................41

*Fligiel v. Samson,*
 440 F.3d 747 (6th Cir. 2006).................................................................................4

*Franciscan Alliance v. Becerra,*
 47 F.4th 368 (5th Cir. 2022)...............................................................................13

*Gen. Fin. Corp. v. FTC,*
  700 F.2d 366 (7th Cir. 1983) ................................................................................................18

*Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal,*
  546 U.S. 418 (2006) ............................................................................................... 24, 29

*Gonzales v. Oregon,*
  546 U.S. 243 (2006) ...........................................................................................................42

*Griener v. United States,*
  900 F.3d 700 (5th Cir. 2018) ........................................................................................ 15, 16

*Griffin v. Dep't of Veterans Affs.,*
  274 F.3d 818 (4th Cir. 2001) ............................................................................................

*Hakki v. Dep't of Veterans' Affs.,*
  7 F.4th 1012 (11th Cir. 2021) ..............................................................................................4

*Hall v. Dep't of Veterans Affs.,*
  85 F.3d 532 (11th Cir. 1996) ...............................................................................................17

*Holt v. Hobbs,*
  574 U.S. 352 (2015) ...........................................................................................................21

*Intel Corp. Inv. Policy Comm. v. Sulyma,*
  140 S. Ct. 768 (2020) .........................................................................................................37

*Jifry v. FAA,*
  370 F.3d 1174 (D.C. Cir. 2004) ..........................................................................................43

*Jones v. Cain,*
  600 F.3d 527 (5th Cir. 2010) ..............................................................................................28

*Jones v. United States,*
  625 F.3d 827 (5th Cir. 2010) ..............................................................................................19

*Kaemmerling v. Lappin,*
  553 F.3d 669 (D.C. Cir. 2008) ............................................................................................32

*Kirkhuff v. Nimmo,*
  683 F.2d 544 (D.C. Cir. 1982) ............................................................................................34

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
  511 U.S. 375 (1994) ...........................................................................................................16

*Ligon v. LaHood,*
  614 F.3d 150 (5th Cir. 2010) ........................................................................................ 19, 20

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
140 S. Ct. 2367 (2020)...................................................................................................41

*Lorillard v. Pons,*
434 U.S. 575 (1978)......................................................................................................36

*Lyng v. Nw. Indian Cemetery Protective Ass'n,*
485 U.S. 439 (1988).............................................................................. 22, 23, 24, 26

*Mims v. Arrow Fin. Servs., LLC,*
565 U.S. 368 (2012)......................................................................................................17

*Morton v. Mancari,*
417 U.S. 535 (1974)......................................................................................................38

*Morton v. Ruiz,*
415 U.S. 199 (1974)......................................................................................................34

*Murphy v. Hunt,*
455 U.S. 478 (1982)......................................................................................................12

*N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York,*
140 S. Ct. 1525 (2020)..................................................................................................12

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
538 U.S. 803 (2003)......................................................................................................14

*Navajo Nation v. U.S. Forest Serv.,*
535 F.3d 1058 (9th Cir. 2008).....................................................................................26

*Nken v. Holder,*
556 U.S. 418 (2009)......................................................................................................45

*Paralyzed Veterans of Am. v. Sec'y of Veterans Affs.,*
345 F.3d 1334 (Fed. Cir. 2003)............................................................................. 34, 42

*PCI Transp. Inc. v. Fort Worth & W. R.R. Co.,*
418 F.3d 535 (5th Cir. 2005)........................................................................................11

*Preminger v. Principi,*
422 F.3d 815 (9th Cir. 2005)...........................................................................17, 18, 20

*Priests for Life v. HHS,*
808 F.3d 1 (D.C. Cir. 2015)..........................................................................................28

*Roark & Hardee LP v. City of Austin,*
522 F.3d 533 (5th Cir. 2008)........................................................................................14

*Sherbert v. Verner,*
374 U.S. 398 (1963) ............................................................................................................27

*Sierra Club v. U.S. Dep't of Interior,*
990 F.3d 909 (5th Cir. 2021) ..............................................................................................42

*Simopoulos v. Virginia,*
462 U.S. 506 (1983) ............................................................................................................29

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'r,*
239 F. Supp. 3d 77 (D.D.C. 2017) ........................................................................21, 22, 27

*Texas v. United States,*
523 U.S. 296 (1998) ............................................................................................................14

*Thomas v. Review Bd. Of Ind. Emp. Sec. Div.,*
450 U.S. 707 (1981) ............................................................................................................27

*Thomas v. Union Carbide Agric. Prods. Co.,*
473 U.S. 568 (1985) ............................................................................................................14

*Tompkins v. Dep't of Veterans' Affs.,*
16 F.4th 733 (10th Cir. 2021) ....................................................................................4, 15, 16

*U.S. Steel Corp. v. EPA,*
595 F.2d 207 (5th Cir. 1979) ..............................................................................................43

*United States v. Fausto,*
484 U.S. 439 (1988) ..............................................................................................................3

*United States v. Johnson,*
529 U.S. 53 (2000) ..............................................................................................................42

*United States v. Johnson,*
632 F.3d 912 (5th Cir. 2011) ..............................................................................................44

*United States v. Washington,*
142 S. Ct. 1976 (2022) ........................................................................................................42

*Univ. of Dallas v. Burwell,*
136 S. Ct. 2008 (2016) ........................................................................................................21

*Univ. of Notre Dame v. Burwell,*
786 F.3d 606 (7th Cir. 2015) ..............................................................................................31

*Veterans for Common Sense v. Shinseki,*
678 F.3d 1013 (9th Cir. 2012) ............................................................................................18

*Walmart Inc. v. Dep't of Justice,*
  21 F.4th 300 (5th Cir. 2021) ........................................................................14

*West Virginia v. EPA,*
  142 S. Ct. 2587 (2022) ..................................................................................41

*Winter v. Nat. Res. Def. Council,*
  555 U.S. 7 (2008) .................................................................................... 10, 11

*Zubik v. Burwell,*
  578 U.S. 403 (2016) .......................................................................................21

*Zummer v. Sallet,*
  37 F.4th 996 (5th Cir. 2022) ................................................................... 15, 16

**Statutes**

5 U.S.C. § 552 ......................................................................................................17

5 U.S.C. § 553 ............................................................................... 17, 19, 20, 43

5 U.S.C. § 706 ............................................................................................ 18, 34

5 U.S.C. § 1214 ......................................................................................................4

5 U.S.C. § 1221 ......................................................................................................4

5 U.S.C. § 2105 ......................................................................................................4

5 U.S.C. § 2301 ....................................................................................................16

5 U.S.C. § 2302 ............................................................................................. 4, 16

28 U.S.C. § 1331 ..................................................................................................18

38 U.S.C. § 502 ............................................................................................*passim*

38 U.S.C. § 1701 ........................................................................................... 4, 41

38 U.S.C. § 1705 ....................................................................................................4

38 U.S.C. § 1710 .........................................................................................*passim*

38 U.S.C. § 1712 ..................................................................................................35

38 U.S.C. § 1781 ................................................................................5, 30, 39, 40

38 U.S.C. § 7401 *et seq.* .......................................................................................................3

38 U.S.C. § 7461 ....................................................................................................................3

38 U.S.C. § 7462 ....................................................................................................................4

38 U.S.C. § 7463 ....................................................................................................................4

38 U.S.C. § 7464 ....................................................................................................................4

38 U.S.C. § 7310 ..................................................................................................................36

38 U.S.C. §7310A ................................................................................................................36

42 U.S.C. § 2000bb .............................................................................................................24

42 U.S.C. § 2000bb-1 ...............................................................................................18, 21, 28

1992 Veterans Health Care Act,
    Pub. L. No.  102–585, 160 Stat. 4943 (Nov.  4, 1992) .....................................................35

Consolidated Appropriations Act, 2022,
    Pub. L. No. 117-103, Div. H, secs. 506–07, 136 Stat. 49, 496 (Mar. 15, 2022) .................37

**Regulations**

38 C.F.R. § 17.38 ...................................................................................................5, 6, 38, 43

38 C.F.R. § 17.270 ...........................................................................................................5, 40

38 C.F.R. § 17.272 .........................................................................................................*passim*

38 C.F.R. § 17.384 ..................................................................................................................5

63 Fed. Reg. 48,100 (Sept. 9, 1998) ....................................................................................41

64 Fed. Reg. 54,207 (Oct. 6, 1999) .......................................................................................5

87 Fed. Reg. 55,287 (Sept. 9, 2022) ..............................................................................*passim*

**Other Authorities**

139 Cong. Rec. 26,193 (1993) (Sen. Hatch) ......................................................................25

139 Cong. Rec. 26,415 (Sen. Grassley) ..............................................................................25

Abortion Can Be Medically Necessary, Am. College of Obstetricians and Gynecologists
    (Sept. 25, 2019), http://www.acog.org/news/news-releases/2019/09/abortion-can-be-
    medically-necessary ......................................................................................................30

Congressional Research Service, Veterans Health Administration: Gender-Specific Health Care Services for Women Veterans (Mar. 11, 2021) ..................................................36

Dep't of Veterans Affairs, VA Directive 5975 (Apr. 2021) ........................................ 6

H.R. Rep. No. 103-88 (1993) ..........................................................................24

H.R. Rep. No. 104–690 (1996) ........................................................................38

Intergovernmental Immunity for the Department of Veterans Affairs and Its Employees When Providing Certain Abortion Services, 46 Op. O.L.C. __ (Sept. 21, 2022) ...................... 36, 42

S. Rep. No. 103-111 (1993) ....................................................................... 24, 25

Veterans Health Administration Directive 10-93-151, December 6, 1993, https://perma.cc/52SU-JK3D ..................................................................... 35, 41

Veterans Health Administration, U.S. Dep't of Veterans Affs., https://www.va.gov/health..............................................................................4

## INTRODUCTION

In September 2022, the Department of Veterans Affairs (VA) amended its regulations to provide certain veterans and beneficiaries access to abortion counseling, as well as abortion care under specified circumstances—when the life or health of the pregnant patient would be endangered if the pregnancy were carried to term or the pregnancy is the result of rape or incest. *See* Reproductive Health Services, Interim Final Rule (IFR), 87 Fed. Reg. 55,287 (Sept. 9, 2022).  The Secretary of Veterans Affairs determined that this care was necessary to ensure that, irrespective of what laws or policies States may impose, covered veterans and beneficiaries who receive care from VA will be able to access life- and health-preserving medical care.

Plaintiff Stephanie Carter is a nurse practitioner employed by VA at the Olin E. Teague Veterans' Center in Temple, Texas, a facility that serves more than 7,000 female patients each year. Ms. Carter alleges that she has a religious objection to providing abortion care as part of her duties for VA, and she sought a religious accommodation from VA exempting her from performing those duties. VA has now granted that accommodation, and specifically informed Ms. Carter that she is not required to personally provide abortion care, including performing, prescribing, or counseling for abortion.

Through this lawsuit, however, Ms. Carter also seeks broader relief—specifically, an injunction against the Temple VA facility's provision of *any* abortions, even when Ms. Carter does not personally participate—because Ms. Carter now asserts that she has a religious objection to working at a facility that provides abortions for reasons other than to save the life of the pregnant patient.  Ms. Carter did not raise this objection with VA prior to filing this lawsuit; but after the objection was raised, VA asked on December 22, 2022, whether transferring Ms. Carter to a different facility that does not perform abortions, such as an administrative or specialized-care facility, would accommodate her objection.  Ms. Carter has not directly responded to VA's inquiry (though her counsel recently asked for more information about it).  Regardless, Ms. Carter continues to seek an emergency injunction from this Court, seeking to prevent the Temple VA facility from providing *any* abortions—even those necessary to save a pregnant patient's life, as to which Ms. Carter has not asserted a religious objection. This request for a facility-wide prohibition is not a request for a religious accommodation; it is a

request for a religious veto.  Nothing in the Religious Freedom Restoration Act (RFRA) supports such a sweeping request.

This Court should deny Plaintiff's motion for a preliminary injunction for several reasons.  As an initial matter, the Court lacks jurisdiction.  Ms. Carter has now received an accommodation, pursuant to which she is not required to perform, prescribe, or provide counseling for any abortion services in the course of her work at the Temple VA facility, which necessarily moots her RFRA claim seeking a personal accommodation.  That leaves Ms. Carter's allegation that she is harmed from working in a facility in which others perform abortions.  But such a claim is not cognizable, and even if it were, is not ripe for judicial review because Ms. Carter has thus far declined to engage with VA staff that have offered to discuss possible options for her to transfer to another VA facility that does not perform abortions.  And even if her claims were otherwise justiciable, they would be barred by the comprehensive personnel system in Title 38 and the Civil Service Reform Act, which govern employment-related claims of Title 38 employees like Plaintiff.  Additionally, pursuant to 38 U.S.C. § 502, Congress has vested exclusive jurisdiction over challenges to VA rulemakings in the U.S. Court of Appeals for the Federal Circuit.  Ms. Carter's RFRA claim asks this Court to examine the validity of a VA rulemaking under the APA, rendering district court review unavailable.

