**FILED**

January 19, 2023

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ lad
                              DEPUTY

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

STEPHANIE CARTER,

                              Plaintiff,

v.                                                          Case No. 6:22-cv-01275

DENIS RICHARD MCDONOUGH,
in his official capacity as United States
Secretary of Veterans Affairs, and the
UNITED STATES DEPARTMENT OF
VETERANS AFFAIRS,

                              Defendants.

---

**AMICUS BRIEF OF MISSISSIPPI, ALABAMA, ARKANSAS, GEORGIA, IDAHO, INDIANA, KANSAS, LOUISIANA, MISSOURI, MONTANA, NEBRASKA, OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, TEXAS, UTAH, AND WEST VIRGINIA IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION, INTEREST OF AMICI CURIAE,
AND SUMMARY OF ARGUMENT ................................................................ 1

BACKGROUND ............................................................................................... 2

ARGUMENT ..................................................................................................... 4

  The Public Interest And Equities Support Injunctive Relief Against The VA's
  Interim Final Rule .......................................................................................... 4

  A. The Public Interest And Equities Weigh Strongly Against The Rule Because
     It Was Issued Without Statutory Authority ................................................ 4

  B. The Rule Undermines The Public-Interest Determinations That States—Not
     Federal Agencies—Are Entitled To Make ................................................. 8

  C. The Rule Harms The Public Interest By Improperly Forcing States To
     Divert Scarce Resources To Investigating And Prosecuting Violations Of
     Their Laws ................................................................................................... 10

CONCLUSION .................................................................................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airline Pilots Ass'n, Int'l, AFL-CIO v. Taca Int'l Airlines, S.A.,*
  748 F.2d 965 (5th Cir. 1984) ..................................................................... 7

*Dobbs v. Jackson Women's Health Organization,*
  142 S. Ct. 2228 (2022) ........................................................... 1, 8, 9, 10, 14

*Gonzales v. Oregon,*
  546 U.S. 243 (2006) ................................................................................. 8

*Hillsborough Cnty., Fla. v. Automated Med. Laboratories, Inc.,*
  471 U.S. 707 (1985) ................................................................................. 8

*Luminant Generation Co. v. EPA,*
  675 F.3d 917 (5th Cir. 2012) ................................................................... 4

*Maine v. Taylor,*
  477 U.S. 131 (1986) ................................................................................ 12

*Metro. Life Ins. Co. v. Massachusetts,*
  471 U.S. 724 (1985) ........................................................................... 8, 11

*Morton v. Mancari,*
  417 U.S. 535 (1974) ................................................................................. 7

*Planned Parenthood of Southeastern Pennsylvania v. Casey,*
  505 U.S. 833 (1992) ................................................................................ 14

*Posadas v. Nat'l City Bank of New York,*
  296 U.S. 497 (1936) ................................................................................. 6

*Rice v. Santa Fe Elevator Corp.,*
  331 U.S. 218 (1947) ................................................................................ 11

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers,*
  531 U.S. 159 (2001) ................................................................................ 11

*Texas v. Biden,*
  10 F.4th 538 (5th Cir. 2021) ............................................................ 4, 5, 7

ii

*Texas v. United States*,
  787 F.3d 733 (5th Cir. 2015) ................................................................. 12

*Valley v. Rapides Parish Sch. Bd.*,
  118 F.3d 1047 (5th Cir. 1997). .......................................................... 5, 7

*Wages & White Lion Invs., LLC v. FDA*,
  16 F.4th 1130 (5th Cir. 2021) ............................................................... 5

**Constitutional Provisions**

U.S. Const. amend. I ................................................................................ 4

U.S. Const. amend. X ............................................................................. 10

**Statutes**

10 U.S.C. § 1093 ...................................................................................... 3

38 U.S.C. § 1710 ................................................................................. 2, 6

38 U.S.C. § 1781 ............................................................................. 2, 3, 6

Miss. Code Ann. § 41-41-45 ................................................................... 9