Apart from lack of jurisdiction, Ms. Carter has not established a likelihood of success on the merits of her RFRA claim for several reasons.  First, the burden Ms. Carter alleges—namely, that the government's own provision of medical care without her participation violates her religious precepts—is not cognizable under RFRA.  Ms. Carter is not required to personally provide such abortion care or counseling; she is therefore not personally forced to engage in conduct with which she disagrees, nor is she coerced to adhere to or forbear from conduct because of a threatened sanction.  As a matter of established case law, the government's independent provision of services— here, abortion care that Ms. Carter is exempt from providing—cannot establish a cognizable substantial burden on Ms. Carter's exercise of religion under RFRA.

Second, VA has a compelling interest in ensuring that patients at the Temple VA facility receive medically necessary health care under the IFR, and the personal accommodation provided to

Ms. Carter is the least restrictive means of ensuring that covered veterans and beneficiaries can receive care in their local VA facility, including at the Temple VA facility.  VA also has a compelling interest in being able to determine, for valid administrative reasons and in order to efficiently offer a full range of care to veterans, which of its facilities will provide which forms of medical care, without having to account for the possibility that whenever an employee finds a form of care religiously objectionable, the VA would have to shift that service away to other facilities.  Ms. Carter's sole counterargument on the compelling interest prong is an attempt to litigate the merits of an Administrative Procedure Act (APA) claim under the guise of RFRA's compelling interest analysis, which is foreclosed by the jurisdictional bar in 38 U.S.C. § 502.  Regardless, the VA IFR was lawfully promulgated, and Plaintiff's APA-based arguments lack merit on their own terms.

Finally, for similar reasons, Plaintiff cannot satisfy the balance of harms or public interest prongs required to obtain extraordinary preliminary relief.  Plaintiff cannot demonstrate irreparable harm, given VA's granting of her personal accommodation and expressed willingness to explore a potential transfer.  And an injunction granting a single employee veto power over the spectrum of medical services offered by other employees to covered veterans and their beneficiaries at a VA facility would disserve the public interest.

## BACKGROUND

## I.   Statutory and Regulatory Background

### A.  Congress's Comprehensive Personnel Scheme Governing VA Employees

Most federal employee-employer relationships are governed by the Civil Service Reform Act (CSRA), which the Supreme Court has long held provides the exclusive means for covered employees to redress employment disputes, including alleged constitutional violations.  *See Elgin v. Dep't of Treas.*, 567 U.S. 1, 11-12 (2012); *United States v. Fausto*, 484 U.S. 439, 455 (1988).  For certain VA employees, however, Congress has created a separate personnel scheme.  Specifically, nurse practitioners (like Ms. Carter) are governed by the Title 38 personnel system.  *See* 38 U.S.C. § 7401 *et seq.*

Under the Title 38 personnel scheme, "major adverse actions"—such as removal, discharge, or transfer, 38 U.S.C. § 7461(c)—taken against certain Title 38 employees and involving a question of

professional conduct or competence may be appealed to an internal Disciplinary Appeals Board, with the availability of subsequent judicial review.  *See id.* §§ 7462, 7464.  For adverse personnel actions not involving major adverse actions or not arising out of a question of professional conduct or competence, certain Title 38 employees may seek redress through an internal grievance or through grievance procedures determined through collective bargaining, but not both.  *See id.* § 7463.  Similar to the CSRA, this Title 38 personnel system is likewise exclusive and does not allow for employment-related appeals outside of those granted by Congress.  *See generally Tompkins v. Dep't of Vet. Affairs*, 16 F.4th 733 (10th Cir. 2021); *Hakki v. Dep't of Vet. Affairs*, 7 F.4th 1012 (11th Cir. 2021); *Fligiel v. Samson*, 440 F.3d 747 (6th Cir. 2006).  Moreover, Title 38 employees are covered by one element of the CSRA scheme—employees may submit complaints to the Office of Special Counsel (OSC) challenging prohibited personnel practices, and invoke the various remedies associated with that process.  *See* 5 U.S.C. § 2105(f) (stating that Title 38 employees shall be considered employees for purposes of OSC-related CSRA provisions); *see also id.* §§ 1214 (describing OSC complaint process), 1221 (discussing individual right of action appeal), 2302 (defining adverse actions and prohibited personnel practices).

## B.  Provision of Medical Care Through the Veterans Health Administration

The Department of Veterans Affairs provides health care to nine million enrolled veterans through its Veterans Health Administration (VHA), the largest integrated health care system in the country.  *See* Veterans Health Administration, U.S. Dep't of Veterans Affs., https://www.va.gov/health.  Enrollment in the VA health care system is determined by statute.  *See* 38 U.S.C. § 1705.  For those veterans enrolled in the VA health care system, subject to certain other criteria, VA provides hospital care and medical services.  The Veterans' Health Care Eligibility Reform Act of 1996 directs VA to establish and operate a nationwide patient enrollment system for providing hospital and medical care to veterans.  The Act directs the Secretary of Veterans Affairs to "furnish hospital care [and] medical services . . . which the Secretary determines to be needed." 38 U.S.C. § 1710(a)(1)-(3).  As relevant here, such "medical services" include "medical examination, treatment," "[s]urgical services," and "[p]reventive health services."  *Id.* § 1701(6).

The Secretary implements this general authority by regulation, and determines what care is

"needed" as part of the VA's medical benefits package, first established in 1999. *See* 38 C.F.R. § 17.384; *see also* Enrollment – Provision of Hospital and Outpatient Care to Veterans, Final Rule, 64 Fed. Reg. 54,207 (Oct. 6, 1999).  The medical benefits package consists of a wide range of basic and preventive care, including inpatient and outpatient medical and surgical care, prescription drugs, emergency care, pregnancy and delivery services, and periodic medical exams.  38 C.F.R. § 17.38(a).  Care included in the medical benefits package is "provided to individuals only if it is determined by appropriate health care professionals that the care is needed to promote, preserve, or restore the health of the individual and is in accord with generally accepted standards of medical practice."  *Id.* § 17.38(b).

The Secretary is also authorized to provide certain medical care and services to spouses, children, survivors, and caregivers of veterans who meet certain eligibility criteria. 38 U.S.C. § 1781(a).[1] This program is known as the Civilian Health and Medical Program of the Department of Veterans Affairs (CHAMPVA).  Under CHAMPVA, VA must provide medical care "in the same or similar manner and subject to the same or similar limitations as medical care" provided by the Department of Defense to active-duty family members, retired service members and their families, and others under the TRICARE (Select) program.  *See id.* § 1781(b).  VA has regulated services covered by CHAMPVA to include those medical services that are medically necessary and appropriate for the treatment of a condition and that are not specifically excluded by regulation. 38 C.F.R. §§17.270(b), 17.272.  Prior to September 2022, VA regulations excluded abortion care and counseling from both the medical benefits package and the services provided by CHAMPVA, except that CHAMPVA covered abortions where the life of the pregnant person would be endangered if the pregnancy were carried to term.

### C.  VA's Interim Final Rule Regarding Reproductive Health Services

On September 9, 2022, the Secretary issued an IFR amending the restrictions on medical services covered in the medical benefits package and by CHAMPVA so that medical coverage includes: (1) providing abortions that a health care professional determines are needed when the life

---

[1] For ease of reference, Defendants refer to this population as "beneficiaries" or "CHAMPVA beneficiaries."

or health of the pregnant veteran or beneficiary would be endangered if the pregnancy were carried to term or if the pregnancy is the result of an act of rape or incest, and (2) providing abortion counseling. *See* 87 Fed. Reg. 55,287; 38 C.F.R. §§ 17.38(c)(1)(i)-(ii), 17.272(a)(64)(i)-(ii).

The Secretary determined that an IFR removing restrictions on abortion coverage from the medical benefits package and CHAMPVA was necessary in light of the rapidly diminishing access to reproductive health care in many States across the country. After the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), many States acted to restrict access to abortion, with varying degrees of exceptions for medical necessity or where the pregnancy is the result of rape or incest. In response, VA sought to ensure that, irrespective of what laws or policies States may impose, veterans who receive care from VA set forth in the medical benefits package will be able to obtain abortion counseling and care, if a health care professional determines such care to be needed, when the life or the health of the pregnant veteran would be endangered if the pregnancy were carried to term or where the pregnancy is the result of rape or incest. 38 C.F.R. § 17.38(c)(1)(i)-(ii). Similarly, VA acted to ensure CHAMPVA beneficiaries can obtain abortion counseling and care in the same set of circumstances. The IFR became effective immediately to minimize the amount of time that veterans and beneficiaries would potentially lack access to vital health- and life-preserving medical care and counseling.

### D.   VA's Practice of Accommodating Religious Beliefs

It has long been VA's practice to accommodate religious exemption requests from its employees. *See, e.g.*, Dep't of Veterans Affairs, VA Directive 5975, ¶ 2(b)(1) (Apr. 2021) (attached as Exhibit J) (noting VA policy to "Provide timely and effective religious accommodation and Reasonable Accommodation to applicants and employees"); *id.* ¶ 5(m) (defining religious accommodation as, *inter alia*, "[a] change in the work environment or in work schedule that enables an individual to adhere to his/her religious practices or beliefs"). For example, VA has granted accommodations to employees when it is contrary to their religion to fill or dispense birth control pills, work on holy days, or remove facial hair. *See* Babcock Decl. ¶ 6. Likewise, at VA, compensatory time for religious reasons is the only type of compensatory time that can be used before it is earned,

and VA will frequently permit employees to adjust their work schedules to facilitate time off for prayer or specific days off for religious observances.  *Id.* ¶ 6.  Supervisors at particular VA facilities routinely process requests for religious accommodations consistent with applicable policies and regulations. Fashina Decl. ¶¶ 8-9.

One week prior to the publication of the IFR, the Secretary of VA sent a Department-wide email to all employees, reiterating that religious beliefs are protected at VA.  *See* Ex. D. Similarly, on October 17, 2022, VA's Under Secretary for Health informed VHA employees that VA is committed to respecting individuals' sincere religious objections to participation in abortions or abortion counseling, and informed employees that the Department was developing formal guidance for processing such requests in connection with the IFR. *See* Ex. E.  In the meantime, VA granted interim accommodations to eligible employees pursuant to its general accommodation policies. *See* Babcock Decl. ¶ 9 ("The guidance provided to the VHA human resources personnel and Reproductive Health representatives from each VISN prior to release of the final accommodation policy documents was that employees who requested to be excused from providing some aspect of reproductive health care should be granted an interim accommodation to be excused from the aspect of care at issue.").  Such guidance that interim accommodations be issued (pending the development of the formal guidance) was conveyed throughout VHA.  *Id.* ¶¶ 9-10.

On January 6, 2023, the Department finalized its Reasonable Accommodation policy specific to the IFR and issued a Memorandum to VHA's Central Office Senior Leaders and Medical Center Directors which explained the policy, reminded supervisors and Human Resource coordinators of the process for religious accommodation requests, and provided additional guidance to share with employees. *See* Ex. F.  The Memorandum reiterated that VA "respects the rights of employees who carry out our mission every day," and "[t]o that end, employees and applicants may request to be excused from providing, participating in, or facilitating an aspect of clinical care, including reproductive health clinical care." *Id.* at 2.  The memorandum specifically stated that "if excusal is requested, supervisors should grant interim excusal for employees from duties or training regarding reproductive health care while requests are being processed." *Id.*; *see also* Babcock Decl. ¶ 9.

## II.     Factual Background

Plaintiff Stephanie Carter is a nurse practitioner currently employed at the Olin E. Teague Veterans' Center in Temple, Texas.  Compl. ¶ 2, ECF No. 1.  This facility is a full-service VA hospital serving Temple and the surrounding community.  Fashina Decl. ¶ 15.  Ms. Carter states that she "is a devout Christian" who has "a sincere religious objection to abortion and object[s] to its practice." Carter Decl. (Pl.'s App'x 0003) ¶¶ 8, 10; *see also id.* ¶ 14 ("Pursuant to my religious conscience, I cannot perform, prescribe, or counsel for abortions, or work in a facility in which abortions are performed for reasons other than to save the life of the mother.").

On October 11, 2022, Ms. Carter received an email from her supervisor, which forwarded an earlier email from VA's national Primary Care Office, discussing the new IFR and informing VA primary care providers that they can request a reasonable accommodation "if they have a moral/ethical objection" to performing abortion care.  *See* Carter Decl., Ex. A (Pl.'s App'x 0010).  On October 18, 2022, Ms. Carter wrote to one of her supervisors, Dr. Katherine Fong, requesting more information about the religious accommodation process referenced in the October 6, 2022 email, and Dr. Fong informed her that there was "more information to come" but that "we cannot apply yet."  *Id.* Ex. B (Pl.'s App'x 0012).  On October 27, 2022, Ms. Carter sent a follow-up email to Dr. Fong, in which Ms. Carter requested an "accommodation not to participate in abortion services because of my religious beliefs against performing, prescribing or counseling for an abortion."  *Id.* Ex. C (Pl.'s App'x 0014).  Dr. Fong replied that "this e-mail will not suffice" because "the process is not in place yet." *Id.*  As discussed above, those e-mail responses were correct that the final accommodation process specific to the IFR was not yet in place, but they were incorrect in suggesting that Ms. Carter's e-mail was insufficient to request an interim accommodation. Bishara Decl. ¶ 14; Babcock Decl. ¶ 9.