Religious Freedom Restoration Act,
  42 U.S.C. § 2000bb *et seq.*. ................................................................ 4

Veterans Health Care Act of 1992,
  Pub. L. No. 102-585, 106 Stat. 4943 (1992) ................................. 3, 5, 6, 7

Veterans' Health Care Eligibility Reform Act of 1996,
  Pub. L. No. 104-262, 110 Stat. 3177 (1996) ...................................... 6, 7

**Executive Order**

Exec. Order No. 13132,
  64 Fed. Reg. 43255 (1999) ................................................................... 11

## Regulations

38 C.F.R. § 1.201 *et seq.* ................................................................. 12

38 C.F.R. § 17.38 ...................................................................... 2, 3, 5

38 C.F.R. § 17.272 ........................................................................ 3

## Rulemaking

Reproductive Health Services,
    87 Fed. Reg. 55287 (Sept. 9, 2022) ................................ 2, 3, 4, 6, 8, 9, 10, 11, 12, 13

## Other Authorities

Comments on Interim Final Rule from
    Democrat Attorneys General to
    Dr. Shereef Elnahal, Under Secretary for Health,
    U.S. Dep't of Veterans Affairs (Oct. 11, 2022) ................................................. 13-14

Regulatory Impact Analysis for RIN 2900-AR57(IF),
    Reproductive Health Services (Sept. 1, 2022) ....................................................... 12

## INTRODUCTION, INTEREST OF AMICI CURIAE,
## AND SUMMARY OF ARGUMENT

Last year, the Supreme Court held that abortion is a matter that is entrusted to "the people and their elected representatives" to address. *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2284 (2022). Overruling precedent that took that authority away from the people, the Court returned the issue of "regulating or prohibiting abortion" to "the citizens of each State." *Ibid.* States may thus pursue their "legitimate interests" in protecting unborn life, women's health, and the medical profession's integrity by regulating or restricting abortion. *Ibid.*

Amici curiae are the States of Mississippi, Alabama, Arkansas, Georgia, Idaho, Indiana, Kansas, Louisiana, Missouri, Montana, Nebraska, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and West Virginia. Like other States, amici have, consistent with the Constitution and the Supreme Court's decision in *Dobbs*, adopted laws regulating abortion that reflect the considered judgments of "the people and their elected representatives." *Ibid.* These laws strike a balance among the competing interests and reflect the outcome of hard-fought democratic processes. Some amici have chosen to adopt tighter restrictions on abortion following *Dobbs*. Other States have maintained or embraced more permissive regimes. All States have provisions in their abortion laws to protect a woman's life. Amici commonly include exceptions in other circumstances. These choices reflect the approach the Constitution envisions for addressing complex issues that require "legislative bodies" to "draw lines that accommodate competing interests." *Id.* at 2268.

Rather than respect the Constitution and the Supreme Court's decision, the Biden Administration has sought to wrest control over abortion back from the people. The rule at issue in this case typifies that effort. In September 2022, the Department of Veterans Affairs adopted an interim final rule that purports to authorize taxpayer-funded abortions and abortion counseling for certain veterans and their beneficiaries. Reproductive Health Services, 87 Fed. Reg. 55287 (Sept. 9, 2022). The rule reversed longstanding agency practice. Plaintiff here has moved to preliminarily enjoin that rule.

This brief explains why the public interest and equities strongly support injunctive relief against the VA's rule. First, the rule was issued without statutory authority and so it disserves the public interest. Second, the rule defies the public-interest determinations made by the amici States, which are entrusted with balancing the relevant policy and equitable considerations in this area. Last, the rule obstructs and hinders the amici States' enforcement of duly enacted laws and thus undercuts the public interest that those laws promote. For these reasons, injunctive relief against the rule's enforcement would promote the public interest.