Subsequently, VA corrected that error and provided Ms. Carter an interim religious accommodation.  Specifically, on December 19, 2022, Ms. Carter's second-line supervisor—Dr. Rima Bishara, Associate Chief of Staff with VA's Central Texas Health Care System—e-mailed Ms. Carter the following:

> VA's practice is to grant interim accommodations in such cases where possible, and I apologize that was not made clear to you when you made your request. While we await

> additional guidance on processing accommodation requests, please know that your request is granted on an interim basis. The granting of this accommodation means that you are not required to participate in abortion services, to include performing, prescribing, or counseling for abortion. No further action is required from either you or the agency for you to receive this interim accommodation. I will be in touch once we have any additional guidance on the accommodations process.

*See* Ex. H.   In response to this email, Ms. Carter replied on December 19: "Does the interim accommodation also include my religious objection to working in a facility that provides abortions for reasons other than to protect the life of the mother?"  *Id.*  Dr. Bishara responded to Ms. Carter that the "initial accommodation request dated October 27 did not indicate that you objected to working in a facility that provides abortions for reasons other than to protect the life of the mother," but said that if Ms. Carter was "now requesting a broader accommodation," Dr. Bishara could look into the possibility of a transfer "to a different VA facility that does not provide abortions, such as the VBA Regional Office or the Killeen Heights Vet Center," and asked Ms. Carter whether that would accommodate her religious objection. *Id.*  These two facilities do not directly provide traditional medical care (including abortions); instead, the VBA Regional Office generally processes veteran benefit claims, and the Killeen Heights Vet Center offers counseling services.  *See* Babcock Decl. ¶ 14.

On January 12, 2023, Dr. Bishara sent another e-mail to Ms. Carter, informing her that VA had granted her a final accommodation "not to participate in abortion services (performing, prescribing, or counseling)." Ex. I; *see also id.* ("With this decision, you are not required to perform, prescribe, or counsel for abortion.").  With respect to Ms. Carter's "request not to work in a facility that provides abortions for reasons other than to protect the life of the mother," Dr. Bishara noted that she had "not receive[d] a response to my last email to you on December 22, 2022," and "[i]n the absence of a response, it is unclear if you intend to pursue an accommodation related to that portion of your request." *Id.*  Dr. Bishara provided Ms. Carter with information about how to administratively pursue that request under the new accommodations policy, as well as an employee guide regarding the

IFR accommodations process.  *Id.*  As of the date of this filing, undersigned counsel are not aware of any response by Ms. Carter directly to Dr. Bishara.  *See* Bishara Decl. ¶¶ 17, 19.[2]

## III.   Procedural History

Ms. Carter filed her complaint in this case on December 13, 2022.  ECF No. 1 (Compl.). She filed a Motion for Preliminary Injunction on December 14, 2022.  Pl.'s Mot. for Prelim. Inj., ECF No. 13 (PI Mot.).  The sole claim on which Ms. Carter seeks preliminary relief is her RFRA claim. *Id.* at 1.  Through her motion, Ms. Carter requests that VA be enjoined "from requiring Plaintiff to perform, counsel for, or prescribe medications for any abortion," and also be enjoined "from performing any abortions at the Olin E. Teague Veterans' Center in Temple, Texas."  Proposed Order, ECF No. 13-1, ¶¶ 3-4.

On December 20, 2022, following Ms. Carter's receipt of her interim accommodation on December 19, Plaintiff filed a Notice of Supplemental Factual Developments, acknowledging the interim accommodation, proposing that Defendants execute a consent judgment along the lines of the proposed preliminary injunction, but otherwise "maintain[ing] her request for injunctive relief." Pl.'s Notice of Suppl. Factual Developments, ECF No. 17 at 3.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008), and "the decision to grant such relief is to be treated as the exception rather than the rule."  *City of Austin v. Kinder Morgan Tex. Pipeline, LLC*, 447 F. Supp. 3d 558, 567 (W.D. Tex. 2020).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,

---

[2] On the afternoon of Friday, January 13, 2023, Plaintiff's counsel sent Defendants' counsel an e-mail noting Dr. Bishara's December 22 e-mail, and asking for "more information about the proposed position in Waco."  Ex. M.  Defendants' counsel responded that they would confer with VA, but were unsure when they could provide a response given the timing.  In the meantime, Defendants' counsel requested confirmation (1) whether Ms. Carter agrees that, if a position acceptable to her is identified, a transfer would accommodate her religious objection; and (2) if there are any particular types of positions that Ms. Carter thinks would likely be acceptable at the VBA Regional Office or the Killeen Heights Vet Center (or another VA facility).  *See* Ex. N. Plaintiff's counsel responded at 6:31 p.m. CT on Tuesday, January 17, 2023—four days later and less than six hours before this filing is due— declining to answer Defendants' counsel's questions and again requesting more information.  *See id.*

that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  The party seeking injunctive relief carries the burden of persuasion on all four requirements.  *PCI Transp. Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005).  "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24.

## ARGUMENT

### I.    This Court Lacks Jurisdiction Over Plaintiff's Claims.

As a threshold matter, the Court need not consider the merits of Ms. Carter's motion for preliminary injunction because the Court lacks jurisdiction over her RFRA claim.  First, Ms. Carter has now received an accommodation, pursuant to which she is not required to perform, prescribe, or provide counseling for any abortion services in the course of her work at the Temple VA facility.  That accommodation necessarily moots this element of her claim.  Moreover, to the extent that Ms. Carter alleges harms from working in a facility that performs abortion, such claims—even if cognizable—are not ripe for judicial review because Ms. Carter has thus far declined to engage with VA staff that have offered to discuss possible options for accommodating that broader objection, such as transfer to another VA facility that does not perform abortions.  Ms. Carter, as a federal employee, also cannot obtain review in district court because she has not pursued the exclusive remedies provided by the governing Title 38 and CSRA personnel schemes.  Finally, even if Ms. Carter's claims were justiciable, under 38 U.S.C. § 502 Congress has vested exclusive jurisdiction over challenges to VA rulemakings in the U.S. Court of Appeals for the Federal Circuit, rendering her claim inappropriate for adjudication in district court.  For all those reasons, this Court lacks jurisdiction over Ms. Carter's claims, and her motion for preliminary injunction should be denied.

### A.    Ms. Carter Has Been Granted an Accommodation that Permits Her to Abstain From Performing Any Abortion Care or Counseling, and Her Remaining Facility-Wide Claim Is Not Ripe.

Ms. Carter's RFRA claim seeks two forms of relief: (1) an injunction against "requiring Plaintiff to perform, counsel for, or prescribe medications for any abortion," and (2) an order enjoining Defendants from "performing any abortions at the Olin E. Teague Veterans' Center in Temple,

Texas."  Proposed Order ¶¶ 3-4; *see also* PI Mot. at 1.  This Court lacks subject matter jurisdiction to consider these claims, for two reasons.

*First*, insofar as Ms. Carter's claim centers on the argument that the IFR obliges her to "participate in abortions and counsel women about abortion," Compl. ¶ 7, that element of her claim is now moot because Ms. Carter has received an accommodation confirming that she is not required to perform any such duties herself.  The email granting her that interim accommodation explained that she is "not required to participate in abortion services, to include performing, prescribing, or counseling for abortion."  Ex. H.  Although this accommodation was provided after the lawsuit was filed, VA made clear the delay was only because of an inadvertent error.  *See id.* ("VA's practice is to grant interim accommodations in such cases where possible, and I apologize that was not made clear to you when you made your request.").  *Id.*  The agency also advised Ms. Carter that it would "be in touch once we have any additional guidance on the accommodations process."  *Id.*  And VA has now provided Ms. Carter with a final accommodation to her personal participation in these duties.  Ex. I.

Given that she has received the principal relief that she seeks in her complaint, Ms. Carter's claims for individual relief are moot, and the Court therefore lacks jurisdiction to adjudicate them. "The doctrine of mootness arises from Article III of the Constitution, which provides federal courts with jurisdiction over a matter only if there is a live 'case' or 'controversy.'"  *Dierlam v. Trump*, 977 F.3d 471, 476 (5th Cir. 2020); *see also Arizonans for Off. English v. Arizona*, 520 U.S. 43, 66–67 (1997).  A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *Murphy v. Hunt*, 455 U.S. 478, 481 (1982).  Here, VA has granted the individual relief that Plaintiff seeks in her Complaint—a religious accommodation that allows her to continue her job without counseling, prescribing, or performing abortions.  *See N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1526 (2020) (per curiam) (holding that claim for declaratory and injunctive relief was moot where city's actions during the pendency of the suit granted petitioners "the precise relief" that petitioners had requested in their complaint); *Dierlam*, 977 F.3d at 476 (case is moot where "an intervening event renders the court unable to grant the litigant "any effectual relief whatever").  Accordingly, Ms. Carter's request for individual relief is moot.

Plaintiff cannot avoid this result by claiming that the challenged behavior might recur.  *See* ECF No. 17 at 2 (citing, *e.g.*, *Franciscan Alliance v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022)).  VA has confirmed that the initial failure to provide Ms. Carter with an interim accommodation was a mistake, and VA has now issued Ms. Carter a final accommodation, consistent with VA's accommodation policies, which have also now been finalized.  *See* Bishara Decl. ¶14; Ex. I.  These policies do not offer any reason to suspect that Plaintiff might one day be deprived of her accommodation. Certainly, there is no "prosecutorial indecision" of the type at issue in *Franciscan Alliance*, 47 F.4th at 376.  Thus, Plaintiff cannot avoid mootness of her individual claim based on speculation about the harm recurring. Nor is a party required to execute a consent judgment, providing Plaintiff with final relief to which Defendants do not believe Plaintiff is legally entitled, in order to demonstrate mootness.  *Cf.* ECF No. 17 at 2.  At a minimum, Plaintiff cannot show such a significant likelihood of the conduct recurring as to warrant the extraordinary remedy of a preliminary injunction.

*Second*, with respect to Ms. Carter's claim that she objects to "working in a facility that performs abortion services," even if that claim were otherwise cognizable, it is not ripe here.  Ms. Carter did not present it before filing suit and has not meaningfully responded to VA's follow-up inquiries regarding a possible transfer to another facility that does not perform abortions in order to accommodate this objection.  Nonetheless, VA's efforts to understand the scope of and potentially accommodate Ms. Carter's religious objections remain ongoing.  Specifically, on December 22, 2022, VA asked Ms. Carter whether a "transfer to a different VA facility, such as the VBA Regional Office or the Killeen Heights Vet Center, that does not provide abortions" would accommodate Plaintiff's religious objection. Ex. H.  As of this filing date, Ms. Carter has not replied to VA's December 22, email, and her counsel's inquiry on the eve of this filing, *see* note 2, *supra*, only highlights that any dispute lacks concreteness at this stage.  Any adjudication of Ms. Carter's effort to seek emergency, facility-wide relief is thus premature and not ripe for judicial review.

Ripeness is a justiciability doctrine designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies," and "also to protect the agencies from judicial interference until an administrative decision

has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (citation omitted).  Accordingly, a party's claim "is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)).

The ripeness inquiry relies on two factors: (1) "the fitness of the issues for judicial decision"; and (2) "the hardship to the parties of withholding court consideration." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 545 (5th Cir. 2008).  In other words, the issues at stake must be "purely legal ones; conversely, a case is not ripe if further factual development is required." *Cochran v. SEC*, 20 F.4th 194, 212 (5th Cir. 2021) (quotation omitted); *see also DM Arbor Ct., Ltd. v. City of Houston*, 988 F.3d 215, 218 (5th Cir. 2021) (issues are ripe for review only "when [they] 'would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now'").  Both of these factors demonstrate that Plaintiff's claim is not ripe.

Given that discussions between the parties remain ongoing as to Ms. Carter's facility-wide objection—and given the new Reasonable Accommodation policy recently announced by VA, *see* Ex. F—further factual development is necessary to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Abbott Lab'y v. Gardner,* 387 U.S. 136, 148-49 (1967).  Indeed, courts have repeatedly concluded a case is not ripe where, as here, critical facts remain to be developed which would define the scope of the controversy and aid the court in reaching a decision. *See, e.g.*, *Nat'l Park Hosp. Ass'n*, 538 U.S. at 812 (holding case unripe because "further factual development would significantly advance our ability to deal with the legal issues presented"); *Walmart Inc. v. Dep't of Justice*, 21 F.4th 300, 311 (5th Cir. 2021) (holding case unripe because even though adjudication "would be theoretically possible . . . the question would be easier if the court knew exactly what obligations" were at issue, such that the court could "assess whether those obligations accorded with the governing regulations").  Unless and until Plaintiff clarifies the scope of her religious objection and VA decides whether it can voluntarily

accommodate that objection by transferring her to a different facility that does not perform abortions, it is not clear whether Plaintiff will even suffer any Article III injury.

Moreover, there is no hardship to Plaintiff in requiring that she avail herself of the relevant administrative options in an effort to secure an accommodation before asking this Court to take the extraordinary step of issuing an emergency injunction.  Indeed, the Complaint alleges a lack of available administrative process, *see, e.g.,* Compl. ¶¶ 9, 178, and Plaintiff's argument in seeking extraordinary preliminary relief from this Court is that she needs "a religious accommodation, but the text of the Rule itself offers no opportunity for a religious exemption," and her "supervisor repeatedly refused to recognize" her requests for a religious accommodation.  PI Mot. at 2.  Having now received an exemption and further information about additional accommodation options, including a possible transfer to a facility that does not perform abortions, it is not clear what hardship, if any, Ms. Carter would suffer from engaging with the very process she claims is lacking.  Moreover, if Ms. Carter engages with VA and a transfer to a different facility is effectuated, there would be no controversy left for this Court to resolve.  This ongoing process reinforces the lack of ripeness and, in turn, the inappropriateness of extraordinary preliminary relief here.