## BACKGROUND

Federal law authorizes the Department of Veterans Affairs to "furnish hospital care and medical services" to qualifying veterans. 38 U.S.C. § 1710(a)(1). The VA implements its general treatment authority for veterans through regulations defining its "medical benefits package." 38 C.F.R. § 17.38. The VA is also authorized to provide medical care for certain spouses, children, survivors, and caregivers of veterans, known as CHAMPVA beneficiaries. 38 U.S.C. § 1781. Such care must be provided "in

2

the same or similar manner and subject to the same or similar limitations as medical care is furnished" to family members of active-duty personnel and others under the Department of Defense's TRICARE (Select) program. *Ibid.*

For decades, VA regulations expressly excluded "[a]bortions and abortion counseling" from the medical benefits package offered to veterans. 38 C.F.R. § 17.38(c)(1) (effective until Sept. 9, 2022). These regulations aligned with statutory limitations directing the VA to provide veterans with "health care services" that cover "[g]eneral reproductive health care ... but not ... abortions." Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 106(a)(3), 106 Stat. 4943, 4947 (1992). VA regulations also "specifically excluded" from medical coverage for CHAMPVA beneficiaries "[a]bortion" ("except when a physician certifies that the life of the mother would be endangered if the fetus were carried to term") and "[a]bortion counseling." 38 C.F.R. § 17.272(a)(64), (65) (effective until Sept. 9, 2022). The exclusion for CHAMPVA beneficiaries aligned with federal law governing TRICARE, which bars using Defense Department funds or facilities for abortion "except where the life of the mother would be endangered if the fetus were carried to term or in a case in which the pregnancy is the result of an act of rape or incest." 10 U.S.C. § 1093(a) & (b).

The VA has now changed course. On September 9, 2022, it adopted the interim final rule, greenlighting taxpayer-funded abortions and abortion counseling for certain veterans and beneficiaries. 87 Fed. Reg. 55287. The rule amends the longstanding VA regulations described above to provide abortions in purportedly "limited circumstances" "when the life or health of the pregnant veteran [or beneficiary] would be endangered if the pregnancy were carried to term" or "when the

3

pregnancy is the result of an act of rape or incest." *Id.* at 55291, 55292. The rule also provides for abortion counseling "to aid a pregnant individual in making a decision about an unwanted pregnancy" and "to help the pregnant individual implement the decision." *Id.* at 55292. The VA claims that the rule "preempt[s]" any "State or local civil or criminal law that restricts, limits, or otherwise impedes a VA professional's provision of care permitted by" the rule. *Id.* at 55294.

## ARGUMENT

**The Public Interest And Equities Support Injunctive Relief Against The VA's Interim Final Rule.**

The VA's rule is deeply flawed. It rests on a claim of legal authority that the VA does not have, it flouts the public-interest determinations that States have properly made, and it undermines the public interest in the enforcement of validly enacted state laws. These features strongly support injunctive relief against the rule.

**A.    The Public Interest And Equities Weigh Strongly Against The Rule Because It Was Issued Without Statutory Authority.**

Plaintiff has demonstrated how the VA's rule violates her religious liberty protected under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, and the First Amendment. *See* Mot. 14-17, 35-37, Dkt. 13. Amici emphasize that the rule was issued without statutory authority, so the public interest and equities favor enjoining the rule's enforcement.

An agency rule defies the public interest if it is unlawful. A federal agency "literally has no power to act ... unless and until Congress confers power upon it." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 932 (5th Cir. 2012). "There is generally no public interest in the perpetuation of unlawful agency action." *Texas v.*

*Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (brackets omitted); *see also Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021). Allowing illegal actions by government agencies to stand "undermine[s]" the public interest. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1056 (5th Cir. 1997). And there is a strong public interest "in having governmental agencies abide by the federal laws that govern their existence and operations." *Biden*, 10 F.4th at 559.