### B.  Plaintiff's Claims are Barred by VA's Comprehensive Personnel System and the Civil Service Reform Act.

As noted above, *see* Background, Part I.A, Plaintiff is a Title 38 employee whose employment in VHA is governed by the comprehensive personnel system outlined in Title 38, and certain provisions of the CSRA.  Regardless of how Ms. Carter seeks to style her claim, she is plainly challenging an aspect of her ongoing employment relationship—which means she cannot obtain court review unless provided for in the exclusive provisions of Title 38 and the CSRA.  *See, e.g.*, *Zummer v. Sallet*, 37 F.4th 996, 1003 (5th Cir. 2022) (discussing exclusive CSRA process), *cert. petition docketed*, No. 22-443 (Nov. 10, 2022); *Elgin*, 567 U.S. at 11-12; *Tompkins*, 16 F.4th at 742-43.

In particular, Ms. Carter's claim appears to be directed at an alleged prohibited personnel practice subject to the OSC complaint process.  *See Griener v. United States*, 900 F.3d 700, 705 (5th Cir. 2018) (holding that the OSC complaint process is exclusive and barred VA employee's claims).

Specifically, Ms. Carter seeks to challenge (though Defendants do not concede) an alleged "significant change in duties, responsibilities, or working conditions," 5 U.S.C. § 2302(a)(2)(A)(xii)—*i.e.*, the scope of duties personally imposed on her as a result of the VA IFR, as well as the conditions within the broader facility in which she works.  And she alleges that this action was unlawful, *id.* § 2302(b)(12), because it violated her religious rights, *id.* § 2301(b)(2).  The proper remedy for Title 38 employees like Plaintiff is to pursue any claims (including constitutional and RFRA claims) through the avenues provided by Title 38 and the CSRA, not to proceed directly into federal district court.  *Elgin*, 567 U.S. at 12; *see also Tompkins*, 16 F.4th at 742-43; *Zummer*, 37 F.4th at 1012.  Indeed, Ms. Carter has not even attempted to comply with the CSRA avenue afforded to her.  *Cf. Griener*, 900 F.3d at 705 ("It is undisputed that Dr. Griener has never petitioned the OSC.").  This Court therefore lacks jurisdiction over her claim.  *See id.*

### C.  Pursuant to 38 U.S.C. § 502, This Court Lacks Jurisdiction Over Plaintiff's Claim.

This Court independently lacks jurisdiction to address the RFRA claim in Ms. Carter's motion because Congress has vested exclusive jurisdiction over challenges to VA regulations in the U.S. Court of Appeals for the Federal Circuit, *see* 38 U.S.C. § 502, and Ms. Carter's RFRA claim expressly asks this Court to examine the validity of the IFR under the APA and seeks to enjoin the IFR across the entire Temple VA facility.

Federal courts "are courts of limited jurisdiction" that "possess only that power authorized by the Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Congress has the power to "prescribe the procedures and conditions under which, and the courts in which, judicial review of administrative orders may be had." *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 335-36 (1958).  For example, Congress may provide for exclusive review in a court of appeals of an agency's actions. *See id.*; *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 378-79 (2012).  "It is well settled that if Congress . . . specifically designates a forum for judicial review of administrative action, that forum is exclusive." *Drummond Coal Co. v. Watt*, 735 F.2d 469, 475 (11th Cir. 1984).

Under 38 U.S.C. § 502, judicial review of certain actions of the Secretary of Veterans Affairs "may be sought only in the United States Court of Appeals for the Federal Circuit."  These actions

include any agency rulemaking under 5 U.S.C. § 553, and any agency action that requires publication in the Federal Register under 5 U.S.C. § 552(a)(1), both of which describe the IFR at issue in this case. *See* 38 U.S.C. § 502;[3] *Chinnock v. Turnage*, 995 F.2d 889, 893 (9th Cir. 1993) ("Under 38 U.S.C. § 502, VA rulemaking is subject to judicial review only in the Federal Circuit."); *Hall v. Dep't of Veterans Affs.*, 85 F.3d 532, 534 (11th Cir. 1996) (per curiam).   As one court has explained, "§ 502 applies to (1) actions that require publication in the Federal Register, such as rules of procedure, substantive rules of general applicability, statements of general policy, and amendments, revisions, or repeals to those actions, under 5 U.S.C. § 552(a)(1); and (2) agency rulemaking, under 5 U.S.C. § 553." *Preminger v. Principi*, 422 F.3d 815, 821 (9th Cir. 2005).

Thus, "Section 502 gives the Federal Circuit exclusive jurisdiction to review challenges to most actions by the Secretary of Veterans' Affairs," *id.*, including Ms. Carter's challenge here, under RFRA, which asks this Court to review the validity of the IFR and seeks relief directly against the IFR at the entire Temple VA facility.   *See* PI Mot. at 1 (seeking an order "enjoining Defendants from applying Defendants' interim final rule titled Reproductive Health Services, 87 Fed. Reg. 55,287 (Sept. 9, 2022) . . . at the Olin E. Teague Veterans' Center, in Temple, Texas").   Because Ms. Carter's challenge expressly calls into question the validity of VA's rulemaking under the APA—an action that plainly falls within the exclusive review provision of 38 U.S.C. § 502—her RFRA claim can be brought only in the Federal Circuit, and this Court must therefore decline to exercise jurisdiction over this claim. *See Veterans for Common Sense v. Shinseki*, 678 F.3d 1013, 1016 (9th Cir. 2012); *Chinnock*, 995 F.2d at 893.

That Plaintiff brings a RFRA claim does not alter this analysis.   The Third Circuit recently considered whether a RFRA claim could be brought in district court where an exclusive-review provision applied.   *See Adorers of the Blood of Christ ("ABC") v. FERC*, 897 F.3d 187, 198 (3d Cir. 2018) (considering exclusive-review provision in the Natural Gas Act).   The court held that "a claim under RFRA" brought under 28 U.S.C. § 1331 "does not abrogate or provide an exception to a specific and

---

[3] 38 U.S.C. § 502 states: "An action of the Secretary to which section 552(a)(1) or 553 of title 5 (or both) refers is subject to judicial review.   Such review shall be in accordance with chapter 7 of title 5 and may be sought only in the United States Court of Appeals for the Federal Circuit."   Chapter 7 of title 5 refers to the APA.

exclusive jurisdictional provision prescribed by Congress for judicial review of an agency's action." *Id.*; *see also Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983) (similar). The court expressly rejected the argument that RFRA grants plaintiffs the "statutory right to assert their RFRA claim in district court," determining that "[n]owhere does the text specifically confer jurisdiction to the federal district courts to hear RFRA claims." *ABC*, 897 F.3d at 194.

The same is true here. Plaintiff's RFRA claim attempts to contest the validity of the VA's IFR and seeks relief against it—not only as applied to Plaintiff, but facility-wide—and § 502 channels review of such a claim exclusively to the Federal Circuit. RFRA is not jurisdictional and does not require a claim to be brought in district court. *See* 42 U.S.C. § 2000bb-1(c) (an individual may invoke RFRA "as a claim or defense in a *judicial proceeding*") (emphasis added). Rather, it sets forth a substantive legal standard. Where an exclusive-review provision applies, a RFRA claim must be brought in the manner provided by that statute.

Some courts have held that, although district courts are "statutorily barred from reviewing a *facial* challenge to a VA regulation, [they] retain jurisdiction to review an *as-applied* challenge." *Preminger*, 422 F.3d at 821; *see also Griffin v. Dep't of Veterans Affs.*, 274 F.3d 818, 820 (4th Cir. 2001) (similar). Under this framing, a plaintiff raising a pure RFRA claim against application of a concededly valid VA rule, and seeking only individual relief therefrom, could perhaps bring a challenge in a district court after exhausting her administrative remedies. But unlike in *Preminger*, Ms. Carter is not challenging only "[t]he *application* of a rule that is deemed to be (or that the Federal Circuit has held to be) valid," 422 F.3d at 821; she is contesting the validity of the IFR itself under the APA, which is precisely the type of claim subject to § 502. *See Chinnock*, 995 F.2d at 893 (holding, in individual benefits denial suit, that district court lacked jurisdiction to consider whether VA regulation was "inconsistent with the statutes under which the VA promulgated that regulation").

Although Ms. Carter has styled her claim solely under RFRA, she expressly seeks to use her RFRA claim as a vehicle for adjudicating the IFR's compliance with the APA. *See* PI Mot. at 17 (invoking "the framework of [5 U.S.C.] § 706" to argue that the IFR is invalid); *id.* at 14, 18-22, 25-35. Indeed, Plaintiff's own pleadings confirm that her RFRA claim is a backdoor attempt to litigate the

rule's validity under the APA. Specifically, Plaintiff argues that VA lacks a compelling interest under RFRA in enforcing the IFR at the Temple VA facility because the Rule was promulgated in excess of the Secretary's authority, is arbitrary and capricious, and should have gone through 5 U.S.C. § 553's notice-and-comment procedures. *See* PI Mot. at 17-35; *see also id.* at 14 (challenging whether "the Rule was properly implemented under the APA"). These are precisely the sorts of arguments a plaintiff would bring when challenging the validity of a rule under the APA. And the first sentence of her motion expressly confirms she is seeking relief against the IFR itself. *Id.* at 1.

Based on Plaintiff's own framing, then, her APA arguments are at least inextricably intertwined with her RFRA claim, which independently confirms that the claim must be brought in the Federal Circuit consistent with § 502. As the Fifth Circuit has made clear, when an exclusive-review provision applies, district courts lack jurisdiction both over "direct challenges" to the agency action as well as "claims that are inescapably intertwined with a review of the procedures and merits surrounding" the challenged action. *Ligon v. LaHood*, 614 F.3d 150, 155 (5th Cir. 2010) (citation omitted); *see also, e.g.,* *Jones v. United States*, 625 F.3d 827, 830 (5th Cir. 2010) (per curiam) (holding that "Jones's Title VII and § 1981 claims are inescapably intertwined with a challenge to the procedure and merits of that final order" for which an exclusive-review provision applies and therefore the district court lacked jurisdiction). As Plaintiff has styled her RFRA claim, for her to succeed, this Court necessarily must decide the very APA issues that are precluded under § 502—thus confirming that the RFRA claim is inescapably intertwined with APA issues and district court jurisdiction is lacking.

Moreover, Ms. Carter seeks relief beyond a personal exemption from the IFR; Ms. Carter also requests an injunction preventing Defendants from implementing the IFR anywhere at the Temple VA facility. See PI Mot. at 1. Facility-wide relief, like VA-wide relief, extends beyond the individual plaintiff's personal circumstances, and cannot be characterized as individual relief. Indeed, if Ms. Carter's facility-wide claim is successful, it is difficult to see why she or other plaintiffs could not just as easily bring a claim seeking to stop all VA abortion care under the IFR. Additionally, Ms. Carter's requested relief—to stop all abortions at the Temple VA facility, even those necessary to save a pregnant patient's life, PI Mot. at 1—extends beyond the scope of Ms. Carter's asserted religious

objection, cf. Carter Decl. ¶ 14, thereby confirming that she is seeking APA relief against the IFR itself, not relief rooted in an individualized RFRA claim.  See ECF No. 13-1 at 1-2.

In sum, because Ms. Carter asks this Court to do the very thing that Congress has channeled to the Federal Circuit—review whether a VA regulation was "properly implemented under the APA," PI Mot. at 14—and she is seeking relief directly against the IFR, not just as applied to herself, but across the entire Temple VA facility, this Court lacks jurisdiction under the channeling provision of 38 U.S.C. § 502, notwithstanding any attempt to characterize her claim as an "as-applied" challenge. *See Ligon*, 614 F.3d at 155 ("[A] plaintiff may not circumvent the exclusive jurisdiction of the court of appeals by collaterally attacking an administrative order in a federal district court."); *Bright v. Lehman*, 725 F.2d 788, 790 (D.C. Cir. 1984) ("We will not allow [plaintiff] to circumvent the appeals procedure defined by Congress simply by casting a [different] label on his claim.").  At a minimum, the Court lacks jurisdiction to address APA issues she raises, including whether the Rule was promulgated in excess of the Secretary's authority, is arbitrary and capricious, and should have gone through 5 U.S.C. § 553's notice-and-comment procedures—and the Court should decline to address those issues.  *Cf. Preminger*, 422 F.3d at 820-21.[4]

## II.    Plaintiff Is Virtually Certain Not to Succeed on the Merits of Her RFRA Claim.

Even if this Court had jurisdiction, Plaintiff has not demonstrated a likelihood of success on the sole claim at issue in her preliminary injunction motion.  Under RFRA, the federal government may not "substantially burden a person's exercise of religion" unless application of that burden to the person is the least restrictive means of furthering a compelling governmental interest.  42 U.S.C.