The rule here is unlawful. The VA lacks statutory authority to permit VA-provided abortions for veterans. The central law here is the Veterans Health Care Act of 1992. That law seeks to (among other things) "improve health care services for women veterans," "improve preventive health services for veterans," and "make other improvements in the delivery and administration of health care by the [VA]." Pub. L. No. 102-585, 106 Stat. 4943. But, consistent with other longstanding federal laws, that Act does not authorize abortions. Section 106(a)(3) of the Act authorizes the VA Secretary to provide "health care services" that cover "[g]eneral reproductive health care … , *but not including* under this section infertility services, *abortions*, or pregnancy care (including prenatal and delivery care), except for such care relating to a pregnancy that is complicated or in which the risks of complication are increased by a service-connected condition." 106 Stat. at 4947 (emphases added). Section 106 thus forecloses the VA's provision of abortions to veterans. This statutory bar was reflected in longstanding VA regulations that the new rule purports to cast aside. *See* 38 C.F.R. § 17.38(c)(1) (effective until Sept. 9, 2022) (The "medical benefits package" for veterans "does not include" "[a]bortions and abortion counseling.").

The VA claims that Section 106's "under this section" language means that it "d[oes] not limit" the VA's authority under other laws. 87 Fed. Reg. at 55289. But Section 106 by its terms applies to "hospital care and medical services *under chapter 17 of title 38, United States Code*." 106 Stat. at 4947 (emphasis added). Chapter 17 of Title 38 sets out the VA's legal authority to provide medical care and contains the very statutory provisions on which the rule relies. *See* 87 Fed. Reg. at 55291-93 (claiming to provide for abortions and abortion counseling under 38 U.S.C. §§ 1710 & 1781). Section 106 thus applies and defeats the rule.

The VA also claims that the Veterans' Health Care Eligibility Reform Act of 1996 "effectively overtook" Section 106. 87 Fed. Reg. at 55289. This argument fails too. The VA says that the 1996 law "made major changes to eligibility for VA health care" and replaced the existing "patchwork of eligibility criteria" with a "single, streamlined eligibility provision" for VA healthcare benefits. *Ibid.* But the VA does not point to any text in that law actually repealing or replacing Section 106—or discussing abortion at all. In fact, the 1996 law expressly repealed or amended other provisions of the 1992 Act while leaving Section 106 untouched. *See* Pub. L. No. 104-262, 110 Stat. 3177, 3193 (1996) (amending "Title II" and "Section 201 of the Veterans Health Care Act of 1992" and repealing "Section 204 of such Act"); *id.* at 3197 (amending Sections 107(a) and (b)). This shows that Congress knew how to "overt[ake]" that law when it wanted—and that it did not want to overtake Section 106. On top of these points, "repeals by implication are not favored." *Posadas v. Nat'l City Bank of New York*, 296 U.S. 497, 503 (1936). "[T]he intention of the legislature to repeal must be clear and manifest," *ibid.*, and the 1996 law shows no such

6

intention: as just explained, it shows the opposite with Section 106. *Cf. Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."). There is no reason why the 1996 law (which governs general eligibility criteria and does not discuss abortion) and the 1992 Act (which includes an express and specific abortion limitation) cannot coexist, as they had for the decades before the VA hastily adopted the new rule. "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Id.* at 551; *Airline Pilots Ass'n, Int'l, AFL-CIO v. Taca Int'l Airlines, S.A.*, 748 F.2d 965, 969 (5th Cir. 1984) ("[S]tatutes ... are to be interpreted, to the maximum extent possible, so as to be consistent and harmonious."). So courts must respect Section 106—which bars the VA's rule.

The lack of statutory authority fundamentally undermines the VA's entire rulemaking. (Plaintiff further explains how the rule's provisions on CHAMPVA beneficiaries contradict additional statutory limitations on the VA's authority. *See* Mot. 9, 21-22.) And because the rule lacks a lawful basis, the VA cannot claim any public interest in its enforcement. Indeed, enjoining the VA to "abide by" federal law would promote the public interest, *Biden*, 10 F.4th at 559—and not issuing injunctive relief would "undermine" the public interest, *Valley*, 118 F.3d at 1056.