---

[4] This argument does not conflict with the prior argument in Part I.B about Title 38 and CSRA preclusion.  Section 502's channeling requirement does not exempt employees from the requirement that they must pursue their Title 38 and CSRA remedies.  And to the extent an employee is entitled to file a lawsuit after exhausting those remedies, challenges to VA regulations within the scope of § 502 would be required to be filed in the Federal Circuit.  Here, then, Plaintiff's claim is doubly precluded because she has not exhausted her CSRA remedies and she also filed in the wrong court (even if her claim were otherwise cognizable at this stage).  Ultimately, Plaintiff's RFRA claim cannot be used to challenge the IFR (which is a challenge that must be brought in the Federal Circuit), and also cannot be used to make a personnel claim (which must follow the processes set forth in Title 38 and the CSRA)—but either way jurisdiction is precluded in this Court (even assuming Plaintiff otherwise had a cognizable injury, *see* Part I.A, *supra*).

§ 2000bb-1(b).  Plaintiff "bears the burden of proving" that the VA IFR substantially burdens her exercise of religion.  *Holt v. Hobbs*, 574 U.S. 352, 361 (2015); *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'r*, 239 F. Supp. 3d 77, 88 (D.D.C. 2017).  Only if Ms. Carter has demonstrated a substantial burden need the Court consider whether the government has demonstrated that imposing that burden (here, by allegedly continuing to provide abortion services at the Temple VA facility *without* Ms. Carter's involvement) is the least restrictive means to further a compelling government interest. 42 U.S.C. § 2000bb-1(a)-(b); *see E. Tex. Baptist Univ. v. Burwell*, 793 F.3d 449, 463 (5th Cir. 2015) ("Because the plaintiffs have not shown that the regulations substantially burden their religious exercise . . . we need not reach the strict-scrutiny prong or the other requirements for an injunction."), *vacated and remanded sub nom. Zubik v. Burwell*, 578 U.S. 403 (2016), and *cert. granted, judgment vacated sub nom. Univ. of Dallas v. Burwell*, 136 S. Ct. 2008 (2016);[5] *Standing Rock*, 239 F. Supp. 3d at 88.

Ms. Carter has not established a likelihood of success on her RFRA claim for several reasons. *First*, even if the Court concludes that Ms. Carter's claim about her personal accommodation is not moot, the claim plainly does not involve a substantial burden on Ms. Carter's exercise of religion, given the availability of a personal accommodation, which she has now received.

*Second*, with respect to Ms. Carter's facility-wide claim, VA's independent provision of abortion care at the facility in which she works does not impose a cognizable burden on her religious exercise. Ms. Carter is not required to personally provide such care or counseling, and she cannot challenge the government's independent provision of services without her participation—otherwise, the range of government action subject to challenge under RFRA would be limitless.

*Third*, VA has a compelling interest in ensuring that patients at the Temple VA facility receive counseling and medically necessary health care under the IFR, and the personal accommodation provided to Ms. Carter is the least restrictive means of ensuring that veterans and beneficiaries can receive care in their local communities, including at the Temple VA facility.  VA also has a compelling

---

[5] The Court in *Zubik* did not vacate the Fifth Circuit's decision because of a disagreement with the merits, and the reasoning in this case on substantial burden remains persuasive.  *See Zubik v. Burwell*, 578 U.S. 403, 409 (2016) ("The Court expresses no view on the merits of the cases.").  Instead, the Court vacated the opinions because the parties had "clarifi[ed] and refin[ed]" their positions.  *Id.*

interest in identifying the most efficient and effective facilities in which to provide veterans with medical care without having to take account of the specter of potential religious objections by individual employees that would, if granted, compel VA to shift services to alternative facilities based on a single religious objector. Ms. Carter's only argument that the government lacks such a compelling interest are her arguments expressly invoking the APA, which are inapposite to her RFRA claim and therefore should not be considered. Regardless, the IFR was lawfully promulgated and providing services under the IFR it at the Temple VA facility is the least restrictive means of furthering the government's compelling interests.

### A. Plaintiff Has Not Demonstrated that VA's Independent Provision of Abortion Care Substantially Burdens Her Religious Exercise.

A burden is substantial under RFRA where the government "demands" that a plaintiff "engage in conduct that seriously violates their religious beliefs" or face "severe" consequences. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720 (2014). Thus, there is no substantial burden where there is a "lack of coercion in the face of a threatened sanction or a government benefit conditioned on religious adherence or forbearance." *Standing Rock*, 239 F. Supp. 3d at 96. The Supreme Court has also established that a religious objection to the government's conduct of its own affairs is not a cognizable substantial burden for purposes of the Free Exercise Clause, *see Bowen v. Roy*, 476 U.S. 693, 695-97 (1986); *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988), and Congress incorporated that understanding into RFRA. Plaintiff's claimed burden here—that VA independently provides abortions through other employees at her facility—is therefore not cognizable, and in any event, does not exist on this record given VA's willingness to voluntarily consider a potential transfer.

### 1. Plaintiff's Objection to the Government's Independent Provision of Abortion Services Does Not Establish a Cognizable Substantial Burden Under RFRA.

Plaintiff advances a startlingly broad assertion of substantial burden that would extend RFRA far beyond what the statute or the Supreme Court's cases support. In essence, Ms. Carter asserts that working at a government facility where *other VA employees* provide abortion care necessary for the life or health of the patient or in cases of rape or incest substantially burdens her religious exercise and that the only suitable accommodation is to require the government to cease providing such care at the

Temple VA facility altogether.  If Ms. Carter's view were correct, RFRA's substantial-burden standard would be satisfied whenever a plaintiff asserts a sincere religious objection to any government function in her place of work, even if the objection is not predicated on any requirement placed on the objector. Under this theory, any employee who has a sincere religious objection to any one of the many functions of the federal government could assert a veto over the government's affairs at the office in which she works, or even at the organization as a whole.  When past objectors have asserted such expansive claims, amounting to a single person's religious veto over internal government operations, the Supreme Court has squarely rejected them.  *See Roy*, 476 U.S. at 695-97; *Lyng*, 485 U.S. at 439.

In *Bowen v. Roy*, the Supreme Court considered a Free Exercise claim asserted by parents who objected to a law requiring the government to use a Social Security number to identify their daughter in processing a claim for welfare benefits filed on her behalf.  *Roy*, 476 U.S. at 695-97.  In a portion of the opinion joined by eight Justices, the Court explained it had never "interpreted the First Amendment to require the Government *itself* to behave in ways that the individual believes" will not violate their religious conscience.  *Id.* at 699.  "The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens."  *Id.*  Thus, the parents in *Roy* could not "demand that the Government join in their chosen religious practices by refraining from using a number to identify their daughter."  *Id.* at 700.  As the Court explained:

> Roy may no more prevail on his religious objection to the Government's use of a
> Social Security number for his daughter than he could on a sincere religious objection
> to the size or color of the Government's filing cabinets. The Free Exercise Clause
> affords an individual protection from certain forms of governmental compulsion; it
> does not afford an individual a right to dictate the conduct of the Government's
> internal procedures.

*Id.*  The Court thus vacated an injunction akin to the one Ms. Carter seeks here.  *Id.* at 701.

Ms. Carter's facility-wide theory is impossible to reconcile with *Roy*.  Just as in *Roy*, Ms. Carter cannot "demand that the [VA] join in [her] chosen religious practices by refraining from" providing abortions at the Temple VA facility or otherwise provide medical care "in ways that comport with [her] religious beliefs."  *Id.* at 699.  Under Ms. Carter's theory, heightened scrutiny should have applied

in *Roy* because the challenged statute placed substantial pressure on the parents to take an action they sincerely believed to be wrongful—*i.e.*, using a Social Security number to which they objected if the parents applied for needed benefits for their daughter.  *See id.* at 713 (Blackmun, J., concurring in part). Yet the Court squarely rejected the parents' claim, holding that the parents' objection to submitting an application that would trigger the government's use of their daughter's Social Security number did not establish a cognizable burden, because individuals do not have the "right to dictate the conduct of the Government's internal procedures."  *Id.* at 699-701.

The Court applied a similar rule in *Lyng*, which rejected a Free Exercise challenge to the construction of a road on federal land that would have entirely prevented members of several Native American tribes from continuing to use sacred sites for religious rites.  *Lyng*, 485 U.S. 439.  The Court acknowledged that the challenged project would have "devastating effects on traditional Indian religious practices."  *Id.* at 451.  The burdens on religious exercise experienced by tribal members were thus unquestionably substantial, but the Court concluded that the government's actions did not amount to *cognizable* harm because they did not "coerce[]" the affected individuals "into violating their religious beliefs[]" or "penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens."  *Id.* at 449; *see also id.* at 452 ("government simply could not operate if it were required to satisfy every citizen's religious needs and desires").

*Roy* and *Lyng*—both Free Exercise cases—are relevant because Congress intended that the RFRA test, which itself was borrowed from the Supreme Court's pre-1990 Free Exercise jurisprudence, *see Emp. Div. v. Smith*, 494 U.S. 872, 883 (1990), would "not expand, contract or alter the ability of a claimant to obtain relief in a manner consistent with free exercise jurisprudence, including Supreme Court jurisprudence, under the compelling governmental interest test prior to *Smith*."  H.R. Rep. No. 103-88, at 8 (1993); *accord* S. Rep. No. 103-111, at 12 (1993); *see also* 42 U.S.C. § 2000bb(a)(5) (congressional finding endorsing "the compelling interest test as set forth in prior Federal court rulings"); *see also Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006).  Congress specifically intended that *Roy* and *Lyng* would be among the pre-*Smith* decisions that give content to RFRA's substantial-burden standard.  *See* S. Rep. No. 103-111, at 9 & n.19 (1993)

(citing those decisions for the proposition that "strict scrutiny does not apply to government actions involving only management of internal Government affairs or the use of the Government's own property or resources"); 139 Cong. Rec. 26,193 (1993) (Sen. Hatch) ("RFRA would have no effect on cases like *Bowen v. Roy*:"); 139 Cong. Rec. 26,415 (Sen. Grassley) (same).

Ms. Carter's objection is foreclosed by *Roy* and *Lyng*, and bears no resemblance to the religious objections at issue in the few Supreme Court cases upon which she relies, PI Mot. at 15. Nor has she identified any case vindicating a broad claim like the one she asserts here. The Court's pre-*Smith* decisions establish that there are objective limits on the burdens that qualify as cognizable, and that those limits operate where, as here, an individual objects to the government's provision of its own services where she is not required to provide those services herself.

Plaintiff's facility-wide theory of RFRA has no logical endpoint, and the implications of accepting Ms. Carter's theory demonstrate why it cannot be correct. If Ms. Carter's theory prevails, every employee who has a sincere religious objection to any one of the federal government's numerous functions can assert a veto over the government's affairs, or at least subject them to RFRA scrutiny. If Ms. Carter may object under RFRA to working at a facility that provides abortions because of her religious beliefs, so too may an employee of another religion object if her facility *fails* to provide abortions when the health and life of the mother were endangered or in cases of rape or incest, and then seek an injunction requiring VA to provide such abortions. And though Ms. Carter's particular objection is limited to the Temple facility, another VA employee could assert a religious objection to the provision of abortions—or any other procedure—by the VA organization as a whole. For example, a VA employee with a religious objection to blood transfusions could seek to prevent all such care at their facility, or by VA as a whole. There is also no discernable principle limiting such claims to VA employees, rather than federal employees generally. Could an individual who objects to working on a particular day seek an injunction preventing anyone at the agency from working on that day? Could a Hindu employee who abstains from eating beef on religious grounds demand that the workplace cafeteria stop serving beef altogether?

The Supreme Court, long ago, anticipated such scenarios and emphasized the obvious but foundational principle that in a multicultural society the "government simply could not operate if it were required to satisfy every citizen's religious needs and desires" because "[a] broad range of governmental activities . . . will always be considered essential to the spiritual well being of some citizens" yet "deeply offensive" to others. *Lyng*, 485 U.S. at 452. The Supreme Court has therefore rejected such expansive claims of substantial burden as non-cognizable, for good reason. "Were it otherwise, any action the federal government were to take, including action on its own land, would be subject to the personalized oversight of millions of citizens. Each citizen would hold an individual veto to prohibit the government action solely because it offends his religious beliefs, sensibilities, or tastes, or fails to satisfy his religious desires." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1063 (9th Cir. 2008) (en banc). The legal implications of Ms. Carter's theory would upend the Court's caselaw on substantial burdens and nullify Congress's intent in passing RFRA—that individual accommodations be available, but that cases such as *Bowen* and *Lyng*, which established that an individual may not object to the government's internal affairs, would continue to govern.

### 2. The VA IFR Does Not Require that Plaintiff Engage in Conduct that Substantially Burdens Her Religious Exercise.

Most of Ms. Carter's discussion of substantial burden is devoted to her allegation that she is burdened because she "cannot request a religious accommodation," PI Mot. at 17, and the VA IFR "requires Ms. Carter to counsel for and provide abortion services," which "forces her to decide whether to lose her livelihood or violate her sincerely held religious beliefs." *Id.* at 15-17. But VA offered, and Ms. Carter received, a religious accommodation so that she is not required to counsel for or to provide abortion care. Because Ms. Carter has already been granted an accommodation from personally providing abortion-related care, she cannot demonstrate that VA is requiring her to personally engage in conduct that she finds objectionable, and therefore faces no substantial burden on her religious exercise on that basis.