**B.** **The Rule Undermines The Public-Interest Determinations That States—Not Federal Agencies—Are Entitled To Make.**

In adopting the rule, the VA sought to override state abortion regulations that took effect after the *Dobbs* decision. The Department acknowledged that it was "acting to help to ensure that, *irrespective of what laws or policies States may impose,* veterans [and beneficiaries] ... will be able to obtain abortions." 87 Fed. Reg. at 55288 (emphasis added). This approach upends the system that the Supreme Court recognized in *Dobbs*. Under our constitutional system, elected representatives in States—not unelected bureaucrats in federal agencies—strike the balance between "competing interests" on abortion. *Dobbs*, 142 S. Ct. at 2268. The rule attempts to override the balance struck by States. If allowed to stand, the rule will harm the public interest.

Under our Constitution, States have the primary authority to legislate to protect the health, safety, and welfare of their citizens. *Hillsborough Cnty., Fla. v. Automated Med. Laboratories, Inc.*, 471 U.S. 707, 719 (1985) ("[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern."); *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) ("The States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.") (internal quotation marks omitted). This power includes regulating the licensure, registration, and disciplining of medical professionals. *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) ("[A] functioning medical profession [is] regulated under the States' police powers.").

Using this authority, States have adopted varying approaches to abortion that reflect the policy decisions of their constituent citizens. State laws restricting abortion ubiquitously include provisions to protect a woman's life. *See, e.g.,* Miss. Code Ann. § 41-41-45(2). They commonly include exceptions in other circumstances as well. *See, e.g., ibid.* (abortion permitted "where the pregnancy was caused by rape"). And state abortion laws—whether they address informed consent, waiting periods, parental notification, reporting requirements, or regulations or restrictions on who may perform abortions—reflect considered determinations about how to balance interests in life, physical health, mental health, the medical profession's integrity, and other important interests. Determining where to draw the lines in this area reflects careful balancing and hard-fought democratic processes. The resulting state laws thus already account for the public interests that the VA's rule purports to address—and they do so with the benefit of democratic legitimacy (and legal authority, *see supra* Part A). The rule here can make no such claim. And by obstructing those judgments, the rule undermines the public interest.

To the extent that the VA's rule purports to permit abortions beyond the limits of state law, it does not fill a gap left open by the States or reflect an exercise of authority committed to the federal government. Rather, it reflects disregard for the democratic process, intrusion on areas of traditional state authority, and defiance of the Supreme Court's recognition that the hard questions in this area have been "return[ed]" to "legislative bodies." *Dobbs,* 142 S. Ct. at 2277. As noted above, the VA justifies the rule not because of the absence of state laws on the subject of abortion but because of the Department's disapproval of them on policy grounds. *See* 87 Fed.

9

Reg. at 55293 & n.27 (criticizing state and local laws taking effect after *Dobbs*). Given the absence of authority for the VA to act—and States' retained authority to act, U.S. Const. amend. X—the public interest strongly weighs against the VA's effort to override duly enacted state laws based on policy differences.

### C. The Rule Harms The Public Interest By Improperly Forcing States To Divert Scarce Resources To Investigating And Prosecuting Violations Of Their Laws.

Even if the VA had the authority it claims, its rule would not simply displace state laws regulating abortion. The amici States are entitled to enforce duly enacted laws, including those that prohibit conduct—such as clearly elective abortions—that the VA's rule purports to allow. State laws also address other important matters— such as informed consent, waiting periods, parental notification, and reporting requirements—that the rule does not. And state laws establish the standards that govern medical personnel who perform abortions, consistent with state authority to regulate the medical profession. *See supra* Part B. Yet the rule encourages VA personnel to violate state law and to ignore "State license, registration, certification, [and] other requirements." 87 Fed. Reg. at 55293. By cloaking such law-breaking activity in federal approval and concealment, the rule threatens the effective enforcement of state laws and obstructs the investigation and prosecution of any violations of those laws. This unlawful encroachment on legitimate state authority provides further reason to enjoin the rule's operation.