Ms. Carter also asserts that she is substantially burdened by "work[ing] in a facility that participates in abortions for reasons other than to save the life of the mother." *Id.* at 16. This, Ms.

Carter asserts, "forces her to decide whether to lose her livelihood or violate her sincerely held religious beliefs." *Id.* On the current factual record, however, VA has not actually placed Ms. Carter in this asserted dilemma, and she therefore cannot presently demonstrate a substantial burden on this basis either. Specifically, VA has not "demanded" that Ms. Carter work at a facility that provides abortions for reasons other than to save the life of the pregnant patient or face "severe" penalties if she refuses to do so. *Hobby Lobby*, 573 U.S. at 720. To the contrary, VA asked Ms. Carter whether a transfer to a different facility that does not provide abortions would satisfy her religious objection. Thus, Ms. Carter is not being "forced" to choose between her religion and continuing to work for VA; rather, she is being asked to continue with the administrative accommodations process in an effort to potentially *resolve* her religious objection.

Because VA has not required Ms. Carter to work at the Temple VA facility specifically, she is not similarly situated to the plaintiffs in the cases she cites in her motion as supportive. PI Mot. at 15 (citing *Thomas v. Review Bd. Of Ind. Emp. Sec. Div.,* 450 U.S. 707, 718 (1981); *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)). For example, in *Thomas*, there were no available transfers that could resolve the plaintiff's religious objection. 450 U.S. at 710. Similarly, in *Sherbert*, the plaintiff was unable to find work that would comport with her religious beliefs. 374 U.S. at 399-400 & n.2. But here, the IFR does not impose any requirement on Ms. Carter specifically, and VA has offered to explore other potential options and whether they would accommodate Ms. Carter's religious beliefs. Ms. Carter accordingly cannot show "coercion in the face of a threatened sanction or a government benefit conditioned on religious adherence or forbearance." *Standing Rock*, 239 F. Supp. 3d at 96. Ms. Carter is no more entitled to an injunction to prevent VA from providing abortions at the Temple VA facility than if the plaintiff in *Thomas* sought to prevent the factory at which he worked from producing weapons of war because of his singular religious objection to production of these weapons, without taking the reasonable step of determining whether an unobjectionable position was available to him.

Plaintiff's motion does not attempt to analogize her claim to the complicity-based objections in *Hobby Lobby* or *Zubik*, so any such arguments are forfeited. *See, e.g.*, *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) ("Arguments raised for the first time in a reply brief are generally waived."). Nor would

such an analogy have merit:  In *Hobby Lobby*, the Court determined the plaintiffs faced a substantial burden because Defendants "require[d]" the Plaintiffs to engage in conduct by "arrang[ing]" for and "provid[ing]" health insurance or face a "severe" penalty of $450 million a year.  573 U.S. at 720. Similarly, in *Zubik* and related cases, the plaintiffs objected to a requirement that they submit a form under the threat of penalty on the grounds that it would make them complicit in conduct to which they objected. *See Priests for Life v. HHS*, 808 F.3d 1, 19 (D.C. Cir. 2015) (Kavanaugh, J., dissenting from denial of rehearing en banc) ("No one disputes, moreover, that plaintiffs will be required to pay huge monetary penalties if they do not submit the required form.").  Plaintiffs thus alleged that they faced a mandate by the government requiring the plaintiffs to *do* something that violated their religious beliefs, which is not the case here.  *See Hobby Lobby*, 573 U.S. at 720.  Because VA has offered to explore alternate ways to accommodate Ms. Carter's facility-wide religious objection, she has not demonstrated a substantial burden at present.

> **B. The Provision of Abortion Services, Including at the Temple Facility, Serves Compelling Interests, and Offering the Services at Issue while Providing Ms. Carter with an Individual Accommodation is the Least Restrictive Means of Achieving those Interests.**

Even if Plaintiff could demonstrate a substantial burden on her religious exercise (she has not), her RFRA claim would still fail because both the IFR and the personal accommodation provided to Ms. Carter satisfy strict scrutiny.  Protecting the lives and health of our nation's veterans and beneficiaries and ensuring that they have access to medically necessary services furthers a "compelling governmental interest."  42 U.S.C. § 2000bb-1(b).  And providing those services but allowing individuals to seek accommodations—such as the individual accommodation VA has already provided to Ms. Carter allowing her to abstain from personally participating in abortion services to which she objects—is the "least restrictive means of furthering that compelling governmental interest." *Id.*  The alternative that Ms. Carter proposes—banning medically necessary abortion care at the entire Temple VA facility based solely on her objection—is not the least restrictive means of furthering the government's interest in providing care at the Temple VA facility.  Moreover, VA has a compelling interest in identifying the most efficient and effective facilities in which to provide veterans with

medical care without having to take account of the specter of potential idiosyncratic religious objections by individual employees that would, if granted, compel VA to shift services to alternative facilities based on a single religious objector.

In considering whether the government has a compelling interest, the government must "demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Hobby Lobby*, 573 U.S. at 726 (quoting *O Centro*, 546 U.S. at 430-31). The government may also "demonstrate a compelling interest in uniform application of a particular program by offering evidence that granting the requested religious accommodations would seriously compromise its ability to administer the program." *O Centro*, 546 U.S. at 435.

### 1.   VA Has Compelling Interests

Protecting the lives and health of our nation's veterans and beneficiaries by ensuring that they have access to needed abortion care when their lives or health are endangered or when their pregnancies are the result of rape or incest is a compelling interest. *See, e.g.*, *Simopoulos v. Virginia*, 462 U.S. 506, 511 (1983) (government has a "compelling interest in maternal health"); *Austin v. U.S. Navy SEALs 1-26*, 142 S. Ct. 1301, 1305 (2022) (mem.) (Alito, J., dissenting) (government has a "compelling interest in minimizing any serious health risk"). VA also has an interest in being able to determine, for valid administrative reasons and in order to efficiently offer a full range of care to all veterans, which of its facilities will provide particular forms of medical care, without having to account for the possibility that whenever an employee finds a form of care religiously objectionable, VA would have to shift that service away to other facilities. Religious objections cannot compel VA to provide less than complete services at particular facilities. VA could not administer this IFR if facilities across the country could be prevented from providing care because of the religious objection of a single employee. *Cf. O Centro*, 546 U.S. at 435.

Congress provided the Secretary with broad authority to determine what medical services are needed for veterans and what services are medically necessary and appropriate for CHAMPVA beneficiaries. 38 U.S.C. §§ 1710(a), 1781(a). The Secretary reasonably determined that VA may

provide abortions for veterans and their beneficiaries when a health care professional has determined that "the life or health of the pregnant veteran would be endangered if the pregnancy were carried to term or when the pregnancy is the result of an act of rape or incest." 87 Fed. Reg. at 55,290. Finally, the Secretary determined that abortion counseling "is needed to ensure that [veterans] can make informed decisions about their health care." *Id.* at 55,288; 55,293. Providing abortion counseling, abortions in cases of rape or incest, and abortion where the life or health of the patient would be endangered undoubtedly serves a compelling interest in ensuring the health of our nation's veterans and their beneficiaries, as the Secretary determined.

As VA explained in the rulemaking, pregnancy and childbirth can result in physical harm for certain pregnant individuals, and individuals with pregnancy complications who lack access to abortion may risk loss of future fertility, significant morbidity, or death. *Id.* at 55,291. Additionally, there can be "severe health consequences associated with being forced to carry a pregnancy that is the result of rape or incest to term." *Id.* at 55,292. Moreover, there is widespread medical consensus that abortion or pregnancy termination is the medically necessary and appropriate treatment for certain medical conditions, including pre-eclampsia, pre-term premature rupture of the membranes, placental abruption and hemorrhage, among many others. *See id.* at 55,295 (citing Abortion Can Be Medically Necessary, Am. College of Obstetricians and Gynecologists (Sept. 25, 2019), http://www.acog.org/news/news-releases/2019/09/abortion-can-be-medically-necessary). Pregnancy may exacerbate pre-existing conditions, like renal or cardiac disease, which can severely compromise health or, if untreated, escalate to cause death. *Id.*; *see also Hobby Lobby*, 573 U.S. at 737 (Kennedy, J., concurring) ("There are many conditions for which pregnancy is contraindicated," including for women "with certain chronic medical conditions" or women with "serious medical conditions."). And certain patients, when denied a medically necessary abortion, may suffer serious long-term health consequences that, though short of death, can cause permanent long-term disability, result in loss of fertility, and lead to other serious medical repercussions. 87 Fed. Reg. at 55,291.

2.      **Personally Accommodating Ms. Carter Is the Least Restrictive Means of Furthering VA's Compelling Interests.**

VA's accommodation process ensures that VA can consider requests from employees with sincerely held objections to abortion and flexibly address these objections to provide appropriate accommodations.  Through this accommodation process, VA can consider religious objections while still furthering its compelling interest in ensuring that pregnant veterans and their beneficiaries are able to access necessary medical care from their local VA facilities.  This individual-accommodations process furthers VA's compelling interest in providing care while using the least restrictive means of accomplishing that compelling interest.  Indeed, the accommodation that VA provided to Ms. Carter respects her religious objection to abortion and ensures that she does not have to counsel on, provide, or prescribe abortions for patients at the Temple VA facility.

Ms. Carter seeks to prevent the Temple VA facility from providing *any* abortions, based solely on her religious objection—even though her objection does not extend to abortions needed to save the life of the pregnant patient.  Again, although not legally required, *see* Part II.A, *supra*, VA responded to her objection by inquiring whether transferring Ms. Carter to a different facility that does not perform abortions would accommodate her objection.  To date, Ms. Carter has not meaningfully responded, instead pressing forward with this litigation and her request for emergency relief.  But as Plaintiff's motion makes clear, the requested "accommodation" is not an accommodation in any understanding of that word.  "The very word 'accommodation' implies a balance of competing interests." *Univ. of Notre Dame v. Burwell*, 786 F.3d 606, 618 (7th Cir. 2015).  Plaintiff, by contrast, would require the government to abandon its compelling interest in providing abortion care to VA patients at the Temple facility.  This is not a request for a religious accommodation; it is a request for a religious veto.  The breadth of this position is overbroad, incorrect, and untenable.  *See supra* Part II.A.1.  It would also elevate the beliefs of Ms. Carter over the rights of veterans and their beneficiaries to receive care physicians deemed necessary.

RFRA does not require that VA use an alternative that does not serve its compelling interests "equally well."  *Hobby Lobby*, 573 U.S. at 731; *see also Kaemmerling v. Lappin*, 553 F.3d 669, 684–85 (D.C.

Cir. 2008) (rejecting RFRA and constitutional challenges where "[a]ny alternative method of identification would be less effective" in accomplishing the government's compelling interests). "[I]n applying RFRA 'courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries'" of the accommodation. *Hobby Lobby*, 573 U.S. at 730 n.37 (Kennedy, J., concurring) (quoting *Cutter v. Wilkinson,* 544 U.S. 709, 720 (2005)). Taking these burdens into account in *Hobby Lobby* meant that women would still receive "precisely the same access" to contraceptives under the proposed less-restrictive alternative. *Hobby Lobby*, 573 U.S. at 692. Nor would the proposed alternative in *Hobby Lobby* "result in any detrimental effect on a third party." *Id.* at 730 n.37 (Kennedy, J., concurring).

In stark contrast to *Hobby Lobby*, if VA were to grant Ms. Carter's requested accommodation, a single objector would be allowed to shutter particular care at an entire government facility, denying veterans and their beneficiaries in Temple and the surrounding areas access to crucial health-preserving care under the IFR. *See, e.g.,* Proposed Order ¶ 4 (seeking prohibition on "performing any abortions" at facility). Instead of having "precisely the same access" to abortion care as patients at VA facilities where Ms. Carter does not work, patients at the Temple VA facility would be deprived of abortion care entirely. Granting Ms. Carter's facility-wide accommodation means that a patient who survived an experience of rape or incest and came into the Temple VA facility seeking abortion care permitted under the IFR would be denied that care because of Ms. Carter's objection. It would mean that a patient who comes in with dangerously high blood pressure due to severe preeclampsia, placing the patient at risk of seizures and kidney failure, would be denied termination of the pregnancy because of Ms. Carter's objection. It would mean that a pregnant patient who develops an infection after the amniotic sac surrounding the fetus has ruptured prematurely and could rapidly develop sepsis and organ failure without an emergency termination of the pregnancy would be denied that care because of Ms. Carter's objection. Accommodating Ms. Carter's request would place a tremendous and potentially life-endangering burden on veterans and their beneficiaries in the Temple area. *Cf. Cutter,* 544 U.S. at 720.

Worse still, if Plaintiff were correct that RFRA required the Temple facility to cease providing needed medical care because of her sole religious objection, then the VA's critical decisions about where and how to provide medical services to veterans would be at the mercy of all religious objectors throughout the nation.  Allowing for a facility-wide ban on care under the IFR each time a single person objects would not serve patients "equally well," and Plaintiff does not contend otherwise. *Hobby Lobby*, 573 U.S. at 731.  Denial of such facility-wide changes in order to alleviate an alleged burden on an employee's religious exercise is plainly the least restrictive means of advancing the VA's compelling interest in avoiding the chaos and administrative burden that would otherwise result. Again, Plaintiff presents no arguments whatsoever on this element, except her improper APA challenges.