To start, the VA is wrong to claim broad preemptive effect for the rule. The Department asserts that its rule "preempt[s]" any "State or local civil or criminal law that restricts, limits, or otherwise impedes a VA professional's provision of care

permitted by" the rule. 87 Fed. Reg. at 55294. But the VA does not point to any law manifesting Congress's "clear and manifest purpose" to displace state law in this context. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *see also ibid.* (Courts should "start with the assumption that the historic police powers of the States [are] not to be superseded ... unless that was the clear and manifest purpose of Congress."). The need for a clear statement from Congress "is heightened" where, as here, an "administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 173 (2001); *see also Metro. Life*, 471 U.S. at 740 (Courts "must presume that Congress did not intend to pre-empt areas of traditional state regulation."). The VA points to Executive Order 13132, *see* 87 Fed. Reg. at 55294, but that order itself stresses the need for "clear evidence that the Congress intended preemption of State law." Exec. Order No. 13132, 64 Fed. Reg. 43255, 43257 (1999); *see also ibid.* ("[R]egulatory preemption of State law shall be restricted to the minimum level necessary to achieve the objectives of the statute pursuant to which the regulations are promulgated."). The relevant statutes here *limit* the VA's authority over abortion. *See supra* Part A.

At most, even if the rule rested on lawful authority (as explained, it does not), it would preempt state law only in very narrow cases. The VA itself claims that its rule will authorize abortions in "limited circumstances." 87 Fed. Reg. at 55291, 55295. The rule applies only to qualifying veterans and CHAMPVA beneficiaries. *Id.* at 55287. It applies only "when the life or health of the pregnant [woman] would be endangered if the pregnancy were carried to term" or "when the pregnancy is the

result of an act of rape or incest." *Id.* at 55291, 55292. It applies only in VA facilities. *See id.* at 55294. Given these limitations, the Department asserts that the rule will result in about 1,000 "cases" each year and that abortions occurring beyond the early stages of pregnancy "will be very infrequent." Regulatory Impact Analysis for RIN 2900-AR57(IF), Reproductive Health Services 3-5 (Sept. 1, 2022) (assuming that 99 percent of cases will occur in the first trimester and 1 percent will occur in the second trimester). By the rule's own terms, then, States are entitled to enforce their duly enacted laws in the overwhelming majority of circumstances in which the rule does not apply. And States are also entitled to hold the VA to its promises that the rule will operate narrowly.

But the rule's design obstructs States' ability to enforce their own laws and to make sure that the VA is abiding by its promises. The rule encourages federal personnel—including those licensed to practice medicine by a State and subject to state licensing boards and disciplinary authorities—to violate their obligations under state law. *See* 87 Fed. Reg. at 55294. The rule will thus require States to divert scarce resources to investigate and potentially prosecute violations of those laws to vindicate the public interests they represent. *Cf. Maine v. Taylor*, 477 U.S. 131, 137 (1986) ("[A] State clearly has a legitimate interest in the continued enforceability of its own statutes."); *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015) ("[S]tates have a sovereign interest in the power to create and enforce a legal code.") (internal quotation marks omitted). Such enforcement risks being especially difficult in these circumstances, given the VA's position that its personnel are free to ignore their legal obligations, including their obligation under federal law to report violations of state

12

and local law. *See* 87 Fed. Reg. at 55294 (claiming that VA employees can ignore their obligations under 38 C.F.R. § 1.201 *et seq.* to report "actual or possible violations" of state law "related to VA programs, operations, [or] facilities" since "no actual or possible violations of [such] laws" are possible). The VA's endorsement of violations of state law confirms that the VA is devoted to concealing that law-breaking from state authorities, increasingly the cost and difficulty of enforcement.