### C. The Interim Final Rule Was Lawfully Promulgated, and Implementing It Is a Compelling Government Interest.

Plaintiff argues that VA lacks a compelling interest in implementing the IFR because it was promulgated in excess of the Secretary's authority, is arbitrary and capricious, and is procedurally improper.  This Court should reject Plaintiff's attempts to use her RFRA claim as a vehicle for litigating the validity of the IFR under the APA, particularly given that any such direct claims would belong exclusively in the Federal Circuit.  *See supra* Part I.C.  Plaintiff cites no precedent allowing her to refute a "compelling governmental interest" simply by attacking the APA validity of the IFR.   Whether a governmental interest is compelling does not depend on the APA validity of the particular government action being taken in pursuit of that interest.  And unless and until a party actually brings an APA claim and succeeds on that claim, this Court has no basis for discounting the legal validity of the IFR or the underlying interests it serves.  Plaintiff, of course, has not pled any such APA claims in this case, and therefore the Court need not even consider these issues.  Nevertheless, as explained below, Plaintiff's contention that the government lacks a compelling interest because the IFR was promulgated in violation of the APA is meritless.  *See* 5 U.S.C. § 706. The IFR is lawful both substantively and procedurally.

1.   **It Is Within the Secretary's Authority to Determine Which Medical Services Are "Needed" in the Medical Benefits Package.**

The VA IFR was a valid exercise of the Secretary's rulemaking authority to determine what medical services are needed.  The VA has the statutory authority to provide medical services that are "needed," and Congress has specifically committed the determination of which medical services are needed to the Secretary's discretion.  38 U.S.C. § 1710(a)(3) ("the Secretary may, to the extent resources and facilities are available and subject to the provisions of subsections (f) and (g), furnish hospital care, medical services, and nursing home care which the Secretary determines to be needed"); *see also E. Paralyzed Veterans Ass'n, Inc. v. Sec'y of Veterans Affs.* ("*EPVA*"), 257 F.3d 1352, 1362 (Fed. Cir. 2001) (holding that "the Secretary has broad discretion to determine the precise hospital or medical services to be supplied").

VA is charged with "interpreting and applying the various veterans' benefits statutes; this is a task for which it has considerable expertise." *Kirkhuff v. Nimmo*, 683 F.2d 544, 549 (D.C. Cir. 1982); *see generally Paralyzed Veterans of Am. v. Sec'y of Veterans Affs.*, 345 F.3d 1334, 1340-60 (Fed. Cir. 2003) (deferring to Secretary's reasonable interpretations of veterans' benefits statutes).  As the Supreme Court has explained, "'[t]he power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.'" *Paralyzed Veterans*, 345 F.3d at 1340 (quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)).  And courts should defer to an agency's rulemaking "'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Astrue v. Capato ex rel. B.N.C.*, 566 U.S. 541, 558 (2012).  The Federal Circuit, analyzing these same medical benefits package regulations, has concluded that "the Secretary has broad discretion to determine the precise hospital or medical services to be supplied" and afforded deference to the Secretary's determination of what medical services are "needed." *EPVA*, 257 F.3d at 1362.

Plaintiff argues that the Secretary's broad authority to determine which medical services are "needed" has been circumscribed in the context of pregnancy- and abortion-related care by § 106 of

the 1992 Veterans Health Care Act ("VHCA"), Pub. L. No.  102–585, 160 Stat. 4943 (Nov.  4, 1992). That Act provided that VA may provide some limited reproductive health care, "but not including *under this section* infertility services, abortions, or pregnancy care (including prenatal and delivery care), except for such care relating to a pregnancy that is complicated or in which the risks of complication are increased by a service-connected condition."  *Id.* (emphasis added).  The prohibition on furnishing infertility services, abortions, or pregnancy care "under this section," Plaintiff argues, precludes the Secretary from furnishing infertility services, abortions, or non-excepted pregnancy care under *any other section* of the statutory provisions governing veterans' medical benefits.  *See* PI Mot. at 18.  That assertion is incorrect.

VA has consistently applied a common-sense, textual interpretation of § 106 to conclude that the phrase "under this section" means that while § 106 bars the provision of any abortion or infertility or general pregnancy services under § 106 of the VHCA, it does not limit VA's authority to provide such services under any other statutory provision.  *See* Veterans Health Administration (VHA) Directive 10-93-151, December 6, 1993, *available at* https://perma.cc/52SU-JK3D.  Consistent with this interpretation, VA has provided infertility and pregnancy-related services under 38 U.S.C. § 1710 for decades.  *See* 87 Fed. Reg. at 55,289; *see also* 64 Fed. Reg. at 54,210 ("[W]e conclude that pregnancy and delivery services . . . should be included in the medical benefits package. We also conclude that . . . infertility services . . . should not be excluded").  Similarly, VA has long recognized that a veteran could be eligible for infertility services for a service-connected disability under 38 U.S.C. § 1712, even though that veteran would have been ineligible for infertility services under § 106 of the VHCA.  87 Fed. Reg. at 55,289.  VA's interpretation is therefore entitled to "considerable weight." *Davis v. United States*, 495 U.S. 472, 484 (1990) (courts "give an agency's interpretations and practices considerable weight where they involve the contemporaneous construction of a statute and where they have been in long use").  Today, VA relies on 38 U.S.C. § 1710(a)(1)-(3), not § 106 of the VHCA, to provide pap smears, breast exams and mammography, general reproductive health services, pregnancy services, and infertility services to thousands of veterans nationwide.  *See, e.g.,* Congressional Research Service, Veterans Health Administration: Gender-Specific Health Care Services for Women Veterans (Mar.

11, 2021).  This longstanding interpretation confirms that § 106's prohibition on providing certain services "under this section" does not restrict the provision of medical services under any other statutory provisions. *See also* Intergovernmental Immunity for the Department of Veterans Affairs and Its Employees When Providing Certain Abortion Services, 46 Op. O.L.C. __ ,slip op. at 8 (Sept. 21, 2022) (explaining "that section 106 does not prohibit VA from providing abortion services to veterans pursuant to its general treatment authority, 38 U.S.C. § 1710").

Plaintiff contends that VA's interpretation of § 106 and 38 U.S.C. § 1710 should not be given weight because that interpretation has never been challenged.  PI Mot. at 20.  But she fails to mention that VA's interpretation has been endorsed by the Federal Circuit.  In *EPVA*, the Federal Circuit reasoned that, although "[n]othing in the Act indicates that Congress intended to require the Department to provide veterans with infertility treatment[,]" "the Secretary has broad discretion" to include infertility services in the medical benefits package.  *EPVA*, 257 F.3d at 1362 (upholding regulation that included infertility services, except for in vitro fertilization, in medical benefits package under 38 U.S.C. § 1710 and noting that the Secretary has broad discretion to determine what medical services are "needed").

This interpretation has also been ratified by Congress.  For example, the Deborah Sampson Act of 2020, which expanded women's health care services provided by VA including "obstetric care" and "gynecological care," did not reference § 106 of the VHCA and only referenced VA's medical benefits package—which shows that Congress did not view § 106 of the VHCA as a limitation on VA's authority to provide care to "women veterans" under authorities other than § 106.  *See* 38 U.S.C. §§ 7310A, 7310.  At the time Congress passed the Deborah Sampson Act of 2020, Congress knew that VA had been providing fertility- and pregnancy-related care to veterans under 38 U.S.C. § 1710 for decades. *See Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute" and where "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute").

VA's authority to determine that abortion services can be "needed" in the VA's medical benefits package is further bolstered by the fact that, unlike many government agencies, VA's funding of medical services is not restricted by any type of so-called "Hyde Amendment." Congress knows how to restrict funding for abortion to allow their provision only in certain circumstances. *See, e.g.*, Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, Div. H, secs. 506–07, 136 Stat. 49, 496 (Mar. 15, 2022) (providing that no covered funds "shall be expended for any abortion" or "for health benefits coverage that includes coverage of abortion," except "if the pregnancy is the result of an act of rape or incest; or . . . in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed"). No similar provision restricts VA's funding or provision of medical services. "[W]e generally presum[e] that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 777 (2020).

Finally, § 106 of the VHCA has long since been overtaken by a statutory and regulatory overhaul of VA's medical benefits system. When § 106 was enacted in 1992, VA health care was subject to a patchwork of eligibility criteria, and care was largely linked only to service-connected conditions. *See* 87 Fed. Reg. at 55,288-89 (explaining history). The Veterans' Health Care Eligibility Reform Act of 1996 effectively overtook § 106 of the VHCA by replacing the old system that delineated specific medical services based on distinct eligibility criteria with a system where a veteran could receive whatever medical care and services the Secretary determines are "needed." *See* 38 U.S.C. § 1710. VA no longer relies on Section 106 to provide any health care services. *See* 87 Fed. Reg. at 55,289-90.

Plaintiff argues that the Veterans' Health Care Eligibility Reform Act of 1996 should not be viewed as having overtaken the VHCA of 1992 because repeals by implication are disfavored. *See* PI Mot. at 18 (citing *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974)). But there is no need even to consider this argument given that the plain text of § 106 makes clear it does not apply to other authorities, *i.e.*,

it applies only to care "under this section."  There is thus no conflict between the two statutory provisions.  In any event, Plaintiff's position is belied by the "clearly expressed congressional intention" that the 1996 Act would, in fact, substitute for the 1992 Act and would render the 1992 Act outdated.  *Morton*, 417 U.S. at 551; *see* H.R. Rep. No. 104–690, at 4 (1996) ("[The Act] would substitute a single uniform eligibility standard for the complex array of standards governing access to VA hospital and outpatient care.  While the new standard is a simple one, more importantly, it employed a clinically appropriate 'need for care' test, thereby ensuring that medical judgment rather than legal criteria will determine when care will be provided and the level at which that care will be furnished."); *id.* at 13 ("[The Act] would substitute a single, streamlined eligibility provision—based on clinical need for care—for the complex array of disparate rules currently governing veterans' eligibility for hospital and outpatient care.").  Congress abandoned the delineation of specific covered services previously required by the 1992 Act and replaced it with a broader grant of discretion to the Secretary to determine what care is "needed" through the VA's medical benefits package.  *See* 38 U.S.C. § 1710.

In sum, 38 U.S.C. § 1710 gives the Secretary broad discretion to determine what care is "needed" by regulation through the VA's medical benefits package.  *EPVA*, 257 F.3d at 1362.  VA has consistently interpreted its governing statutes to allow the Secretary to include pregnancy and reproductive health care in the medical benefits package—a view that Congress has endorsed.  And the Secretary, in exercising that broad grant of authority, determined that abortion counseling and abortions in cases of rape or incest or where necessary to protect the health or life of the pregnant patient are "needed" to "promote, preserve, or restore the health" of veterans under 38 C.F.R. § 17.38.  Because the IFR was promulgated within the Secretary's lawful exercise of authority, the government has a compelling interest in implementing the IFR to provide life- and health- preserving care to veterans.

### 2. The IFR Was Validly Promulgated Pursuant to the Secretary's Authority to Provide Medical Benefits to CHAMPVA Beneficiaries.

Plaintiff also challenges the Secretary's authority to amend the CHAMPVA regulations to provide for abortion counseling and to cover abortions when the life or health of the mother is endangered and in cases of rape or incest.  38 C.F.R. § 17.272(a)(64)(i)-(ii).  Under CHAMPVA, VA must provide for medical care "in the same or similar manner and subject to the same or similar limitations as medical care" provided by the Department of Defense to active-duty family members, retired service members and their families, and others under the TRICARE (Select) program (hereafter referred to as TRICARE Select, for ease of reference).  *See* 38 U.S.C. § 1781(b).  Before the issuance of the IFR, TRICARE Select covered abortions in cases of rape or incest and where the life of the mother was endangered, while CHAMPVA covered abortions only where the life of the mother was endangered.  The IFR amends CHAMPVA to add coverage for abortions in cases of rape or incest, thus bringing it more closely in line with the TRICARE Select program.  38 C.F.R. § 17.272(a)(64)(i)-(ii).  The amended CHAMPVA regulations also provide for abortions in cases where the health, not just the life, of the mother is endangered.  *Id.*

Plaintiff recognizes that the requirement that CHAMPVA coverage be the "same or similar" to TRICARE Select does mandate not identical treatment.  PI Mot. at 21; *see also* 87 Fed. Reg. at 55,290 ("[38 U.S.C. § 1781(b)] does not require CHAMPVA and TRICARE (Select) to be administered identically.  Rather, by referring to care that is 'similar,' the statute permits VA flexibility to administer the program for CHAMPVA beneficiaries.").  VA has long provided for coverage under the CHAMPVA program that encompasses more medical benefits than TRICARE Select offers, and the IFR is consistent with that long history of providing benefits under the CHAMPVA program that, while "similar" to TRICARE Select, are slightly more robust.  *See, e.g.*, 38 C.F.R. § 17.272(30)(xiii) (providing coverage for annual physical exams, even though TRICARE Select does not cover annual physical exams); *see also Davis*, 495 U.S. 484 (agency's longstanding interpretation of statute is entitled to "considerable weight").  The inclusion of more medical benefits in CHAMPVA than in TRICARE Select is thus consistent with VA's longstanding interpretation of the requirement that the benefits be

"similar" and is a valid exercise of the Secretary's discretion.  38 U.S.C. § 1781(b); *see also* 38 C.F.R. § 17.272(a) (CHAMPVA benefits cover medical services and supplies that "are medically necessary and appropriate for the treatment of a condition").