All of this defies the public interest. As the VA does not contest, States are entitled to continue enforcing their own laws in the many cases the rule does not reach. And States are not obliged to take the VA at its word that it will apply the rule judiciously or with due respect for state law. It defies belief to think that the VA will cooperate with States seeking to enforce their laws regulating abortion, given the rule's aim to defy those laws. The rule's very existence thus subverts the public interest and the equities represented by validly enacted state laws.

*     *     *

The severe problems catalogued above reveal the unsettling truth that animates the rule. The fact that States already soundly legislate in this area suggests that the real motivation behind the VA's rule is to create a mechanism for allowing purely elective abortions that States have properly prohibited or to send a political signal to the Administration's political base—or both. Indeed, the Administration's political allies have expressed their desire for the rule to create a federal abortion regime in defiance of the democratic lawmaking process. *See* Comments on Interim Final Rule from Democrat Attorneys General to Dr. Shereef Elnahal, Under Secretary for Health, U.S. Dep't of Veterans Affairs 1, 6 (Oct. 11, 2022) (available at

13

https://bit.ly/3hjLGUl) (lauding the rule for "removing barriers" and greenlighting abortions "without contending with administrative or legal obstacles"). But sound consideration of the public interest means that "'[t]he permissibility of abortion, and the limitations upon it, are to be resolved like most important questions in our democracy: by citizens trying to persuade one another and then voting,'" *Dobbs*, 142 S. Ct. at 2243 (quoting *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 979 (1992) (Scalia, J., concurring in judgment in part and dissenting in part)), not by federal bureaucrats wielding power that neither the people nor their elected representatives ever gave them.

## CONCLUSION

The public interest and equities support injunctive relief against the VA's rule.

Dated: January 17, 2023

Respectfully submitted,

STEVE MARSHALL
Attorney General

EDMUND G. LACOUR JR.* (AL Bar No. 9182-U81L)
 *Solicitor General*
ALIXANDRIA MORRIS (TX Bar No. 24095373)
 *Special Litigation Counsel*
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 300152
Montgomery, AL 36130
(334) 435-8671
alixandria.morris@alabamaag.gov
*Counsel for Amici Curiae*

LYNN FITCH
Attorney General

JUSTIN L. MATHENY* (MS Bar No. 100754)
 *Deputy Solicitor General*
MISSISSIPPI ATTORNEY
GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
justin.matheny@ago.ms.gov
*Counsel for Amici Curiae*

*\*Pro hac vice* applications forthcoming

14

On behalf of:

Tim Griffin
Attorney General
State of Arkansas

Christopher M. Carr
Attorney General
State of Georgia

Raúl R. Labrador
Attorney General
State of Idaho

Theodore E. Rokita
Attorney General
State of Indiana

Kris W. Kobach
Attorney General
State of Kansas

Jeff Landry
Attorney General
State of Louisiana

Andrew Bailey
Attorney General
State of Missouri

Austin Knudsen
Attorney General
State of Montana

Mike Hilgers
Attorney General
State of Nebraska

Gentner F. Drummond
Attorney General
State of Oklahoma

Alan Wilson
Attorney General
State of South Carolina

Marty J. Jackley
Attorney General
State of South Dakota

Jonathan Skrmetti
Attorney General
State of Tennessee

Ken Paxton
Attorney General
State of Texas

Sean D. Reyes
Attorney General
State of Utah

Patrick Morrisey
Attorney General
State of West Virginia

15

## CERTIFICATE OF SERVICE

I, Alixandria Morris, hereby certify that the foregoing brief has been served on all counsel of record by mail and email.

Dated: January 17, 2023

ALIXANDRIA MORRIS
*Counsel for Amici Curiae*

16