Plaintiff primarily takes issue with the provisions of the IFR that allow CHAMPVA beneficiaries to access abortion when such care is needed because the health, not just the life, of the pregnant patient is endangered. PI Mot. at 21. Plaintiff is incorrect that this provision offers "unrestricted abortion" or is "arbitrary and capricious," *id.* at 22, because the regulation still requires the coverage to be "medically necessary and appropriate for the treatment of a condition," 38 C.F.R. § 17.272(a); *see also id.* § 17.270(b).  As the Preamble to the IFR explained, and as discussed above, there is widespread medical consensus that abortion or pregnancy termination is the medically necessary and appropriate treatment for certain medical conditions, including pre-eclampsia and placental abruption and hemorrhage, among many others.  *See* 87 Fed. Reg. at 55,295; Part II.B.1, *supra.*  Patients may suffer serious long-term consequences when denied a medically necessary abortion that, though short of death, can cause permanent long-term disability, result in loss of fertility, and lead to other serious medical repercussions.  Allowing the provision of abortions in cases necessary to protect the health of the patient also allows health care providers to treat serious health conditions *before* they escalate to a point that can become life-threatening, which, if survived, can mean a longer and more difficult path to recovery.  By amending the regulation to include abortions in cases of rape or incest, as well as abortions in cases where the health or life of the pregnant beneficiary is endangered, the IFR brings coverage of abortions under CHAMPVA more closely in line with TRICARE Select and is also consistent with the Secretary's longstanding practice of providing coverage under CHAMPVA that is similar to coverage provided by TRICARE Select and is medically necessary.  The IFR is therefore a valid exercise of the Secretary's authority to provide CHAMPVA beneficiaries access to medically necessary health care.

### 3.  The Major Questions Doctrine is Inapplicable.

Departing from normal principles of statutory interpretation, Plaintiff invokes the major questions doctrine.  That doctrine is of no help to Plaintiff because it is limited to "certain

extraordinary cases," *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022), involving assertions of "highly consequential power beyond what Congress could reasonably be understood to have granted," *id.* at 2609.  In the vast majority of cases, that doctrine does not supplant general statutory interpretation principles, including that courts ordinarily may not "impos[e] limits on an agency's discretion that are not supported by the text."  *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020).

Here, unlike in *West Virginia v. EPA*, VA has not found "a newfound power" in an "ancillary provision" of the Veterans' Health Care Eligibility Reform Act of 1996, as the Supreme Court found the EPA had done with the Clean Power Plan.  *See* 142 S. Ct. at 2602, 2610 (concluding that EPA had identified for its regulation a statutory "backwater" that had been "used . . . only a handful of times since the enactment of the statute").  To the contrary, Congress clearly delegated to the Secretary of VA the authority to "furnish hospital care [and] medical services . . . which the Secretary determines to be needed," 38 U.S.C. § 1710(a)(1)-(3), where such "medical services" may include "medical examination, treatment," "[s]urgical services," and "[p]reventive health services." 38 U.S.C. § 1701(6).  Identifying the medical services "determine[d] to be needed" for veterans thus falls squarely within VA's wheelhouse.  This is also not the first time that the VA has covered medically necessary abortion care.  *See* VHA Directive 10-93-151, December 6, 1993, *available at* https://perma.cc/52SU-JK3D (recognizing Secretary's authority to provide abortions to treat a service-connected disability).  And since at least 1998, the Secretary has exercised his statutory authority under CHAMPVA to cover abortions in cases where "the life of the mother would be endangered if the fetus were carried to term," *Civilian Health and Medical Program of the Department of Veterans Affairs (CHAMPVA)*, 63 Fed. Reg. 48,100, 48,105 (Sept. 9, 1998), which wholly undercuts any assertion that providing coverage for certain medically needed abortions is a "newfound power."

Nor does the IFR "substantially restructure" a significant portion of the economy akin to a complete reorganization of American energy infrastructure, *West Virginia*, 142 S. Ct. at 2610; changing the terms of 80% of American residential leases, *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021); upending the entire tobacco industry, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120

(2000); or unilaterally rescinding physicians' state-issued licenses to practice medicine, *Gonzales v. Oregon*, 546 U.S. 243 (2006). Instead, the IFR is a traditional exercise of VA's well-established authority to determine what medical services are "needed" and thus what medical services VA itself will provide. And any argument that, pursuant to the major questions doctrine, § 1710 should be read as *impliedly* foreclosing the Secretary from authorizing abortion-related care is contrary to Plaintiff's own acknowledgment that Congress has elsewhere expressly addressed the topic of abortion with respect to other VA authorities, while simultaneously not overruling CHAMPVA's inclusion of certain abortion coverage. *See supra* Part II.C.1; *cf. United States v. Johnson*, 529 U.S. 53, 58 (2000) ("When Congress provides exceptions in a statute, it does not follow that courts have authority to create others. The proper inference, and the one we adopt here, is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth.").

### 4. The Interim Final Rule Is Not Arbitrary or Capricious Because It Does Not Expose Plaintiff to Civil or Criminal Liability Under Texas Law.

Plaintiff's contention that the IFR is arbitrary and capricious because it subjects her to civil or criminal liability is incorrect as a matter of law and as a matter of fact and is inapposite to her RFRA claim. Arbitrary and capricious "review is 'highly deferential' to the actions of the agency." *Paralyzed Veterans*, 345 F.3d at 1340 (quotation omitted); *see also Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021). Ms. Carter's fear that she may be exposed to criminal or civil liability under Texas law has been remedied by her religious exemption. Because Plaintiff is not required to perform, prescribe, or counsel abortions, she does not face any risk that Texas will try to impose criminal or civil liability against her.[6] Plaintiff also suggests that she could face punitive action from the Texas Board of Nursing if she fails to comply with certain reporting requirements, PI Mot. at 24-25, but she

---

[6] Even if Plaintiff were required to perform abortions—and she is not—Texas could not sanction her for doing so because "[t]he Supremacy Clause of the U.S. Constitution bars state officials from penalizing VA employees for performing their federal functions, whether through criminal prosecution, license revocation proceedings, or civil litigation." 87 Fed. Reg. at 55,293-94; *see also* Intergovernmental Immunity for the Department of Veterans Affairs and Its Employees When Providing Certain Abortion Services, 46 Op. O.L.C. __ ,Slip Op. at 1 (Sept. 21, 2022); *United States v. Washington*, 142 S. Ct. 1976, 1984 (2022) (interpreting "the Constitution as prohibiting States from interfering with or controlling the operations of the Federal Government").

does not explain how someone else performing an abortion as authorized by the IFR would constitute an event she would be required to report.  The IFR is not arbitrary and capricious because it does not require Plaintiff to expose herself to any potential civil or criminal liability, and VA expressly considered and addressed that issue.

### 5. The Secretary Had Good Cause to Forgo Notice and Comment and Make the Interim Final Rule Effective Immediately.

Plaintiff's contention that the VA lacks a compelling interest in implementing the IFR because it was procedurally flawed is similarly unavailing.  The APA generally requires that agencies go through a process of notice and comment for substantive rules and provide not less than a 30-day delay before the rules becomes effective.  An agency may forgo these requirements, however, if the agency for good cause finds that compliance would be impracticable, unnecessary, or contrary to the public interest, 5 U.S.C. § 553(b)(B), if good cause exists to excuse the 30-day delay, *id.* § 553(d)(3), or if the rule "recognizes an exemption or relieves a restriction," *id.* § 553(d)(1).  The Secretary determined that "good cause" existed to excuse both notice and comment and the 30-day delay in light of the imminent threat to the health and lives of pregnant veterans and beneficiaries and also concluded that the 30-day delay was not required because the IFR merely amends the regulation to relieve restrictions on the provision of abortion care.  87 Fed. Reg. at 55,295; *see* 38 C.F.R. §§ 17.272(a), 17.38(c) (relieving restrictions on what health care is "excluded from" coverage).

The "good cause" exception "is an important safety valve to be used where delay would do real harm."  *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979); *see also Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (excusing notice and comment was "necessary to prevent a possible imminent hazard to aircraft, persons, and property within the United States").  Delay would do real harm to pregnant veterans and beneficiaries here.  The Secretary explained that "leaving veterans and CHAMPVA beneficiaries without access to abortions and abortion counseling puts their health and lives at risk."  87 Fed. Reg. at 55,295.  Before *Dobbs*, veterans could obtain abortion services from non-VA facilities in their communities.  Because many States acted immediately to restrict abortion access after *Dobbs*, veterans around the country faced an imminent risk of losing access to important health-

and life-preserving care. *See* 87 Fed. Reg. at 55,291.  Courts have approved forgoing the APA's procedural requirements when challenged rules have "life-saving importance." *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981); *see also Biden v. Missouri*, 142 S. Ct. 647, 654 (2022) (finding good cause existed to promulgate CMS Vaccination IFR).  This is such a case.

Even if this Court were to conclude that VA lacked good cause to bypass the notice and comment process or the 30-day delay, any error is harmless.  "In administrative law, as in federal civil and criminal litigation, there is a harmless error rule."  *United States v. Johnson*, 632 F.3d 912, 930 (5th Cir. 2011).  All of the arguments that Plaintiff raises in her challenge to the IFR were adequately considered and rejected by the Secretary.  "[W]hen a party's claims were considered, even if notice was inadequate, the challenging party may not have been prejudiced." *Id.* at 931.  Additionally, even if the rule had become effective 30 days after it was issued, it would have been effective as of October 9, 2022, nine days before Plaintiff first requested a religious accommodation to exempt her from the rule. *Id.* at 930 (finding harmless error where sex offender did not engage in conduct violative of the Interim Final Rule until 30 days after it had been issued).  Thus, any failure to follow the APA's procedural requirements was harmless.  *Id.*  At any rate, VA solicited comments in the IFR and is preparing to respond to them.  There is no record of Plaintiff having submitted a comment during the notice and comment process, further underscoring the lack of procedural harm.

## III.    Plaintiff Cannot Satisfy the Balance of Harms or Public Interest Prongs.

In addition to failing to demonstrate a substantial likelihood of success on the merits, Plaintiff fails to satisfy the remaining factors for extraordinary preliminary relief.  Indeed, there is no "threat of irreparable injury" at all, much less a "substantial threat," *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009), because Plaintiff has been granted a religious accommodation.  *See* Ex. H ("The granting of this accommodation means that you are not required to participate in abortion services, to include performing, prescribing, or counseling for abortion.").  This was the very accommodation sought by Plaintiff in her October 27, 2022 email to her supervisor. *See* Ex. B ("I need accommodation not to participate in abortion services because of my religious beliefs against performing, prescribing or counseling for an abortion.").  Plaintiff's decision not to meaningfully engage with VA regarding her

facility-wide objection undermines her claim of irreparable harm.  Far from "applying the Rule to Ms. Carter without consideration for her religious objections," PI Mot. at 35, or "put[ting] her to a choice between her job and violating her sincerely held religious beliefs," *id.*, VA has granted her an accommodation with respect to her personal duties, and has offered to engage further with Plaintiff on potential additional accommodations, including a possible transfer. Particularly on this record, Plaintiff cannot demonstrate irreparable injury, rendering inapposite the various First Amendment and RFRA cases cited.  *See* PI Mot. at 35 (citing *Elrod v. Burns*, 427 U.S. 347 (1976), and *BST Holdings, L.L.C. v.* OSHA, 17 F.4th 604, 618 (5th Cir. 2021)).

The remaining requirements for issuance of a preliminary injunction—the balance of harms and the public interest, which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009)—also tilt sharply against the issuance of injunctive relief.  As noted in the Declarations of Dr. Olawale Fashina and Meggan Babcock, *see* Exhibits. B & C, VA has a substantial interest in providing comprehensive healthcare coverage and treatment to its veterans and beneficiaries, and VA crafts individual accommodations (like the one granted to Plaintiff here) in a way that balances the religious practices of individual employees with the mission of the Department and the needs of veterans.  Contrary to Ms. Carter's conclusory suggestion that "there is no public interest served by the VA's application of the rule to … the Temple VA facility," PI Mot. at 37, VA has determined that reproductive healthcare, including abortion care and counseling in circumstances covered by the IFR, "is needed to protect the lives and health of veterans."  87 Fed. Reg. at 55,288. Additionally, these services are particularly needed given the local population served by the Temple VA facility.  *See* Fashina Decl., ¶¶ 6, 15-17.

Finally, as discussed *supra* at Part II.A.1, there is no basis for a single employee to exercise veto power over the scope of medical care provided at a VA facility.  Given the unprecedented and unworkable nature of Plaintiff's theory, the requested injunction would disserve the public interest.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for a preliminary injunction.

Dated: January 17, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

AMY KOSSAK
Counsel to the Principal Deputy Assistant
Attorney General, Civil Division

DANIEL SCHWEI
Special Counsel

*/s/ Lisa Newman*
LISA NEWMAN (TX Bar No. 24107878)
ANNA DEFFEBACH
ALEXANDER N. ELY
MICHAEL CLENDENEN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 514-5578
lisa.n.newman@usdoj.gov

*Counsel for the United States*